## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CITY PENSION FUND FOR FIREFIGHTERS
AND POLICE OFFICERS IN THE CITY OF
MIAMI BEACH, Individually and On Behalf Of
All Others Similarly Situated,

     Plaintiff,

vs.

ARACRUZ CELULOSE S.A., CARLOS
ALBERTO VIEIRA, CARLOS AUGUSTO LIRA
AGUIAR, and ISAC ROFFE ZAGURY,

     Defendants.

) CASE NO: **08-23317**
) **CIV-LENARD** MAGISTRATE JUDGE
)         GARBER
)
)
) FILED by _____ D.C.
)
) NOV 2 6 2008
)
) STEVEN M. LARIMORE
) CLERK U S DIST. CT.
) S. D. of FLA. – MIAMI
)
)
)

---

## CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
## SECURITIES LAWS

  Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami

Beach ("Plaintiff") alleges upon personal knowledge as to allegations specifically pertaining to

Plaintiff and Plaintiff's counsel, and upon information and belief and in reliance on the

investigation of counsel as to all other matters, as follows:

### NATURE OF THE ACTION

  1.  This is a federal securities class action brought on behalf of all purchasers of the

common stock and American Depositary Receipts ("ADRs") of Aracruz S.A. ("Aracruz" or the

"Company") who purchased the Company's securities between April 7, 2008 and October 2,

2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange

Act of 1934 (the "Exchange Act").

2.     Aracruz is a major Brazilian manufacturer of forest products.  Their main products are bleached eucalyptus pulp and high-grade hardwood, which they market to manufacturers of consumer paper products around the world.

3.     During the Class Period, Aracruz entered into undisclosed currency derivative contracts to purportedly hedge against the Company's U.S. dollar exposure, essentially "shorting" the U.S. dollar.  The Company characterized the use of these contracts as protection against foreign interest rate volatility and assured investors that this type of trading did not represent "a risk from an economic and financial standpoint."  However, these contracts violated Company policy in that they were far larger than necessary.  Simply put, the currency derivative contracts were pure speculation on the part of Aracruz – a high-stakes gamble that went undisclosed to the Company's shareholders.

4.     As the U.S. dollar strengthened against the Brazilian Real, the value of Aracruz's currency derivative contracts dwindled, resulting in an ultimate mark-to-market loss for the Company of over $2 billion.  As a result of Aracruz's clandestine currency wager, credit rating agencies downgraded Aracruz, the Company's CFO resigned, and Aracruz's stock suffered a severe decline, plummeting to the lowest levels in 14 years.  On October 3, 2008, the price of the ADRs traded on the New York Stock Exchange closed at $23.40, down $7.84 per share, a decline of 25%.  The Company's common stock suffered similar drastic declines on the Bovespa.

5.     The Complaint alleges that, throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects.  Specifically, Defendants failed to disclose or indicate (1) that Aracruz entered into currency derivative contracts to hedge against U.S. dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's hedge policy; (3) that the Company's financial

2

statements were materially false and misleading in that they failed to account for the Company's massive exposure to currency market fluctuations; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

6.     As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78(i)(b), 78(t) and 78t-1(a) and pendent common law claims.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     The Court has personal jurisdiction over this action because Aracruz does business in this District at Harbour Centre, 18851 NE 29th Ave., Suite 530 Aventura, FL 33180. In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of Aracruz in the form of ADRs at artificially inflated prices during the Class Period and has been damaged thereby.

3

11.     Defendant Aracruz is a Brazilian corporation and maintains its principal executive offices at Av. Brigadeiro, Faria Lima, 2,277 Sao Paulo, SP01452-000, Brazil.  The Company's ADRs are traded on the NYSE under the symbol "ARA."  In addition, the Company's common stock traded on the Sao Paulo Stock Exchange ("Bovespa") under the symbol "ARCZ6 BZ."

12.     Defendant Carlos Alberto Vieira ("Vieira") has served as the Company's Chairman of the Board during the Class Period.

13.     Defendant Carlos Augusto Lira Aguiar ("Aguiar") has served as the Company's Chief Executive Officer and President during the Class Period.

14.     Defendant Isac Roffe Zagury ("Zagury") served as the Company's Chief Financial Officer during the Class Period until his resignation following the news of the scandal in October 3, 2008.

15.     Defendants Vieira, Aguiar and Zagury are collectively referred to herein as the "Individual Defendants."

16.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Aracruz, were privy to confidential, proprietary and material adverse non-public information concerning Aracruz, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

4

17.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Aracruz's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose ADRs were, and are, registered with the Securities Exchange Commission ("SEC") pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Aracruz's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Aracruz's securities would be

based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Aracruz's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Aracruz engages in the production and sale of bleached hardwood kraft market pulp primarily in Brazil.  The Company produces eucalyptus pulp, a hardwood pulp used by paper manufacturers to produce various products, including premium tissue, printing and writing papers, liquid packaging board, and specialty papers.   Aracruz sells its products in North America, Europe, Asia, and Brazil.  The Company was founded in 1967 and is headquartered in Aracruz, Brazil.

22.     In the Company's annual report on Form 20-F filed with the SEC on March 31, 2008, Aracruz provided the following description of its sensitivity to exchange rate fluctuations and its efforts to protect against such variations:

> In accordance to the financial policies, balance sheet currency exposure to exchange rate fluctuations was substantially protected at the end of 2007 according to U.S. GAAP rules.
>
> * * *
>
> The Company's foreign currency risk management strategy may use derivative instruments to protect against foreign exchange rate volatility.
>
> During 2007 the Company has recognized, as financial income, gains of US$57.3 million (2006 -US$88.8 million) related to derivative instruments registered in BM&F - Brazilian Mercantile & Futures Exchange. These operations are marked to market on a daily basis and as of December 31, 2007 outstanding contracts

amounted US$0.6 million (as of December 31, 2006 outstanding contracts amounted US$1.4 million).

It also has recognized gains of US$ 38.3 on swap transactions (TJLP or interest long-term rate against Dollar). There were no such kind of derivative instruments in 2006. These operations are marked to market, and at December 31, 2007, the notional amount of these swaps totaled US$ 334.1 million with maturity in April 2010. The outstanding amount of these contracts were reported as an asset of US$ 38.3 million.

As a result of our exposure to exchange rate fluctuation, the gain and loss on currency remeasurement at the end of 2007 (after the local currency devaluation) was a net gain of US$0.9 million.

Having our revenues substantially dollar-denominated and our costs and expenses mostly local currency denominated, our costs are being increased due to the local currency appreciation during 2007 on an ongoing basis, negatively impacting our margins.

23.     Aracruz provided the following regarding its derivative instruments and credit and market risks:

The Company may use derivative and non-derivative instruments to implement risk management strategy. However, by using derivative instruments, the Company exposes itself to credit and market risk. Credit risk is the failure of a counterparty to perform under the terms of the derivative contract. Market risk is the adverse effect on the value of a financial instrument that results from a change in interest rates, currency exchange rates, or commodity prices. The Company addresses credit risk by restricting the counterparties to such derivative financial instruments to major financial institutions. Market risk is managed by the Treasury. The Company's foreign currency risk management strategy may use derivative instruments to protect against foreign exchange rate volatility, which may impair the value of certain of the Company's assets.

24.     Accordingly, the Company's purported policy with respect to currency derivative contracts is focused on managing the risk of currency exchange variations rather than using such contracts as an alternate source of revenue.  In other words, Aracruz told shareholders that its currency hedging activities were designed to minimize risk, rather than create it.

### False and Misleading Statements

25.     The Class Period begins on April 7, 2008 when the Company filed its Form 6-K

with the SEC reporting the Company's financial results for the three-month period ended March

31, 2008.   The Form 6-K was signed by Defendant Aguiar and provided the following

description of the market risks that could affect the Company, including currency variations, and

its exposure to such risks:

**Derivative instruments and risk management activities**

The Company's foreign currency risk and interest rate management strategy may
use derivative instruments *to protect* against foreign exchange and interest rate
volatility.

During the three-month period ended March 31, 2008 the Company recognized,
gains of US$ 7.0 million on swap transactions (TJLP or interest long-term rate
against the US Dollar). There were no such derivative instruments for the three-
month period ended March 31, 2007. As of March 31, 2008, the notional amounts
of these swaps totaled US$ 345.4 million and the result outstand balance was an
asset of US$ 36.2 million.

26.     Similarly, on July 7, 2008, Aracruz filed a Form 6-K with the SEC reporting

financial results for the three- and six-month periods ending June 30, 2008.  The Form 6-K was

signed by Defendant Aguiar and again emphasized the conservative nature of Aracruz's

derivative instruments, stating:

**Derivative instruments and risk management activities**

The Company operates internationally and is exposed to market risk from foreign
exchange and interest rate volatility. *The exposure of U.S. Dollar denominated
liability does not represent a risk from an economic and financial standpoint*,
because the future payment in local currency of such liability is offset by
operating revenue which is expressed in U.S. Dollars since almost all sales
originate from exportation.

The Company's foreign currency risk and interest rate management strategy may
use derivative instruments *to protect* against foreign exchange and interest rate
volatility.

8

27.     Notably absent from Aracruz's financial results during the Class Period was any mention of the Company's substantial exposure to currency fluctuations or the true extent of its investments in currency contracts hedging the U.S. dollar.  Indeed, the Company had represented that its exposure to U.S. Dollar liability did not represent a risk from an economic and financial standpoint.

28.     Despite these assurances that the Company's exposure to market risks does not represent a financial risk, and that Aracruz implements derivative instruments to protect against foreign exchange and interest rate volatility, the Company entered into purely speculative currency derivative contracts as a purported "hedge" against the U.S. dollar.

29.     The statements identified above were materially false and misleading because Defendants failed to disclose (1) that Aracruz had entered into currency derivative contracts to hedge against U.S. dollar exposure that were far larger than necessary; (2) that the Company's financial statements were materially false and misleading because they failed to account for the Company's substantial exposure to currency market fluctuations; (3) that the Company's exposure to currency contracts was massive and violated the Company's own internal policy; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

### The Truth Comes To Light

30.     On September 26, 2008, Aracruz filed a Form 6-K with the SEC announcing the resignation of its Chief Financial Officer, Defendant Zagury.   In addition, the Company cautioned investors that it was in the process of assessing the size of losses caused by derivative investments and a strengthening dollar.  Aracruz said it did not yet know the amount of losses it

had in these financial operations such as future currency contracts. The Form 6-K was signed by

Defendant Aguiar and stated in pertinent part as follows:

1.  On this date the members of the Company's Board of Directors were informed by the Company's internal controls and compliance committees that the Company's current exposure to the financial derivatives instruments (called "Target Forward") has been strongly affected by the recent US Dollar trade prices instability, caused by the high volatility moment experienced by the markets throughout the world.

2.  The Company's Board of Directors were also told that: (i) the maximum loss volume on derivative transactions and also the total exposure to futures contracts based on U.S. Dollars may have exceeded the limits set forth in Company's Financial Policy approved by the Board of Directors; (ii) the Company's management has been taking all measures necessary to gradually reduce the Company's exposure to such derivatives transactions so as to minimize the impact in the Company's business; (iii) to enhance the Company's related internal control; and (iv) in order to provide information to the Chief Executive Officer and also to the members of the Company's Board of Directors, it was necessary to verify and determine the current market value of the Company's open interests and total exposures for which purpose the Company has hired a specialized firm. The Chief Financial and Investor Relations Officer formally requested on this date a leave of absence. The Board of Directors resolved that the Company's management will continue to use its efforts during the following months in order to reduce the impact caused by the exposure to the derivatives instruments mentioned above.

3.  Although the work of the external specialized firm is not yet concluded, the only remaining exposure of the Company to the US Dollar refers to the selling of the aforementioned derivatives, only to reflect the marking to market of such contracts – effected under the influence of the current extreme volatility of the markets. The Company's cash currently amounts to approximately US$ 500 million. There is currently no indication that any potential adjustments, as a consequence of the pending derivative contracts analysis, will materially affect the Company's cash account.

31.    Shortly after this announcement, *Bloomberg* published the following article:

Aracruz Celulose SA, the world's biggest eucalyptus-pulp maker, said it's assessing the size of losses caused by derivatives investments and a strengthening dollar. Chief Financial Officer Isaac Zagury resigned.

Aracruz said it doesn't yet know the amount of losses it had in financial operations, such as future currency contracts, according to a regulatory filing the

Aracruz, Brazil-based company posted last night. The company said it plans to disclose details on the financial operations before releasing third-quarter earnings.

The pulp maker didn't name a person to replace Zagury.

32.    On October 3, 2008, Aracruz filed a Form 6-K with the SEC, signed by Defendant Aguiar, in which the Company revealed that the "fair value" of its currency-related derivative contracts on September 30, 2008 was negative 1.95 billion Reais, or $1.02 billion. The Form 6-K provided in pertinent part as follows:

1.  The Company is predominantly an exporter, with 98% of its revenues denominated in US Dollars while 15% of its indebtedness denominated, and approximately 75% of its production costs incurred, in Brazilian Reais.

2.  A consulting firm hired to analyze the Company's operations with derivative instruments examined derivative contracts maintained by the Company and determined a "fair value" of such contracts of approximately negative US$1.02 billion, utilizing the base date of September 30, 2008. In making this determination, the interest rate curve, the currency volatility and the exchange rate at closing – all of which have been extraordinarily influenced by the recent extreme instability of the global financial markets – were considered.

33.    The investing public was shocked at the extent of Aracruz's loss.  Following this announcement, the Company's ADRs and common stock plunged 25% on the NYSE and Bovespa.  Morgan Stanley cut its earnings estimate for Aracruz, Merrill Lynch downgraded the stock to "neutral" from "buy," and Merrill Lynch lowered the forecast for the Company's ADR's to $49 from $50.  In addition, both Moody's and Standard & Poor's stated that they may lower Aracruz's ratings should the losses prove to be bigger than announced.

34.    In an article published on October 3, 2008, *Bloomberg* provided the following commentary on the announcement:

Aracruz Celulose SA, the world's biggest eucalyptus-pulp maker, dropped the most in at least 14 years in Sao Paulo trading after saying it may lose about $1 billion from derivative investments.

11

*Aracruz plunged 1.6 reais, or 25 percent, to 4.85 reais in Sao Paulo Stock Exchange trading, the biggest loss since at least Aug. 2, 1994.* The stock has dropped 62 percent this year.

The Brazilian currency's 24 percent slump since Aug. 1, after a four-year winning streak, is leading to losses for commodity exporters who sought to hedge against a weaker dollar. Aracruz said in a statement late yesterday that the "fair value" of its currency-related derivative contracts on Sept. 30, the end of last quarter, was negative 1.95 billion reais, or $1.02 billion, after Brazil's real slumped.

*"Nobody thought it would be such a big loss,"* said Guilherme Sand, who helps manage the equivalent of $330 million at Solidus Brokerage in Porto Alegre, Brazil. *"It looks like, to lose that much, they probably were leveraged in their bets."*

Aracruz last week said Isac Zagury, 57, resigned as chief financial officer. Sadia SA, Brazil's second-biggest food maker, fired CFO Adriano Lima Ferreira because of derivative investments that violated the company's policy and led to a loss of 760 million reais. Derivatives are financial instruments whose value is based on an underlying asset.

Aracruz said the contracts have an average term of 12 months and most cash is only disbursed or received on the maturity date. The Aracruz, Brazil-based company said that under Brazilian accounting rules it will take a charge of 330 million reais after the weaker real increased the value of its foreign-currency debt in the third quarter.

Outlook

Aracruz had its earnings estimates cut by Morgan Stanley after reporting a wider accounting loss on derivatives than the bank expected. Merrill Lynch & Co. downgraded the stock to "neutral" from "buy."

*"On a stress scenario, we could see Aracruz losing its investment-grade status and facing increased financing costs for their new growth projects,"* Merrill analysts including Marcos Assumpcao said in a report.

The Merrill analysts lowered their forecast for the company's American depositary receipts to $49 from $90. The ADRs tumbled 25 percent to $23.40 in New York.

The Morgan Stanley analysts expect Aracruz to report a loss of $3 per ADR in the third quarter, compared with the previous estimate of a profit of $1.64. The analysts said their rating on the company is under review. Each ADR represents 10 preferred Class B shares.

* * *

*The slump in the shares of Aracruz may trigger a change in the terms of a proposed merger with Votorantim Celulose e Papel SA*, Santander analysts Felipe Reis, Alex Sciacio and Victoria Santaella said in a report today.

VCP is seeking to merge operations with Aracruz to grab a third of the world's eucalyptus-pulp market. In August, VCP agreed to pay 2.71 billion reais to double its stake in the rival. VCP and Aracruz shareholders last month agreed to the merger to cut costs and gain global market share.

Debt Ratings

Aracruz and VCP may have their debt ratings changed by Moody's Investors Service.

*Moody's said today it may lower Aracruz's rating of Baa2, the second-lowest investment grade, should its losses from derivatives prove bigger*. It said it may raise VCP's Baa3 rating, the lowest investment grade, should it succeed in becoming the controlling shareholder of Aracruz.

*Standard & Poor's also said it may lower Aracruz's debt rating from BBB, also the agency's second-lowest investment- grade rating*.

Aracruz processes eucalyptus from about 700,000 acres of plantations in the south and southeast of Brazil into pulp, a raw material for paper. Eucalyptus yields short-fiber pulp, suited for the production of higher-quality paper. Aracruz produces about a quarter of the world's eucalyptus pulp.

35.     On October 6, 2008, the Company's fortunes turned further downward as Moody's and Standard & Poor's said they may lower their debt ratings on Aracruz and Goldman Sachs recommended that investors sell the Company's shares.  On this news, the Company's stock tumbled 15% to R$4.10 on Bovespa trading.

36.     On this same date, *Bloomberg* published the following article commenting on the development in which a Goldman Sachs analyst questions the Company's direction and the full extent of its losses attributable to failed currency bets:

Aracruz Celulose SA, the world's biggest maker of eucalyptus pulp, fell to the lowest in almost six years after Moody's Investors Service and Standard & Poor's

said they may lower their debt ratings after a derivatives loss while Goldman Sachs Group Inc. recommended investors sell the shares.

Aracruz tumbled 15 percent to 4.10 reais in Sao Paulo trading, the lowest since November 2002.

Aracruz said in an Oct. 2 statement that the "fair value" of its currency-related derivative contracts on Sept. 30, the end of last quarter, was negative 1.95 billion reais ($1.02 billion) after Brazil's real slumped.

Gains in the dollar against the real won't be enough to compensate for the losses, Goldman analyst Marcelo Aguiar wrote in a note. Separately, Citigroup Inc. said it expects Aracruz's American depositary receipts to trade at $65, a 5.8 percent cut from analyst Tereza Mello's previous estimate of $69 an ADR.

*"It is not clear how much is still exposed and how much larger/smaller (than $1.02 billion) the effective cash loss could be in the next 12 months,"* Mello wrote in a note today.

*"Another concern is management direction, as we still don't know how decisions are being made following the CFO departure."*

Aracruz's Chief Financial Officer Isac Zagury resigned last month after the company announced losses from derivative operations. Chief Executive Officer Carlos Augusto Aguiar will replace him on an interim basis, Aracruz said Sept. 26.

*Moody's and S&P both assigned the company the second-lowest investment-grade rating. Moody's said Oct. 3 it put its Baa2 rating under review, while S&P said it may lower Aracruz's rating from BBB.*

*Votorantim Celulose & Papel SA, which on Oct. 3 said it will postpone the conclusion of its merger agreement with Aracruz,* fell 1 percent to 22.75 reais.

37.     On October 10, 2008, Standard & Poor's lowered Aracruz's debt rating on concerns that the Company's loss may widen. *Bloomberg* published the following article in response to this news:

Aracruz Celulose SA, the pulp maker that posted a derivatives loss of about $1 billion, had its debt rating lowered by Standard & Poor's on concern that the slumping Brazilian currency may widen the company's loss.

*The rating was reduced one grade to BBB-, the lowest for investment-quality securities, from BBB*, S&P said today in a statement. *The rating may be lowered*, S&P said.

Aracruz, the world's biggest eucalyptus-pulp maker, reported a $1.02 billion loss as of Sept. 30, based on the "fair value" of currency-related derivatives because the real slumped. Chief Financial Officer Isac Zagury resigned last month after the company reported the derivatives situation.

"*The rating action reflects the company's contingent liabilities from significant derivative positions, a heightening of currency volatility, and the worsening of credit market conditions*," Standard & Poor's analyst Marcelo Costa said in the report from Sao Paulo.

38.     On October 14, 2008, the Company announced that it had canceled plans to pay interest on capital to shareholders.    Aracruz had previously stated that it would pay approximately $41 million to shareholders on October 15, 2008.

39.     On October 17, 2008, Aracruz filed a Form 6-K with the SEC, signed by Defendant Aguiar, in which the Company reported financial results for the three- and nine-month periods ending September 30, 2008.   The Company posted its first quarterly loss in six years after it took a charge of about $1 billion as a result of its bad currency bets.   Regarding the Company's risk management in relation to foreign currency risk, the Form 6-K provided as follows:

Foreign currency risk: the Company may incur losses as a consequence of fluctuations in exchange rates, which impact invoiced nominal values or loans obtained in the market. To reduce this risk, the company has entered into derivative contracts (see item (c) below).

The indebtedness and the results of the Company's operations are significantly affected by the exchange rate (U.S. dollar). Our foreign currency debt amounts to US$ 1,610,840 on September 30, 2008 (and US$ 963,920 on December 31, 2008). The Company exports 98% of its production of eucalyptus pulp. Consequently, revenues and accounts receivable related to these exports are denominated in U.S. dollars (see Note 4 for details on our accounts receivable with foreign customers).

* * *

15

**Derivatives**

Aracruz and its subsidiaries operate internationally and are exposed to market risks resulting from changes in foreign currency exchange rates and interest rates. The exposure to risk of liabilities denominated in US Dollars is mitigated in part by operating revenues, almost totally derived from export Sales, whereas foreign currency obligations are settled in local currency.

\* \* \*

The Company and its subsidiaries operate internationally and are exposed to market risks as a result of foreign exchange rate variations. Any extreme movement in the Brazilian currency, the Real, against the U.S. Dollar may have a material impact on the amounts at which the Company's assets and liabilities expressed in U.S. Dollars, or vice versa, are realized at subsequent dates. As of September 30, 2008, the Real was quoted against the U.S. Dollar at the rate of R$1.9143 = US$1, increasing to R$2.3924 = US$1 on October 8, 2008, before decreasing to R$2.1854 = US$1 on October 16, 2008 (PTAX closing rate). The U.S. Dollar financial statements of the Company and its subsidiaries as of September 30, 2008 were prepared in accordance with accounting practices generally accepted in the United States of America which require that assets and liabilities denominated in foreign currency be updated monetarily based on the exchange rates of the respective foreign currencies as of the balance sheet date and, therefore, do not reflect the effects of changes in exchange rates subsequent to the balance sheet date.

40.     In response to this news, *Bloomberg* published the following article commenting on the drastic consequences to the Company as a result of its improper currency hedging activities:

Aracruz Celulose SA, the world's biggest eucalyptus-pulp maker, posted its first quarterly loss in six years after it took a charge of about $1 billion on bad currency bets.

The third-quarter net loss of 1.64 billion reais ($764 million), or 1.59 reais per share, compares with net income of 260.9 million reais, or 25 centavos, a year earlier, the Aracruz, Brazil-based company said today in statement to the country's securities regulator. Results are based on generally accepted accounting principles in Brazil.

Aracruz shares have plunged 57 percent since Sept. 25, when Chief Financial Officer Isac Zagury resigned and the company said it would post losses from currency investments. The company posted a third-quarter expense of 2.1 billion

16

reais. A weaker Brazilian real, which has declined 27 percent since the start of August, may generate more losses that will erode operating gains in the fourth quarter, said Felipe Ruppenthal, a paper and pulp analyst at Geracao Futuro Corretora de Valores Ltda.

*"Companies weren't prepared for the big currency fluctuations, and Aracruz was betting against the dollar,"* Ruppenthal said yesterday in an interview. *"For the future, Aracruz is very dependent on the currency."*

Net revenue fell 8.2 percent to 801.6 million reais in the quarter, while the cost of goods sold fell 4.5 percent to 546.9 million reais.

Aracruz shares fell 12 centavos, or 3.3 percent, to 3.57 reais at 10:35 a.m. in Sao Paulo trading.

U.S. GAAP

Under generally accepted accounting principals in the U.S., the company reported a net loss of $545.9 million, compared with net income of $105.3 million a year earlier, Aracruz said in a separate statement.

*Aracruz also said today it will suspend an expansion project at its plant in Guaiba, Brazil, for one year to "preserve the company's liquidity."* Investments in the project in Rio Grande do Sul state will resume when market conditions improve.

*Aracruz is also slowing its land purchases and forest development for its Veracel 2 project, suspending land purchases for its Minas Gerais project and reducing distribution of dividends and interest for stockholders.*

The company said it hired an independent company to determine whether its derivatives operations were in line with company policy.

41.    On October 20, 2008, Moody's announced that it had cut Aracruz's debt rating to below investment grade – a downgrade of two levels to Ba2 from Baa3.  This was the second downgrade in one month, and Moody's indicated that it may cut the Company's debt rating even further.

42.    An article published by *The Wall Street Journal* dated October 22, 2008 and entitled "Big Currency Bets Backfire" summarized the risky currency bets in which Aracruz engaged:

17

As global stock markets have plunged in recent months, so has the value of almost everything else, from Mexico's peso to the price of oil. That's left some companies that made big wagers on the direction prices were headed reeling from unexpected losses.

*Throughout Latin America, companies are telling investors they have lost millions, in some cases billions, of dollars due to foreign-exchange gambles that, in some cases, had little to do with their core businesses.*

\* \* \*

For now, however, such losses appear to be most widespread in Brazil and Mexico. In Brazil, the growing list of blue-chip casualties includes paper-pulp giant Aracruz Celulose SA. . .

\* \* \*

The surprise disclosures have sent stock prices tumbling, and *regulators in both countries are investigating whether companies adequately disclosed their trading risks to investors.*

Some local reports have speculated that the damage in Brazil alone could exceed $30 billion and may affect two hundred companies.

"We really don't have the details yet, and it's definitely not clear where the losses are. *There are a lot of transparency issues*," says Alexander Carpenter, senior vice president for Latin America at Moody's Investors Service, which has issued a flurry of credit downgrades and warnings across the region.

The bad bets were made using currency derivatives -- contracts tied to the value of the U.S. dollar. Companies lost badly when the dollar shot up in value starting in early September as investors cashed out of investments in emerging markets, fleeing to safer havens. And as companies raced to close out their positions they forced local currencies to tumble still further.

Latin American central banks, seeing risks to their economies, sold billions of dollars from their reserves to currency markets to prop up their currencies and cushion the blow from derivatives losses.

Mexico alone burned through about 13% of its international currency reserves. Brazil's government is considering extending loans to affected companies.

"*The companies that bet and lost will have to face up to their responsibilities*," Brazilian President Luiz Inácio Lula da Silva said recently as corporate losses mounted. "Obviously, what Brazil will always be disposed to do is create conditions so that the financial system can lend."

In Mexico, authorities said they are investigating whether Comercial Mexicana and other companies properly disclosed the currency bets that resulted in investor losses. Under Mexican law, failure to disclose certain transactions could result in fines, and in some rare cases, criminal charges.

Among the first Latin American companies to swallow a loss was Brazilian pork and poultry processor Sadia SA, which has seen its stock slide 45% since it announced in September it had lost $360 million in currency trades.

"We had no idea they had these kinds of contracts," says Marcos De Callis, who runs a $300 million Brazil fund for Schroder Investment Management and lost money when Sadia's stock price plummeted. "***When you buy stocks from an industrial company, you expect [them] to stick to their business.***"

\* \* \*

Still, the finger-pointing has started. Brazil's Sadia fired its chief financial officer and is considering suing its bankers for pushing dangerous investments.

In other cases, ***risk-control experts say weak governance is to blame***.

43.     On October 27, 2008, *Bloomberg* published an article reporting that Aracruz would be sued by shareholders in Brazil who are seeking compensation for recent currency losses.  The article stated in pertinent part as follows:

Aracruz SA and Sadia SA shareholders will sue the companies' management and seek compensation for recent currency losses, Folha de S. Paulo reported.

Attorney Alexandre Dantas Fronzaglia told Folha he plans to sue Aracruz's controlling shareholders, including Votorantim Celulose e Papel SA, Banco Safra SA, the Lorentzen family and Brazil's state-controlled development bank, known as BNDES, the newspaper said.

Brazil's securities and exchanges regulator, known as CVM, is receiving a growing number of complaints from investors about companies that lost money after the local currency fell, Folha said.

44.     Following Moody's and Standard & Poor's lead, on October 29, 2008, Fitch also downgraded Aracruz's debt ratings on predictions that the Company's loss could exceed $1 billion.  A *Business Wire* article published on this date provided the following:

Fitch Ratings has downgraded the following ratings of Aracruz Celulose S.A. (Aracruz):

--Local currency Issuer Default Rating (IDR) to 'BB-' from 'BB+';

--Foreign currency IDR to 'BB-' from 'BB+';

--National scale rating to 'A(bra)' from 'AA-(bra)'.

All of these ratings remain on Rating Watch Negative.

*These rating actions reflect an expectation by Fitch that Aracruz will unwind its derivative positions and that realized losses may exceed US$1.5 billion*. Further, Fitch expects Aracruz will fund a majority of these losses with debt provided by the counterparties to these transactions, resulting in a near doubling of the company's leverage. *The Rating Watch Negative indicates that these ratings could be downgraded further if the actual losses and associated debt obligation are larger than anticipated*. Aracruz's credit ratings could also be lowered if the terms and conditions of any agreement with the derivative counterparties are meaningfully lower than the present value of the mark-to-market losses on its derivative instruments, viewing this situation as similar to a distressed debt exchange.

45.     On November 4, 2008, Aracruz announced that it agreed to unwind 97% of its wrong-way currency derivative bets resulting in a $2.13 billion loss.

46.     On November 5, 2008, *The Wall Street Journal* published an article entitled "Aracruz to Unwind Bad Bets on Currency." The article reported that the Company will pay off its more than $2 billion in losses over a number of years. In addition, the effects of the currency hedge fallout will stunt the Company's growth for years to come, and a planned acquisition of the Company by Grupo Votorantim has been placed on hold. The article stated in pertinent part as follows:

Brazilian pulp giant Aracruz Celulose SA, which owes more than $2 billion to a group of banks due to soured currency bets, reached a deal that will let it pay off its losses over a number of years.

The deal, between Aracruz and a handful of banks, saves the company from a potentially crippling payment, but will leave it with a debt load for years.

*The deal's hefty price tag underscored the amount of damage suffered by some Latin American companies from sharp moves in global currencies during the financial crisis.* Many of these companies bet that the commodity boom would continue to drive up currencies like the Brazilian real against the dollar. But Latin American currencies crumbled in recent months as investors cut risk and fled currencies of commodity producers.

* * *

It could take five to 10 years for Aracruz to pay back the $2.13 billion it owes to the banks, said Itau Securities analyst Marcelo W. de Brisac. *Paying off the debt will make it harder for the company to fund investments, limiting future growth.* Terms of the repayment will be determined by the end of the month.

"*All growth plans are now out the window*," said Mr. de Brisac. The company's debt service payments will equal bout 40% of its earnings before interest, taxes and amortizations, he estimates.

The losses have put a snag in other arrangements. *Aracruz was being acquired by Grupo Votorantim when it disclosed the losses. The deal is on hold and it's not clear when it will be revived.*

47.     As a result of Aracruz's improper currency bets, the Company is saddled with a loss of over $2 billion and its plans for future growth have been halted.  Aracruz is now on the precipice of complete failure, leaving shareholders without any options to escape the Company's financial meltdown.

## UNDISCLOSED ADVERSE INFORMATION

48.     The market for Aracruz's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, Aracruz's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Aracruz's securities relying upon the integrity of the market price of Aracruz's securities and market information related to Aracruz, and have been damaged thereby.

49.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Aracruz's securities, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

50.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Aracruz's business, prospects and operations.

51.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Aracruz and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

52.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

53.     As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aracruz, their control over, receipt and/or modification of Aracruz's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Aracruz, participated in the fraudulent scheme alleged herein.

54.     The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Aracruz ADRs and/or common stock on the NYSE or Bovespa during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Aracruz and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

56.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, Aracruz ADRs and common stock were actively traded on the NYSE and Bovespa (open

and efficient markets).   As of March 12, 2008, the Company had over 549 million shares outstanding, of which ADRs represent over 359 million shares.   Record owners and other members of the Class may be identified from records maintained by Aracruz and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Aracruz;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Aracruz;

      e.     whether the market price of Aracruz securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

      f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## STATUTORY SAFE HARBOR

61.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected." Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

62.    Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, Defendants knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Aracruz who knew that such statement was false when made.

## LOSS CAUSATION

63.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aracruz's securities and operated as a fraud or deceit on Class Period purchasers of Aracruz's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Aracruz's securities fell precipitously as the prior inflation came out of the Company's securities price.  As a result of their purchases of Aracruz's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

64.     By failing to disclose the extent of the Company's currency derivative contracts, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of Aracruz's business and prospects.  Thus, instead of disclosing during the Class Period the true state of the Company's business, Defendants caused Aracruz to conceal the truth.

65.     Defendants' false and misleading statements had the intended effect and caused Aracruz's common stock to trade at artificially inflated levels throughout the Class Period.  However, as a direct result of the Company's problems coming to light, Aracruz's common stock price fell over 25% immediately following the announcement of the Company's exposure to currency derivative contracts, and continued to decrease over the following days and months.  This drop removed the inflation from the price of Aracruz's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

66.     The decline in the price of Aracruz's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Aracruz's ADR and common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Aracruz's securities and the subsequent decline in the value of Aracruz's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

67.     At all relevant times, the market for Aracruz stock was an efficient market for the following reasons, among others:

a.     Aracruz securities met the requirements for listing, and were listed and actively traded on the NYSE and Bovespa, both highly efficient markets;

b.     As a regulated issuer, Aracruz filed periodic public reports with the SEC and the NYSE;

c.     Aracruz securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.     Aracruz regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

68.     As a result, the market for Aracruz securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Aracruz's stock price.  Under these circumstances, all purchasers of Aracruz securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

**COUNT I**
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants**

69.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

70.     During the Class Period, Aracruz and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aracruz securities; and (iii) cause Plaintiff and other members of the Class to purchase Aracruz securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Aracruz and the Individual Defendants, and each of them, took the actions set forth herein.

71.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Aracruz securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and

illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Aracruz, as alleged herein.

72.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

73.     Aracruz and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Aracruz as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Aracruz's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Aracruz and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Aracruz's securities during the Class Period.

74.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

75.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Aracruz's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions

alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aracruz securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Aracruz shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Aracruz securities during the Class Period at artificially inflated high prices and were damaged thereby.

77.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Aracruz, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Aracruz securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.     By virtue of the foregoing, Aracruz and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

80.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

81.     The Individual Defendants were and acted as controlling persons of Aracruz within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, Aracruz and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 25, 2008                    By: _____

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Christopher S. Jones
Lester R. Hooker
2424 N. Federal Highway

33

Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3082

***Counsel for Plaintiff***

*⋊JS 44  (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

CITY PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS IN THE CITY OF MIAMI BEACH

**(b)** County of Residence of First Listed Plaintiff   Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Saxena White PA
2424 N. Federal Highway Suite 257
Boca Raton, FL 33431
561-394-3399

**DEFENDANTS**

ARACRUZ CELULOSE S.A., CARLOS ALBERTO VIEIRA, CARLOS AUGUSTO LIRA AGUIAR, and ISAC ROFFE

County of Residence of First Listed Defendant   Aventura
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

FILED by ___ D.C.
INTAKE
NOV 26 2008
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

**(d)** Check County Where Action Arose: ✓ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
✓ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Dade 08cv 23317 - Lenard/Garber

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ✕ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE ____   DOCKET NUMBER ____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. §§ 78; (b) and 78t (a)
Securities Class Action
LENGTH OF TRIAL via   5   days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ ____

CHECK YES only if demanded in complaint:
JURY DEMAND: ✓ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
s/Maya Saxena   *Maya Saxena*

DATE
November 25, 2008

FOR OFFICE USE ONLY
AMOUNT  350.    RECEIPT #  991036    IFP