**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| CITY PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS IN THE CITY OF MIAMI BEACH, Individually and On Behalf Of All Others Similarly Situated, | ) CASE NO: 08-23317-CIV-LENARD ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| ARACRUZ CELULOSE S.A., CARLOS ALBERTO VIEIRA, CARLOS AUGUSTO LIRA AGUIAR, and ISAC ROFFE ZAGURY, | ) ) ) ) |
| Defendants. | ) ) ) |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    NATURE OF THE ACTION ..................................................................................2

III.   PARTIES ................................................................................................................5

       A.    Plaintiff ........................................................................................................5

       B.    Defendants ...................................................................................................5

             i.     The Company .....................................................................................5

             ii.    The Individual Defendants ................................................................5

IV.    DEFENDANTS' FRAUDULENT SCHEME ........................................................6

       A.    The Speculation Begins ...............................................................................6

       B.    Currency Hedging is Insurance, Not a Profit Center ....................................8

       C.    False and Misleading Statements ...............................................................12

             i.     The April 7, 2008 Statements ...........................................................12

                    1.    The Company's Form 6-K Filed April 7, 2008 ........................12

                    2.    The False 1Q08 Earnings Report and Violation of the
                          Company's Stated Financial Policy...........................................12

                    3.    Reasons for Falsity ..................................................................13

                    4.    Defendants' Knowledge of the False Statements .....................15

             ii.    The July 7, 2008 Statements .............................................................20

                    1.    The Company's Form 6-K Filed on July 7, 2008 ....................20

                    2.    The False 2Q08 Earnings Report And Violation of the
                          Company's Stated Financial Policy...........................................21

                    3.    Reasons for Falsity ..................................................................24

                    4.    Defendants' Knowledge of the False Statements .....................25

       D.    The Truth Comes to Light ...........................................................................26

             i.     Defendants' Speculating Luck Runs Out ...........................................26

             ii.    Fallout from Aracruz's Speculation ...................................................32

                    1.    The Losses are Catastrophic......................................................32

                    2.    Investors Learn Their Company Was a Paper Company Only
                          on Paper ....................................................................................35

       E.    Defendants' Omissions of Material Adverse Information..............................42

F.      Loss Causation ...................................................................................43

G.      Presumption of Reliance: Fraud On The Market Doctrine ...........................45

H.      Class Action Allegations ...................................................................46

V.      JURISDICTION AND VENUE ...................................................................48

VI.     EXCHANGE ACT CLAIMS ......................................................................49

VII.    REQUEST FOR RELIEF ...........................................................................54

VIII.   JURY DEMAND ......................................................................................54

*"It was not because of the crisis, but because of speculation. . . .They were practicing, through greed, speculation that is in no way recommendable. . . . The companies that bet and lost will have to face up to their responsibilities."*

-- Luiz Inácio Lula da Silva, President of Brazil

*"We had no idea they had these kinds of contracts.  When you buy stocks from an industrial company, you expect [them] to stick to their business."*

-- Marcos De Callis, Schroder Investment Management

*"We were betting on the real, on economic stability.  We bet on what the president of the Republic said, that there was no crisis in Brazil, in the stability of the currency."*

-- Isac Zagury, Former Chief Financial Officer of Aracruz

## I.  INTRODUCTION

1.      This case involves a simple premise: a Brazilian industrial exporting company called Aracruz repeatedly assured its own investors that it was following a conservative financial policy to effectively manage its risk and exposure to exchange rate fluctuations.  Investors purchasing the Company's securities did so believing the currency hedging activities were done to protect the underlying core business operations, not supplant them.  Behind the scenes, however, the Company engaged in wildly speculative currency bets that contradicted its public statements and violated its corporate policies in a concerted effort to supplement profits.  The result of this secretive behavior effectively turned what appeared to be an industrial wood pulp producer into a much riskier currency trading speculator.

2.      When their reckless currency wagers turned negative, investors were left absorbing the losses, the victims of a massive securities fraud that resulted in billions of dollars in damages.  In the aftermath of this financial disaster, the Company and its executives blamed everything from the global economic crisis to a rogue officer as the source of their troubles.

1

However, the reality is that Defendants gambled away the Company's future and its own

investors' money on undisclosed, highly volatile currency investments.

## II.     NATURE OF THE ACTION

3.     This is a federal securities class action on behalf of all purchasers[1] of the

American Depositary Receipts ("ADRs") of Aracruz S.A. ("Aracruz" or the "Company") who

purchased the Company's ADRs between April 7, 2008 and October 2, 2008, inclusive (the

"Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange

Act") against the Company and certain of its executive officers and directors ("Defendants").

4.     Aracruz is a major Brazilian manufacturer of forest products and one of the

largest pulp manufacturers in the world.  The Company's main products are bleached eucalyptus

pulp and high-grade hardwood, which it markets to manufacturers of consumer paper products

around the world.  Unbeknownst to shareholders, the Company also ran a currency trading

operation whose scale grew in size and scope equal to an *entire fiscal year's revenue* from all

other operations.

5.     During the Class Period, Aracruz claimed to have adopted a financial hedge

policy to guard against fluctuations in currency exchange rates.  A financial hedge is simply a

security transaction that reduces the risk on an already existing investment position.  By

definition, a hedge is not a financial vehicle to obtain additional profits.  Rather, it is analogous

to an insurance policy that will protect against large financial losses.  Aracruz assumed

speculative currency positions that not only exceeded its stated financial policy for hedging

activity, but actually increased the risk to the Company's cash flow instead of protecting it from

risk.

---

[1] The ADR holders are at times referred to in this Complaint as "shareholders."

6.      As a company that exported its pulp, Aracruz claimed to use currency hedging[2] to reduce the risks that U.S. Dollars paid to them for future sales did not decline in value vis-à-vis the Brazilian Real during the pendency of its sales contracts.  Exporting companies typically use currency hedging as an insurance policy to lock in the value of revenue to be received on sales of goods.

7.      Prior to and during the Class Period, Aracruz entered into currency derivative contracts to purportedly hedge against the Company's U.S. Dollar exposure.  The Company characterized the use of these contracts as protection against exchange rate volatility and assured investors that this type of trading did not represent "a risk from an economic and financial standpoint."

8.      Contrary to its public statements regarding the nature of its hedging activities, Aracruz violated its financial policies and engaged in speculative currency derivative transactions with the aim of profiting from local appreciation in the Brazilian Real relative to the U.S. Dollar.  Simply put, the currency derivative contracts were pure speculation on the part of Aracruz—a high-stakes wager that they hid from the Company's shareholders.

9.      As the U.S. Dollar strengthened against the Brazilian Real, the value of Aracruz's currency derivative contracts dwindled, resulting in a massive mark-to-market loss for the Company of over $2.1 billion—a disastrous financial loss that exceeded Aracruz's yearly net operating revenue.  Had Defendants adopted a legitimate currency hedge that was directly tied to Aracruz's outstanding cash flow exposure, any losses the Company incurred on its currency derivative contracts would have been approximately offset by the gains in its sales contracts. However, by speculating that the Real would continue to appreciate against the Dollar,

---

[2] This practice is also known as Foreign Exchange Risk hedging.

Defendants placed the financial survival of the entire Company on the line in an ill-fated and reckless attempt to reap huge gains through rampant speculation.

10.     As a result of Aracruz's illicit "hedging" activities, credit rating agencies downgraded Aracruz, the Company's Chairman of the Board, Chief Financial Officer and various Board members resigned, Aracruz cancelled various projects and expansion plans, the Company's shareholders voted to sue the former CFO, the planned merger of the Company with Votorantim Celulose e Papel S.A. was delayed for nearly a year, and Aracruz's stock suffered a severe decline, plummeting to its lowest levels in 14 years.  In fact, immediately following the disclosure of Aracruz's bad currency bets, the Company's ADRs plunged 25% in value, and in the following weeks, the ADRs declined 57% in value.

11.     Aracruz's currency speculation scheme was a concerted effort that was approved and directed by the Company's executive officers and Board of Directors, each of whom was apprised on a periodic—and eventually daily—basis as to the progress and results of the speculation scheme.  Nevertheless, nearly five months after the Company's disclosure of its illicit currency bets, Aracruz initiated legal action against its former Chief Financial Officer, Defendant Zagury, accusing him of unilaterally spearheading the currency speculation scheme that violated the Company's Financial Policy.

12.     As described in detail below, Defendant Zagury denied the Company's accusations, stating that Aracruz was using him as a "scapegoat," that the Company's currency speculation scheme was "backed by the green light of the financial committee and the board," that "the financial committee was informed in writing of the operations," that the Financial Committee and the Board of Directors received "the results of the exchange operations, the data,

the characteristics, on a daily basis," and that there was "very close oversight" of the Company's hedging activities.

13.     As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's ADRs, Plaintiff and other Class members have suffered significant losses and damages.

## III.     PARTIES

### A.     Plaintiff

14.     Plaintiff Miami Beach Fund administers the retirement benefit plan for the firefighters and police officers of the City of Miami Beach.  As set forth in the certification previously filed in this litigation and incorporated by reference herein, Miami Beach Fund purchased the publicly traded securities of Aracruz in the form of ADRs at artificially inflated prices during the Class Period and has been damaged by Defendants' actions.

### B.     Defendants

#### i.     The Company

15.     Defendant Aracruz is a Brazilian corporation and maintains its principal executive offices at Av. Brigadeiro, Faria Lima, 2,277 Sao Paulo, SP01452-000, Brazil.  The Company operates a wholly owned subsidiary, Aracruz Celulose (USA) Inc., at Aventura Harbour Centre, 18851 NE 29th Ave., Suite 530 Aventura, FL 33180.  The Company's ADRs are traded on the NYSE under the symbol "ARA."

#### ii.     The Individual Defendants

16.     Defendant Carlos Alberto Vieira ("Vieira") served as the Company's Chairman of the Board from April 29, 2004 until his resignation on March 6, 2009.  Vieira was a member of the Aracruz Board of Directors since April 15, 1988.

17.     Defendant Carlos Augusto Lira Aguiar ("Aguiar") served as the Company's Chief Executive Officer and President during the Class Period since his appointment to those positions on April 17, 1998.  Aguiar has served as an Officer of the Company since October 25, 1985.

18.     Defendant Isac Roffé Zagury ("Zagury") served as the Company's Chief Financial Officer and Director of Investor Relations during the Class Period until his resignation on October 3, 2008 following the disclosure of Aracruz's losses associated with the Company's currency derivative contracts.  Zagury was elected a member of Aracruz's Board of Executive Officers on June 6, 2003, and also resigned from that position on October 3, 2008.  During the Class Period, Defendant Zagury made several false and misleading statements concerning Aracruz's currency speculation practices and failed to disclose material information regarding the Company's derivative contracts.  In addition, Zagury participated in discussions and decisions concerning Aracruz's currency speculation practices, approved of the derivative contracts that led to the Company's $2.1 billion loss, and failed to disclose this information to the investing public.

19.     Defendants Vieira, Aguiar, and Zagury are collectively referred to herein as the "Individual Defendants."[3]

## IV.     DEFENDANTS' FRAUDULENT SCHEME

### A.     The Speculation Begins

20.     Aracruz engages in the production and sale of bleached hardwood kraft market pulp primarily in Brazil.  The Company produces eucalyptus pulp, a hardwood pulp used by

---

[3] With respect to the Individual Defendants, Lead Plaintiff is in the process of serving them pursuant to the Inter-American Convention on Letters Rogatory and Additional Protocol, as Plaintiff detailed in its March 16, 2009 Response to Order to Show Cause.  (D.E. # 25).  As explained in that filing, this process can take several years to complete, and therefore both Lead Plaintiff and Aracruz have agreed that this action should proceed forward at this point (subject to later review at the request of any party), rather than waiting for service to be effected on the Individual Defendants.

paper manufacturers to produce various products, including premium tissue, printing and writing papers, liquid packaging board, and specialty papers.  The Company's production facilities consist of the Barra do Riacho Unit in Espirito Santo State, which has three production units each with two bleaching, drying and baling lines, the Guaiba Unit, located in the municipality of Guaiba, State of Rio Grande do Sul, and Veracel, located in the municipality of Eunapolis, State of Bahia, where it has a 50% stake.

21.     During the year ended December 31, 2008, the Company produced approximately 2,556,600 tons of bleached eucalyptus kraft pulp (BEKP) (3,106,000 tons, including 50% of Veracel's pulp production).  In 2006, 2007 and 2008, the Company reported net operating revenues of approximately $1.7 billion, $1.8 billion and $1.9 billion, respectively.  Aracruz sells its products in North America, Europe, Asia, and Brazil.  The Company was founded in 1967 and is headquartered in Aracruz, Brazil.  During the Class Period, Aracruz's ADRs traded on the NYSE under the symbol "ARA."  In addition, Aracruz's common stock traded on the Brazilian Sao Paulo Stock Exchange ("Bovespa") under the symbols "ARCZ5" and "ARCZ6," representing Class "A" and "B" preferred shares, respectively.

22.     As detailed below, Aracruz repeatedly stated prior to and during the Class Period that it engaged in currency hedging to protect against exchange rate fluctuations, that these practices did not represent a risk from an economic or financial standpoint, and that the Company's hedging strategy did not incorporate any speculative elements.

23.      Indeed, for years Aracruz assured investors that these hedging activities were used solely to offset possible losses due to currency fluctuations, not to make profits.  For example, Aracruz's 2005 Annual Report and Sustainability Report (the "Sustainability Report")

described a highly conservative and traditional approach to risk management in general, and currency exchange rate protection in particular.[4]

24.     Specifically, the Sustainability Report explicitly touted that the impact of currency exchange swings on Aracruz's cash flow "*is kept to a minimum*" through its risk management system, that the Company's foreign currency risk classification was increased because it included "*no speculative elements*," that the steps taken to manage Aracruz's risk adhered to "specific indicators" for market and credit risks in hedge, and that the Company's Financial Policy "sets cautionary limits" for these practices.

25.     However, rather than entering into the appropriate currency hedging contracts, Defendants instead deliberately and recklessly agreed to implement massive currency derivative positions, effectively wagering that the Brazilian Real would continue to appreciate in relation to the U.S. Dollar.  These speculative financial practices violated Aracruz's corporate governance, financial and disclosure policies, and were in no way related to the Company's actual financial exposure or its traditional industrial business model.

**B.     Currency Hedging is Insurance, Not a Profit Center**

26.     A hedge is a security transaction that reduces the risk on an already existing investment position.  A party enters into a hedge investment in order to reduce the risk of an adverse price movement in an existing security by taking an offsetting position in a related security.  In this case, Aracruz purportedly used currency hedging in order to reduce the risk that adverse movements in currency exchange rates would negatively affect the Company's cash flow.  A hedge is not a vehicle to make additional profits.  Rather, it is analogous to an insurance policy that will protect against large financial losses.

---

[4] *See* http://www.aracruz.com/minisites/ra2005/localaracruz/ra2005/en/rs/index.html.

27.     As an exporting company, Aracruz assured investors that it used currency hedging—also known as Foreign Exchange Risk hedging—to reduce the risks that the currency paid to them for future sales, in this case U.S. Dollars, does not decline in value vis-à-vis their native currency, in this case the Brazilian Real.  Currency hedging is particularly important for Aracruz since virtually all of its revenue is tied to the U.S. Dollar, whereas 15% of its debt and 75% of its production costs are incurred in Brazilian Reais.  This currency hedging practice is typically used as an insurance policy by exporters to ensure that they can effectively manage the future value of revenue to be received on sales of goods.

28.     For example, assume Aracruz received an export order for $1,000,000 with a delivery date in three months time, and payment to be paid in U.S. Dollars.  At the time the sales contract is placed, the Real is worth US$0.60.  The sales contract is thus worth R$1,666,666 to Aracruz at the time of signing.  If, by the payment date, the Real increases in value to US$0.75, the sales contract is valued at only Real $1,333,333 to Aracruz.

29.     The appreciation in the value of the Real would result in a lower sales contract value to Aracruz.  To mitigate this potential risk, Aracruz would routinely enter into currency derivative contracts that effectively increase in value if this scenario occurred, *i.e.* the appreciation of the Real vis-à-vis the Dollar.  The profit on the contract would effectively offset the lost profit on the sale due to the appreciation of the Real.  If the converse had occurred, the profits on the sale of goods in Dollars would be greater, but Aracruz would lose approximately the same amount of money on the currency contract.  In either instance, the Company makes approximately the same net amount of money.  Thus, a legitimate hedge of currency risk would enable Aracruz to accurately predict future revenues and, more importantly, guard against substantial losses as a result of currency fluctuations.

30.     Legitimate currency hedging was particularly important for Aracruz in recent years because of the consistent currency exchange movements affecting Brazil.  Between 2004 and mid-2008, the Brazilian Real steadily appreciated in value while the U.S. Dollar steadily depreciated in value.  This variance in currency value is depicted in the following chart demonstrating the declining exchange rate value of the Dollar versus the Real between January 2004 and October 2008:

**Exchange Rate: U.S. Dollar v. Brazilian Real (Jan. 2004 – Oct. 2008)**



31.     A June 2009 article published in *Finance and Development* (International Monetary Fund) magazine entitled "A Hedge, Not a Bet"[5] focused on the currency hedging practices of Latin American companies.  The article provides the following succinct summary of

---

[5] *See* Herman Kamil, Bennett W. Sutton, and Chris Walker, *A Hedge, Not a Bet*, Finance & Development (International Monetary Fund), June 2009.

the reasons to protect against fluctuations in exchange rates, as well as the proper uses for

currency hedging in this region:

> Over the past decade, firms have faced higher day-to-day fluctuations in exchange rates as many countries sought greater exchange rate flexibility. Those more flexible rates provided for better adjustment to external shocks and allowed monetary policy more independence. Crucially, it also provided incentives for firms to better manage their currency risk because they no longer could rely on central banks to keep currency movements within a preannounced range. What had been essentially free currency risk insurance to the private sector ended.

* * *

> We found that over the past decade, publicly listed firms in Latin America have in general cut their vulnerability to exchange rate risk by substantially reducing currency mismatches *on their balance sheets*. They did this by relying less on foreign currency debt and by more systematically matching the liabilities they did have to foreign currency assets or to expected flows of dollar income. Consequently, on average, firms more recently became substantially more insulated from currency risk. We also found that for a significant fraction of firms, the impact of exchange rate changes on equity prices had declined considerably since mid-2000. These results suggest that firms had become more aware of exchange rate risk and took steps to adapt their balance sheet structure and risk management practices to meet the potential challenges posed by greater exchange rate flexibility. (Emphasis in original).

32.     As described above, currency hedging is an important financial tool to protect a

company's cash flow from fluctuations in exchange rates. Investors evaluating an exporting

company will tend to believe the company's cash flow is stable and protected from exchange rate

fluctuations if such company incorporates a conservative hedge policy. Legitimate currency

hedging assures the company of a dependable source of cash flow and insures a predictable value

for future income. However, if a company strays from this traditional conservative hedge

philosophy—as Aracruz did—and bets that currency appreciation or depreciation will continue

to follow a certain pattern, disastrous consequences can occur.

C.      **False and Misleading Statements**

i.      **The April 7, 2008 Statements**

1.      **The Company's Form 6-K Filed April 7, 2008**

33.     The Class Period begins on April 7, 2008 when the Company filed its Form 6-K with the SEC reporting the Company's financial results for the three-month period ended March 31, 2008 (the "4/7/08 Form 6-K").  The 4/7/08 Form 6-K was signed by Defendant Aguiar and provided the following description of the market risks that could affect the Company, including currency variations, and its exposure to such risks:

**Derivative instruments and risk management activities**

The Company's foreign currency risk and interest rate management strategy may use derivative instruments *to protect* against foreign exchange and interest rate volatility.

During the three-month period ended March 31, 2008 the Company recognized, gains of US$ 7.0 million on swap transactions (TJLP or interest long-term rate against the US Dollar).  There were no such derivative instruments for the three-month period ended March 31, 2007.  As of March 31, 2008, the notional amounts of these swaps totaled US$ 345.4 million and the result outstand [sic] balance was an asset of US$ 36.2 million.[6]

2.      **The False 1Q08 Earnings Report and Violation of the Company's Stated Financial Policy**

34.     In the Company's quarterly earnings report for the first quarter of 2008 ("1Q08 Earnings Report"), which was also released on April 7, 2008, Defendant Zagury depicted Aracruz's currency hedging transactions as conservative and aimed at covering only five months' worth of exposure:

At the end of the 1Q08, *we increased the level of our cash flow currency protection, to a $270 million short position in dollars, representing 5 months of future exposure, which generated a positive impact of $4 million in the quarter*. We also continued to swap financial liabilities from "TJLP plus spread" into

---

[6] Unless indicated otherwise, all emphasis is added.

12

"dollar coupon" fixed rates, which generated a positive impact of $7 million during the period.

35.     The 1Q08 Earnings Report also stated the following regarding exchange rate fluctuations and Aracruz's currency hedging policy, including the disclosure that the Company's short position on the U.S. Dollar was only $270 million, representing approximately five months' worth of cash flow exposure:

> It is also important to note that the exchange rate impact will continue to shape the market pulp business, as the devaluation of the American dollar persists, leading either to price increases or to additional closures by local producers unable to absorb the increased costs.

* * *

> The "Financial Income" in the quarter was $10.2 million higher than in the 4Q07, **mainly due to the favorable results of our gains on derivative transactions, which amounted to $13.1 million in the 1Q08** (4Q07: $3.5 million).  When compared to the same period of last year, it was $21.1 million lower, mainly due to lower gains on derivative transactions (1Q07: $33.1 million).

> **At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 270 million, which represented approximately 5 months of cash flow exposure to the local currency** (real - R$).

### 3.     Reasons for Falsity

36.     The April 7, 2008 Statements were materially false and misleading for several reasons.  Specifically, Defendants failed to disclose (1) that Aracruz entered into currency derivative contracts to hedge against U.S. Dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's financial and internal controls policies and contradicted Aracruz's public statements concerning the nature of such policies; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

37.     Defendants failed to disclose that, at the time of these statements, Aracruz had already entered into currency derivative contracts to hedge against U.S. Dollar exposure that were speculative in nature and were far larger than necessary.  Regarding the timing of the hedge operations at issue, Defendant Zagury stated in an interview with *Valor Economico* published on November 26, 2008 and entitled "Zagury Breaks His Silence and Says He Is A Scapegoat" (the "*Valor Economico* Interview")[7] that Aracruz entered into in these currency derivative contracts "in the first quarter of 2008."

38.     Regarding the nature and extent of these contracts, Aracruz was eventually forced to sheepishly admit that such contracts "exceeded the limits set forth in Company's Financial Policy approved by the Board of Directors" and that Defendants engaged in derivative transactions that were "above and beyond" those limits, as discussed in greater detail in Section IV(D)(i) below.  Thus, Defendants' suggestion in the April 7, 2008 Statements that Aracruz's currency hedging practices were designed "to protect against foreign exchange and interest rate volatility," and that its cash flow protection strategy covered only 5 months' worth of cash flow exposure, was materially false and misleading.

39.     Indeed, Defendants' $270 million short position representing 5 months' worth of exposure equals approximately $54 million of cash flow exposure per month.  Just five months after the April 7, 2008 Statements, the Company reported a loss of $2.13 billion as a result of its speculative currency contracts.  This $2.13 billion figure, juxtaposed against Aracruz's previously disclosed hedge positions, is equivalent to *39 months'* worth of cash flow exposure and over one year's worth of net operating revenue.  The extent of this gamble further

---

[7] *See* http://www.valoronline.com.br/?impresso/especial/195/5285979/zagury-quebra-silencio-e-se-diz-bode-expiatorio.

underscores the speculative nature of Defendants' hedging activity, which effectively transformed Aracruz's entire business into a high-risk financial investment vehicle.

40.    In addition, Defendants failed to disclose that Aracruz's currency speculation violated the Company's corporate policies, including the Corporate Governance Policy, the Financial Policy and Strategy, and the currency risk management principles set forth in the Sustainability Report.  Moreover, Defendants' failure to promptly disclose to the investing public this material adverse information violated not only U.S. Securities laws, but Brazilian law Article 3 of CVM Instruction 358/02 and Aracruz's Disclosure Policy,[8] both of which require the immediate and full disclosure of relevant acts taken by the Company that may affect investors' decision to purchase or sell Aracruz's securities.

### 4.    Defendants' Knowledge of the False Statements

41.    While Aracruz has admitted that the operations at issue were directed by Defendant Zagury, Defendants' fraud could not have been unknown to the top executives, directors and committee members at the Company.  As detailed below, Defendant Zagury has stated that the Board of Directors and the Financial Committee were involved in the decision making and approval of the Company's currency derivative contracts.  Moreover, Aracruz management was apprised at every step concerning the nature and extent of Aracruz's currency hedging positions.

42.    Aracruz's fraudulent currency hedging scheme was perpetrated with the full knowledge, support and approval of the Company's executive officers, Board of Directors and committee members, including the Individual Defendants.  Indeed, in the following excerpt from an interview conducted with Defendant Zagury and published in a November 25, 2008 *Portal*

---

[8] *See* http://www.aracruz.com/show_inv.do?act=stcNews&menu=true&orig=fin&orig=fin&orig
=fin&lastRoot=109&id=1509&lang=2.

*Exame* article (the "*Portal Exame* Article"),[9] it is evident that Defendants knew and approved of the Company's currency scheme from its inception:

> According to Zagury, the operations were transparent and everyone knew about them.
>
> "*Everything that happened in the financial department was reported monthly to the financial committee, which was responsible for keeping the board of directors informed*," he says. "Nothing was seen as abnormal because it was not an abnormal situation. *The board approved the company's financial policy*."

43.     The *Valor Economico* Article sheds further light as to the level in which Aracruz's executive officers and directors were involved in approving the currency hedging scheme. The *Valor Economico* Article quotes Defendant Zagury extensively as he emphasizes that Aracruz's executives and the Board of Directors were well aware of the Company's illicit currency derivative contracts prior to and during the Class Period:

> "It is an evident case of naming a scapegoat," Zagury said.
>
> * * *
>
> Chosen in 2003 as financial director of Aracruz after a long career with BNDES, Zagury says that the first order he received from the company was to focus on the currency exchange questions, since the company exports 100% of its production and has expenses in reais. The protection of the exchange has always been a policy within Aracruz, approved by the boards, he said. *According to Zagury, the sell target forward operations which resulted in a loss of US $2.1 billion were backed by the green light of the financial committee and the board*.
>
> The accusation which weighs against Isac Zagury is that he decided to implement these contracts at a level that exceeded the limit authorized by the political policy of the company. To him, it is a question of interpretation. "*I was the financial director of the company, but I'm not Superman. The company has a governmental structure. In addition to the board, the financial committee was informed in writing of the operations*."

---

[9] *See* http://www.insidernews.com.br/geral/ex-diretor-da-aracruz-fala-pela-primeira-vez-das-perdas-com-derivativos.

44.     Notably, in response to a question of when the Company's illicit hedging speculation began and who at Aracruz authorized them, Defendant Zagury stated the following:

> *They began in the first quarter of 2008 in Brazil. . . . Each day we sent our exposure to the finance committee, which is composed of one representative from each Controlling Shareholder (VCP, Safra and Lorentzen). We send everything; the operations contracted by the company, the results to date, etc.*

45.     In response to the question of what individuals sat on the finance committee referenced above, Defendant Zagury stated the following:

> Valdir Roque, for VCP, Joao Tourinho, Treasury Director of Banco Safra and Luciano Soares, of Icatu, for Lorentzen. *These are specialized persons who took part in decisions and discussions*. We had semi-annual meetings. *We presented results to them, we discussed tendencies*. Minutes of the meetings are filed at the company. *More recently they (the committee members) began asking to have the results of the exchange operations, the data, the characteristics, on a daily basis. There was very close oversight*.

46.     In response to the question of whether the assessments of the Financial Committee were reported to the Board of directors, Defendant Zagury stated that the "board meets every three months. *There was a meeting in June where the results of the company, including the income from derivatives, were presented*."

47.     In the *Valor Economico* Article, Defendant Zagury was asked for his response to Aracruz's accusation against him that he contracted sell target forward currency exchange operations that were above the limits permitted by the Company:

> *[W]e sent daily reports to the finance committee and they never mentioned the limit*. . . . I was the financial director of the company but I am not Superman. The company has a governmental structure. *In addition to the board, there are committees, including the financial committee, which were responsible for overseeing hedge operations as one of their primary responsibilities. The committee was informed in writing. Some (members of the committee) had doubts and we clarified them in writing.* The company had an independent auditor, Deloitte.

48.     Finally, in response to the question of why Aracruz bet so much on the Brazilian Real, Defendant Zagury stated: "***We were betting on the real, on economic stability***. ***We bet on what the president of the Republic said, that there was no crisis in Brazil, in the stability of the currency***."

49.     As the statements above indicate, Aracruz's fraudulent currency speculation scheme was an organized, intentional attempt on the part of Defendants to supplement the Company's revenue by wagering on the continuing appreciation of the Real versus the Dollar— not simply the disclosed method to "protect" against currency volatility.  Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

50.     As discussed above, Aracruz implemented a corporate governance structure that purportedly ensured that the Company's financial policies and strategies were undertaken with the full knowledge and support of the executives and the Board of Directors.  Indeed, Defendant Zagury repeatedly stated during the Zagury Interview that Aracruz's currency hedging operations "were backed by the green light of the financial committee and the board," that "the financial committee was informed in writing of the operations," that the Financial Committee and the Board of Directors received "the results of the exchange operations, the data, the characteristics, on a daily basis," and that there was "very close oversight" of the hedging activities.

51.      As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aracruz, their control over, receipt and/or modification of Aracruz's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Aracruz, participated in the fraudulent scheme.  The Company's ongoing fraudulent currency speculation scheme could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

52.      Moreover, Aracruz management, including the Individual Defendants, were motivated to artificially increase the Company's revenue for self-serving interests aimed at increasing their own personal compensation through bonuses and other financial rewards. Eschewing all notions of fiscal and logical restraint, these individuals placed shareholders' investments in jeopardy for the purpose and with the intent of lining their own pockets.  The fact that the exact amount of Defendants' remuneration is not disclosed in Aracruz's public filings contributed to their brazen act of self-indulgence.

53.      Defendant Zagury does not even pretend to link Aracruz's activities to a proper hedge—rather, he admits that Defendants were betting on the continued appreciation of the Real. The Company's management team, including the Individual Defendants, was aware of, directly participated in, and approved of the currency bets and failed to disclose this information to the investing public.

54.      In addition to approving the derivative contracts, these individuals were privy to periodic, and eventually daily, reports on the status of the currency scheme, including financial positions and results.  This concerted effort to obtain profits through currency derivative

contracts contradicted Defendants' statements concerning the Company's hedging policies prior to and during the Class Period, rendering such statements materially false and misleading.  In effect, Defendants' scheme transformed what was once a fiscally conservative pulp production company into a risky currency investment vehicle without disclosing this transformation to Aracruz's shareholders.

<b>ii.      The July 7, 2008 Statements</b>

<b>1.      The Company's Form 6-K Filed on July 7, 2008</b>

55.      On July 7, 2008, Aracruz filed a Form 6-K with the SEC reporting financial results for the three- and six-month periods ending June 30, 2008 (the "7/7/08 Form 6-K").  The 7/7/08 Form 6-K was signed by Defendant Aguiar and again emphasized the conservative nature of Aracruz's derivative instruments and risk management activities—going so far as stating that "***exposure of U.S. Dollar denominated liability does not represent a risk from an economic and financial standpoint***":

> **Derivative instruments and risk management activities**
>
> The Company operates internationally and is exposed to market risk from foreign exchange and interest rate volatility.  ***The exposure of U.S. Dollar denominated liability does not represent a risk from an economic and financial standpoint***, because the future payment in local currency of such liability is offset by operating revenue which is expressed in U.S. Dollars since almost all sales originate from exportation.
>
> The Company's foreign currency risk and interest rate management strategy may use derivative instruments ***to protect*** against foreign exchange and interest rate volatility.
>
> **(a) Foreign currency risk management**
>
> During 2008 the Company has recognized, in financial income, gains of US$ 25.5 million on derivative instruments registered at the BM&F - Brazilian Mercantile & Futures Exchange (2007 - US$ 55.0 million).  These operations are marked to market on a daily basis and as of June 30, 2008 the fair value of these contracts were reported as an asset of US$ 0.5 million (as of December 31, 2007, an asset

20

of US\$ 0.6 million).  At June 30, 2008 the Company was not positioned on the BM&F.

It also has recognized, in financial income, gains of US\$ 24.2 million on foreign exchange derivative transactions with financial institutions (Non Deliverable Forward and Target Forward).  There were no such derivative instruments in 2007.  These operations are marked to market, and at June 30, 2008 the notional amount of these derivatives totaled US\$ 360 million with maturities ranging from July to November 2008.  The outstanding amount of these contracts were reported as an asset of US\$ 21.7 million.

## 2.  The False 2Q08 Earnings Report And Violation of the Company's Stated Financial Policy

56.     In the Company's quarterly earnings report for the second quarter of 2008 ("2Q08

Earnings Report"), which was also released on July 7, 2008, Defendant Zagury again assured

investors that Aracruz's currency hedging practices were conservative and in line with the

Company's historical practices:

> The cash production cost for the 2Q08, at \$282/t, was 16% higher to that of the previous quarter, mainly due to the continuing appreciation of the real against the dollar (5% average)…

* * *

> ***Despite the impact of a 45% stronger R\$ against the US\$*** and 28% domestic inflation on our cost structure since the end of 2003, which has been one of the main reasons for the stability of the EBITDA margin in the low 50's/high 40's, the EBITDA/ton has increased by 30% over the same period, from \$224/t in the 4Q03 to \$291/t in the 2Q08, demonstrating that the company has benefited from the higher net pulp prices and the competitive additional capacity.

* * *

> ***We increased the level of our cash flow currency protection to a short position of \$360 million at the end of the 2Q08 (\$270 million at the end of the 1Q08), representing 6 months of future exposure, which generated a positive impact of \$46 million in the quarter.  In the first half of the year, the cash flow protection provided a gain of \$15/t (when divided by the targeted full year production volume), thereby mitigating the negative impact of the Brazilian currency's appreciation against the dollar.***  We also continued to swap financial liabilities from "TJLP plus spread" into "dollar coupon" fixed rates, which generated a positive impact of \$27 million in the 2Q08.  The gains on the short position in

dollars and the interest rate swaps have been recorded in the income statement under financial income.

57.     The 2Q08 Earnings Report also disclosed the following additional financial

figures demonstrating Aracruz's conservative approach to currency hedging:

> The sum of the financial and currency re-measurement results in the quarter showed a net credit of $71.0 million, compared to a net credit of $43.8 million in the same period of last year and a net credit of $6.8 million in the first quarter of 2008.

> \* \* \*

> The "Financial Income" in the quarter was $72.0 million higher than in the 1Q08, mainly due to the favorable results of our gains on derivative transactions, which amounted to $72.3 million in the 2Q08 (1Q08: $13.1 million).  When compared to the same period of last year, the figure was $37.9 million higher, mainly due to higher gains on derivative transactions (2Q07: $39.5 million) and the higher average cash balance.

> ***Protecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure.***

> \* \* \*

> As Brazilian currency loans create exposure for any company that uses the US dollar as its functional currency (98% of Aracruz's revenues are linked to the US dollar), a sum equivalent to US$ 387.2 million has been swapped from "TJLP plus spread" (real denominated) into "dollar coupon" (dollar denominated), at a fixed interest rate of approximately 4.3% p.a., which has generated a positive impact of US$ 34 million over the year-to-date.

> ***The company has also been protecting its cash flow exposure to the local currency by taking short positions in dollars, which involves negligible transaction costs and has a positive carry.  At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 360 million, which represented approximately 6 months of cash flow exposure to the local currency*** (real - R$).

> The cash flow currency protection transaction results accumulated in 2008, showing a gain of $50 million, would be equivalent to approximately $15/t, if

divided by the 2008 production volume target of 3.3 million tons of pulp
(including volumes from Veracel).

58.     The 2Q08 Earnings report specifically referenced Aracruz's Financial Policy,
which is publicly available on its website.[10]  Regarding the Company's specific financial policies
governing its hedging practices, Aracruz's website states that, among other things, its Financial
Policy "is designed to protect the company's cash generation exposure, as measured by the US$
EBITDA, to market risks associated with fluctuations in exchange rate."  Regarding Aracruz's
use of derivative instruments to protect against currency exchange rate fluctuations, the Financial
Policy provides various parameters regulating this use, including that there must be "linkage to
an effective exposure (non-speculative hedging)," that there is "no leveraging involved," that the
"asset side objective is the same as the risk factor that is to be protected," and that the "engaging
of structured financial transactions with built-in derivatives is strictly prohibited."

59.     In addition to the Financial Policy, Aracruz's website also describes a Financial
Strategy used to protect the Company from market risks, including currency exchange rate
fluctuations.[11]  Similar to the Financial Policy, the Financial Strategy also emphasizes the
conservative and protectionist objective Aracruz employs to manage the Company's currency
exchange risks.  Specifically, the Financial Strategy states that Aracruz enters into forward
foreign exchange contracts "*to protect against these market risks*" and "*to minimize currency
risk exposure*."  This stands in stark contrast to Defendants' actual use of currency derivative
contracts, which did not hedge against exchange rate fluctuations but rather anticipated them,
and which did not "protect against" or "minimize" risk but rather created it.

---

[10] *See* http://www.aracruz.com/show_arz.do?act=stcNews&id=309&lang=2#fp.

[11] *See* http://www.aracruz.com/show_inv.do?orig=fin&menu=false&id=347&lastRoot=0&act= stcNews&lang=1.

### 3.   Reasons for Falsity

60.     The April 7, 2008 Statements were false and misleading and made with scienter for the same reasons described in Section IV(C)(i)(3) above.  Specifically, Defendants failed to disclose (1) that Aracruz entered into currency derivative contracts to hedge against U.S. Dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's financial and internal controls policies and contradicted Aracruz's public statements concerning *the nature of such policies; (3)* that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

61.     Regarding the extent and nature of the currency derivative contracts, Aracruz admitted that such contracts violated the limits set forth in the Company's Financial Policy, Defendant Zagury admitted that Defendants entered into such contracts in the first quarter of 2008, and Zagury admitted that Defendants were betting on the continued appreciation or stability of the Real by entering into these contracts.  *See* Section IV(C)(i)(3).  Defendants knowingly and falsely assured investors that Aracruz's currency hedging practices were designed "to protect against" exchange rate fluctuations and that the Company's exposure to currency derivative contracts "does not represent a risk from an economic and financial standpoint."

62.     Moreover, as stated above, Defendants failed to disclose that Aracruz's currency speculation violated the Company's corporate policies, including the Corporate Governance Policy, the Financial Policy and Strategy, the currency risk management principles set forth in the Sustainability Report, and the Disclosure Policy, which requires the immediate and full disclosure of relevant acts taken by the Company that may affect investors' decision to purchase or sell Aracruz's securities.

63.   In addition to the reasons for falsity described above, the July 7, 2008 Statements were also false and misleading because they failed to disclose an additional act of material importance taken by Aracruz just prior to their dissemination.  In the *Valor Economico* Article, Defendant Zagury admitted that the exposure limit incorporated in the Company's Financial Policy was initially $600 million.  However, this limit "became US $1 billion ***after the board of directors meeting in June of [2008]***."

64.   This increase in Aracruz's currency exposure limit pursuant to the Financial Policy was not disclosed in the July 7, 2008 Statements, nor was it disclosed in the minutes to the Company's Board of Directors meetings held on June 19, 2008, June 20, 2008, July 1, 2008, or September 19, 2008, which are publicly available on Aracruz's website.[12]  The modification of the Company's currency exposure limit represented a 67% increase in Aracruz's potential exposure to exchange rate fluctuations—a highly relevant and material fact that would affect an investor's decision to purchase or sell the Company's securities.

### 4.   Defendants' Knowledge of the False Statements

65.   For the same reasons as those stated in Section IV(C)(i)(4), Defendants were fully aware of the materially false and misleading nature of the July 7, 2008 Statements, as well as the omissions of material adverse information regarding Aracruz and its currency hedging operation. Indeed, Aracruz has admitted that the operations at issue were directed by Defendant Zagury. *See* Section IV(C)(i)(4).  Zagury has stated that the Board of Directors and the Financial Committee were involved in the decision making and approval of the Company's currency derivative contracts, that Aracruz management was apprised at every step concerning the nature

---

[12] *See* http://www.aracruz.com.br/template.do?lang=2&url=http://aracruz.infoinvest.com.br/enu/ s-3-enu-2008.html.

and extent of Aracruz's currency hedging positions, and that Defendants were actively betting on the continued appreciation and stability of the Real. *Id.*

66.     Indeed, Defendant Zagury admitted that Aracruz's fraudulent currency hedging scheme was perpetrated with the full knowledge and support of the Company's executive officers, Board of Directors and committee members, including the Individual Defendants. These individuals culpably participated in the hedging fraud with the aim of personally profiting from the increased revenue obtained through the Company's illicit currency contracts. *Id.* Each of these individuals received periodic, and eventually daily, reports on Aracruz's hedging operations, including the results and positions of these practices. *Id.* Accordingly, Defendants' fraudulent hedging scheme was not the product of a single wayward executive, but rather was a concerted effort on the part of Aracruz management to increase profits and their own personal compensation.

### D.     <u>The Truth Comes to Light</u>

#### i.     <u>Defendants' Speculating Luck Runs Out</u>

67.     On September 26, 2008, Aracruz filed a Form 6-K with the SEC (the "9/26/08 Form 6-K"). The 9/26/08 Form 6-K announced that the Company's "maximum loss volume on derivative transactions and also the total exposure to futures contracts based on U.S. Dollars ***may have exceeded the limits set forth in [the] Company's Financial Policy approved by the Board of Directors***." In addition, Aracruz announced that its Chief Financial Officer, Defendant Zagury, was resigning from the Company. While Aracruz stated that it did not yet know the amount of losses it had incurred as a result of these financial operations, the Company also falsely reassured the market that there was no indication that any adjustments related to the

derivative contracts would "materially affect the Company's cash account." The 9/26/08 Form

6-K was signed by Defendant Aguiar and stated in pertinent part as follows:

1.  On this date the members of the Company's Board of Directors were informed
    by the Company's internal controls and compliance committees that the
    Company's current exposure to the financial derivatives instruments (called
    "Target Forward") has been strongly affected by the recent US Dollar trade
    prices instability, caused by the high volatility moment experienced by the
    markets throughout the world.

2.  The Company's Board of Directors were also told that: (i) *the maximum loss
    volume on derivative transactions and also the total exposure to futures
    contracts based on U.S. Dollars may have exceeded the limits set forth in
    Company's Financial Policy approved by the Board of Directors*; (ii) the
    Company's management has been taking all measures necessary to gradually
    reduce the Company's exposure to such derivatives transactions so as to
    minimize the impact in the Company´s business; (iii) to enhance the
    Company's related internal control; and (iv) in order to provide information to
    the Chief Executive Officer and also to the members of the Company's Board
    of Directors, it was necessary to verify and determine the current market value
    of the Company's open interests and total exposures for which purpose the
    Company has hired a specialized firm. The Chief Financial and Investor
    Relations Officer formally requested on this date a leave of absence.  The
    Board of Directors resolved that the Company's management will continue to
    use its efforts during the following months in order to reduce the impact
    caused by the exposure to the derivatives instruments mentioned above.

3.  Although the work of the external specialized firm is not yet concluded, the
    only remaining exposure of the Company to the US Dollar refers to the selling
    of the aforementioned derivatives, only to reflect the marking to market of
    such contracts – effected under the influence of the current extreme volatility
    of the markets.  The Company's cash currently amounts to approximately US$
    500 million.  *There is currently no indication that any potential adjustments,
    as a consequence of the pending derivative contracts analysis, will
    materially affect the Company's cash account*.[13]

68.    Following this announcement, Aracruz's ADRs plunged $8.39 to close on Friday,

September 26, 2008 at $37.99, with an additional decline the next trading day of $4.83 to close

on September 29, 2008 at $33.16.  Thus, over two trading days and as the market digested the

---

[13] Aracruz has not published the opinion of the "specialized firm" contracted to audit the Company's internal
controls and determine the extent of its currency speculation losses.

revelation that Aracruz had been engaging in speculative currency wagers rather than proper hedging activities, the Company's ADRs plummeted over 25% in value.

69.     Notably, this decline was a result of only a partial disclosure that failed to completely remove the inflation from the price of Aracruz's ADRs and occurred prior to the Company disclosing the true extent of its losses associated with its currency bets.  Indeed, Defendants falsely represented to the investing public that there was "currently no indication" that the losses from the derivative contracts would "materially affect the Company's cash account," leading analysts and investors alike to believe that the losses would be contained to a reasonable level.

70.     These assertions were designed to minimize the damage resulting from Aracruz's revelations and are belied again by Defendant Zagury's comments in the *Portal Exame* Article in which he conveyed that he struggled with the knowledge of the Company's losses for a full *three weeks* prior to the September 26, 2008 partial disclosure:

> **For Zagury, they were three weeks of anguish, until, on September 26, Aracruz's losses became public**.  On this date, the then chief financial officer of Aracruz arrived at work normally.  During the day, however, the situation worsened and culminated in his departure.
>
> * * *
>
> "I began to see that the situation had worsened very rapidly and there was no more time to do anything that would reduce the losses for Aracruz.  It was very quick and they were very unpleasant days for me."

71.     This additional failure to promptly and fully disclose a material fact again violated the Company's corporate policies and Article 3 of CVM Instruction 358/02.

72.     On October 3, 2008, Aracruz filed a Form 6-K with the SEC ("10/3/08 Form 6-K").  The 10/3/08 Form 6-K was signed by Defendant Aguiar and announced that the "fair

value" of the Company's currency-related derivative contracts as of September 30, 2008 was negative 1.95 billion Reais, or $1.02 billion.

73.     Following this announcement, Aracruz's ADRs declined $7.84 to close at $23.40 on October 3, 2008. Over the course of the following two trading days, the Company's ADRs declined an additional $8.22 to close at $15.18 on October 7, 2008. Thus, as a result of Aracruz's announcement that it would lose over $1 billion from its currency wagers, the Company's ADRs plummeted over 51% in value. Notably, this decline was a result of only a partial disclosure that failed to completely remove the inflation from the price of Aracruz's ADRs and occurred prior to the Company disclosing the true extent of its losses associated with its currency bets, which would eventually increase to over $2.1 billion.

74.     On October 10, 2008, Aracruz filed a Form 6-K with the SEC announcing that Defendant Zagury was being replaced by Valdir Roque as the Company's Chief Financial Officer, Investor Relations Officer and as a director. Roque served as a member of the Financial Committee during the Class Period and was directly involved in approving Aracruz's illicit currency derivative contracts.

75.     On October 14, 2008, the Company filed a Form 6-K with the SEC announcing that it had canceled plans to pay interest on capital to shareholders due to the financial results stemming from its losses on currency derivative contracts. Aracruz had previously stated that it would pay approximately $41 million to shareholders on October 15, 2008.

76.     On October 17, 2008, Aracruz filed a Form 6-K with the SEC (the "10/17/08 Form 6-K"). The 10/17/08 Form 6-K was signed by Defendant Aguiar and reported the Company's financial results for the three- and nine-month periods ending September 30, 2008.

29

The Company posted its first quarterly loss in six years after it took a charge of about $1 billion as a result of its bad currency bets.

77.    Also on October 17, 2008, Aracruz issued its earnings report for the third quarter of 2008 ("3Q08 Report").  The 3Q08 Report provided the following explanation by the Company's new Chief Financial Officer, Mr. Roque, regarding Aracruz's currency exchange risk strategy and its losses related to currency derivative contracts, placing the blame for the Company's losses on market forces rather than the speculative nature of Defendants' scheme:

> Financial systems around the world are under extraordinary stress, and especially the credit and money markets.  Reflecting this, the Brazilian currency started to significantly devaluate, from the middle of September, which negatively affected the Company's financial results.
>
> Since about 98% of the Company's revenues are linked to the US$, and approximately 75% of its cash production cost, as well as around 15% of its total debt, is exposed to the local currency, a stronger real increases the Company's exposure.  *Since 2004, due to the scenario of a declining US$, the Company has been adopting measures to protect its cash flow and balance sheet exposure to the local currency, taking short positions in US$, which has generated a positive cash impact of $ 290 million over this period, which helped to offset the negative impact of the US$ against the Real*.
>
> A consulting firm hired to analyze the Company's derivative operations examined these instruments and confirmed a negative "fair value" for such contracts of approximately $1 billion, taking the base on September 30, 2008.  In making this determination, the interest rate curve, the currency volatility and the exchange rate at closing – all of which have been extraordinarily influenced by the recent extreme instability of the global financial markets – were considered.  The notional amount of target forward derivative transactions at the end of the 3Q08 was $360 million a month.  Considering an average term of 12 months, the average notional amount was $340 million a month, with a strike at R$1.76/US$. . .
>
> *       *       *
>
> A specialized consultant is concluding an internal audit to verify if the Company's internal policies were being complied with.  The Company is analyzing its internal controls, in order to have better assessment of treasury operations.

78.     On November 4, 2008, Aracruz filed a Form 6-K with the SEC (the "11/4/08 Form 6-K").  The 11/4/08 Form 6-K was signed by Defendant Aguiar and announced that the Company had agreed to unwind 97% of its wrong-way currency derivative bets, *resulting in a massive $2.13 billion loss*.

79.     On November 18, 2008, Aracruz filed a Form 6-K with the SEC (the "11/18/08 Form 6-K").  The 11/18/08 Form 6-K announced that Mr. Roque had resigned from his positions with the Company and that Marcos Grodetzky had been appointed Aracruz's new Chief Financial Officer and Investor Relations Officer.  Thus, Mr. Roque resigned from the Company just over one month after assuming these positions.

80.     On November 25, 2008, Aracruz filed a Form 6-K with the SEC (the "11/25/08 Form 6-K").  The 11/25/08 Form 6-K announced that a majority of shareholders representing more than 96.5% of the Company's "voting capital" had voted to institute a legal action in Brazil against Defendant Zagury, holding him legally responsible for the losses Aracruz suffered as a result of "*engaging in derivative transactions above and beyond the limits provided for in the company's Financial Policy*."

81.     On November 28, 2008, Aracruz filed a Form 6-K with the SEC (the "11/28/08 Form 6-K").  The 11/28/08 Form 6-K announced the resignations of seven members of the Company's Board of Directors or committees in the wake of the Company's enormous losses in its currency derivative contracts.

82.     On August 27, 2009, Aracruz filed a Form 6-K with the SEC (the "8/27/09 Form 6-K").  The 8/27/09 Form 6-K announced that at a shareholders' meeting held on August 24, 2009, the Company's shareholders approved the merger of Aracruz with Votorantim Celulose e

Papel S.A., which had been delayed for nearly a year following the disclosure of the Company's illicit currency hedging activities.

ii.      **Fallout from Aracruz's Speculation**

1.      **The Losses are Catastrophic**

83.      The investing public never anticipated that Aracruz would incur such an enormous loss from its currency derivative contracts.  Indeed, in the quarters and years leading up to the Class Period, the Company had consistently disclosed hedging results that appeared consistent with a traditional and legitimate hedging policy.  In fact, over the eight quarters prior to the start of the Class Period, Aracruz averaged a gain of $15.3 million per quarter on its currency derivative transactions, with a high gain of $35.2 million and a low of $2.7 million:

| Aracruz Derivative Gains/Losses | |
|---|---|
| (U.S. Dollar Amounts) | |
| **Date** | **Amount** |
| June-06 | $2,700,000 |
| September-06 | $8,600,000 |
| December-06 | $15,500,000 |
| March-07 | $19,800,000 |
| June-07 | $35,200,000 |
| September-07 | $24,300,000 |
| December-07 | $3,500,000 |
| March-08 | $13,100,000 |

84.      Given the steady appreciation of the Real during this time period, these results are what one would expect from a proper hedging pattern that would make up for losses on the Company's sales contracts.  These results never suggested that the Company would be exposed to losses from derivative contracts in the *billions* of dollars, as demonstrated in the chart below where the relatively modest gains in the quarters leading up to the Class Period are depicted in solid bars and the losses suffered in the fourth quarter of 2008 are depicted in lined bars:



85.     This comparison is even more startling when comparing the gains and losses Aracruz incurred from derivative transactions in relation to its reported quarterly revenue prior to and during the Class Period.  In the eight quarters leading up to the Class Period, Aracruz averaged a gain from derivative transactions of 3.375% per quarter, with a low of 1% and a high of 7%.  These modest gains are completely dwarfed by the extent of the Company's losses, which reached a *negative* 232% and a *negative* 280% in the 2008 third and fourth quarters, respectively:

| Aracruz Derivative Gains/Losses | | | |
|---|---|---|---|
| (% of Revenue) | | | |
| Date | Percentage | Gain/Loss | Revenue |
| June-06 | 1% | $2,700,000 | $402,000,000 |
| September-06 | 2% | $8,600,000 | $432,000,000 |
| December-06 | 3% | $15,500,000 | $457,400,000 |
| March-07 | 5% | $19,800,000 | $395,400,000 |
| June-07 | 7% | $35,200,000 | $494,200,000 |
| September-07 | 5% | $24,300,000 | $455,500,000 |
| December-07 | 1% | $3,500,000 | $538,700,000 |
| March-08 | 3% | $13,100,000 | $484,200,000 |
| June-08 | 13% | $72,300,000 | $538,400,000 |
| September-08 | -232% | ($1,116,500,000) | $480,900,000 |
| Dec-08 | -280% | ($1,140,100,000) | $407,800,000 |

86.     Again, these results never suggested that Aracruz would be exposed to losses from derivative contracts that would represent nearly *three times* the Company's quarterly revenue, as demonstrated in the chart below where the relatively modest percentage gains in the quarters leading up to the Class Period are depicted in solid bars and the percentage losses suffered in the fourth quarter of 2008 are depicted in lined bars:



2. **Investors Learn Their Company Was a Paper Company Only on Paper**

87.     Following Aracruz's initial announcement on September 26, 2008 regarding its bad currency bets, the Company's ADRs plummeted 25% as the investing public was shocked at the extent of the Company's loss resulting from Defendants' rampant currency speculation that went horribly awry.  For instance, the following quotes and excerpts provide just a sampling of the outrage expressed at the Company and its executives:

- "*The companies that bet and lost will have to face up to their responsibilities*."  Brazilian President Luiz Inácio Lula da Silva  – "Big Currency Bets Backfire," October 22, 2008, *Wall Street Journal*.

- "*It was not because of the crisis, but because of speculation.  They were speculating against the Brazilian currency.  They were practicing, through greed, speculation that is in no way recommendable*."  Brazilian President Luiz Inácio Lula da Silva  – "Lula Accuses Aracruz and Sadia of Massive Speculation," October 4, 2008, *Estadao.com.br*.

- "*Nobody thought it would be such a big loss.  It looks like, to lose that much, they probably were leveraged in their bets*."  Guilherme Sand, manager at Solidus Brokerage, Porto Alegre, Brazil.  – October 3, 2008, *Bloomberg*.

- "*We had no idea they had these kinds of contracts.  When you buy stocks from an industrial company, you expect [them] to stick to their business*."  Marcos De Callis, Schroder Investment Management – "Big Currency Bets Backfire," October 22, 2008, *Wall Street Journal*.

- "*Companies weren't prepared for the big currency fluctuations, and Aracruz was betting against the dollar."*  Felipe Ruppenthal, paper and pulp analyst at Geracao Futuro Corretora de Valores Ltda – October 17, 2008, *Bloomberg*.

- "*There are a lot of transparency issues*."  Alexander Carpenter, senior vice president for Latin America at Moody's Investors Service – "Big Currency Bets Backfire," October 22, 2008, *Wall Street Journal*.

- "It could take five to 10 years for Aracruz to pay back the $2.13 billion it owes to the banks.  *All growth plans are now out the window*."  Itau

35

Securities analyst Marcelo W. de Brisac – "Aracruz to Unwind Bad Bets on Currency," November 5, 2008, *Wall Street Journal*.

- [Aracruz] *had bet the currency would continue a winning streak after doubling in the four years through July*. . . . Aracruz . . . originally used the contracts to secure profits from exports. As the real approached a nine-year high earlier this year, *[Aracruz] began speculating that the currency would continue to appreciate*. – "Aracruz Fails to Settle $2.13 Billion Derivative Loss," December 12, 2008, *Bloomberg*.

- In Brazil, it wasn't bad credit that sent stocks tumbling and massacred the executive ranks. It was the country's currency, which tumbled, *exposing idiotic gambles by CFOs and their staff and turning company boards into financial firing squads*. – "Has Aracruz Celulose Found a Bottom," October 8, 2008, *Seeking Alpha*.

- Aracruz has historically been an active user of currency derivatives, and *it bet wrongly that the Brazilian real would continue to soar against the dollar*. – "Corporate Finance: Pfizer-Wyeth Merger May Set Off A Wave of Consolidation," March 2009, *Global Finance*.

88.    Nevertheless, the initial decline in the price of Aracruz's ADRs following the Company's September 26, 2008 partial disclosure was artificially minimized by Defendants' failure to disclose the true extent of the Company's losses on its hedging speculation. As indicated above, Defendants' disingenuously stated that there was "currently no indication" that the currency losses would "materially affect the Company's cash account." This statement led many analysts and investors to believe that the repercussions for Aracruz would be contained to a relatively reasonable level, as is evident in the following excerpt from a September 26, 2008 report by Morningstar analyst Daniel Rohr:

Although we do not know the precise level of exposure . . . we think we can venture a reasonable guess based on our understanding of the company's prior involvement in currency hedging. In its second-quarter filings, Aracruz announced that it had increased its level of cash-flow currency protection to a short position of $360 million at quarter-end, up from $270 million worth of exposure at the end of the first quarter. On the basis of the disclosure that the current level of exposure exceeds limits defined by the board, we would guess that it now ranges from $500 million to $700 million. Assuming such a level of exposure has been maintained from the beginning of the third quarter until today,

*we estimate current losses may be in the range of $75 million to $105 million*, reflecting the significant appreciation of the U.S. dollar over the time horizon. ***Considering management's statement that it does not believe the exposure will materially affect its cash position, we think this represents a reasonable estimate***.

89.     Despite Defendants' failure to fully disclose the extent of Aracruz's losses in currency derivatives, the market reaction to the announcement was profound.  After Aracruz's initial partial disclosure, the Company's ADRs immediately plunged over 25% on the NYSE— the biggest loss in 14 years.  Morgan Stanley cut its earnings estimate for Aracruz, Merrill Lynch downgraded the stock to "neutral" from "buy," and Merrill Lynch lowered the forecast for the Company's ADRs to $49 from $90, a figure that remained inflated as Aracruz had yet to disclose the full extent of its loss.

90.     In a *Bloomberg* article published on October 3, 2008, Guilherme Sand, who helps manage the equivalent of $330 million at Solidus Brokerage in Porto Alegre, Brazil, stated: "***Nobody thought it would be such a big loss.  It looks like, to lose that much, they probably were leveraged in their bets***."

91.     In an October 4, 2008 article on Estadao.com.br entitled "Lula Accuses Aracruz and Sadia of Massive Speculation," Brazilian President Luiz Inácio Lula da Silva remarked his disgust with Defendants' actions when he noted: "***It was not because of the crisis, but because of speculation.  They were speculating against the Brazilian currency.  They were practicing, through greed, speculation that is in no way recommendable***."

92.     On October 6, 2008, Moody's and Standard & Poor's said they may lower their debt ratings on Aracruz, and Goldman Sachs recommended that investors sell the Company's shares, citing significant concerns with "management direction."

93.    On October 8, 2008, *Seeking Alpha* published an article entitled, "Has Aracruz Celulose Found a Bottom?," which provided the following:

> In Brazil, it wasn't bad credit that sent stocks tumbling and massacred the executive ranks.  It was the country's currency, which tumbled, ***exposing idiotic gambles by CFOs and their staff and turning company boards into financial firing squads***.

94.    On October 10, 2008, Standard & Poor's lowered Aracruz's debt rating to BBB-, the lowest for investment-quality securities, on concerns that the Company's loss may widen.

95.    Following Aracruz's October 17, 2008 announcement reporting financial results in which the Company took a charge of about $1 billion, *Bloomberg* published an article commenting on the drastic consequences to the Company as a result of its improper currency hedging activities, including the suspension of various planned projects and expansions.  In the article, Felipe Ruppenthal, a paper and pulp analyst at Geracao Futuro Corretora de Valores Ltda., was quoted as stating: "Companies weren't prepared for the big currency fluctuations, and ***Aracruz was betting against the dollar***."

96.    On October 20, 2008, Moody's announced that it had cut Aracruz's debt rating to below investment grade—a downgrade of two levels to Ba2 from Baa3.  This was the second downgrade in one month since the revelation of Defendants' currency speculation.

97.    An article published by *The Wall Street Journal* dated October 22, 2008 and entitled "Big Currency Bets Backfire" quoted Brazilian President Luiz Inácio Lula da Silva as stating: "***The companies that bet and lost will have to face up to their responsibilities***."  The article also summarized the risky currency bets in which Aracruz engaged and which altered the characteristics of shareholders' investment in the Company:

> As global stock markets have plunged in recent months, so has the value of almost everything else, from Mexico's peso to the price of oil.  ***That's left some***

*companies that made big wagers on the direction prices were headed reeling from unexpected losses.*

*Throughout Latin America, companies are telling investors they have lost millions, in some cases billions, of dollars due to foreign-exchange gambles that, in some cases, had little to do with their core businesses.*

\* \* \*

The surprise disclosures have sent stock prices tumbling, and *regulators in both countries are investigating whether companies adequately disclosed their trading risks to investors.*

\* \* \*

"We really don't have the details yet, and it's definitely not clear where the losses are. *There are a lot of transparency issues*," says Alexander Carpenter, senior vice president for Latin America at Moody's Investors Service, which has issued a flurry of credit downgrades and warnings across the region.

\* \* \*

"*The companies that bet and lost will have to face up to their responsibilities*," Brazilian President Luiz Inácio Lula da Silva said recently as corporate losses mounted. "Obviously, what Brazil will always be disposed to do is create conditions so that the financial system can lend."

\* \* \*

"*We had no idea they had these kinds of contracts*," says Marcos De Callis, who runs a $300 million Brazil fund for Schroder Investment Management . . . "*When you buy stocks from an industrial company, you expect [them] to stick to their business.*"

98.     On October 27, 2008, *Bloomberg* published an article reporting that Aracruz

would be sued by shareholders in Brazil who are seeking compensation for the recent currency

losses.

99.     Following Moody's and Standard & Poor's lead, on October 29, 2008, Fitch also

downgraded Aracruz's debt ratings on predictions that the Company's loss could exceed $1

billion.

100.    On November 5, 2008, *The Wall Street Journal* published an article entitled "Aracruz to Unwind Bad Bets on Currency."   The article reported that the Company will pay off its more than $2 billion in losses over a number of years.  In addition, the effects of the currency hedge fallout will stunt the Company's growth for years to come, and a planned acquisition of the Company by Grupo Votorantim has been placed on hold.  The article stated in pertinent part as follows:

> Brazilian pulp giant Aracruz Celulose SA, which owes more than $2 billion to a group of banks due to soured currency bets, reached a deal that will let it pay off its losses over a number of years.
>
> The deal, between Aracruz and a handful of banks, saves the company from a potentially crippling payment, but will leave it with a debt load for years.
>
> ***The deal's hefty price tag underscored the amount of damage suffered by some Latin American companies from sharp moves in global currencies during the financial crisis***.  Many of these companies bet that the commodity boom would continue to drive up currencies like the Brazilian real against the dollar.  But Latin American currencies crumbled in recent months as investors cut risk and fled currencies of commodity producers.
>
> * * *
>
> "It could take five to 10 years for Aracruz to pay back the $2.13 billion it owes to the banks," said Itau Securities analyst Marcelo W. de Brisac.  ***Paying off the debt will make it harder for the company to fund investments, limiting future growth***.  Terms of the repayment will be determined by the end of the month.
>
> "***All growth plans are now out the window***," said Mr. de Brisac.  The company's debt service payments will equal about 40% of its earnings before interest, taxes and amortizations, he estimates.
>
> The losses have put a snag in other arrangements.  ***Aracruz was being acquired by Grupo Votorantim when it disclosed the losses.  The deal is on hold and it's not clear when it will be revived***.

101.    On December 12, 2008, *Bloomberg* published an article entitled, "Aracruz Fails to Settle $2.13 Billion Derivative Loss."   The article provided the following commentary regarding the results from Aracruz's currency hedging scheme:

40

Aracruz Celulose SA, the Brazilian pulp maker that posted $2.13 billion of currency-derivatives losses, failed to reach an agreement with banks to settle the wrong-way wagers.

* * *

**The company had bet the currency would continue a winning streak after doubling in the four years through July**.

* * *

Aracruz . . . originally used the contracts to secure profits from exports.  As the real approached a nine-year high earlier this year, **[Aracruz] began speculating that the currency would continue to appreciate**.

102.    A March 27, 2009 article entitled, "Currency Bets Catch Out Brazil's Aracruz," published on FinancialTimes.com, provided the following description of Aracruz's currency speculation activities:

**[Aracruz] began to see such hedges as a source of extra profits and took out contracts in excess of their export earnings**.  When the real suddenly devalued from the second half of last year – it reached R$2.42 to the dollar earlier this month before recovering to about R$2.24 this week – [Aracruz] suffered enormous losses.

103.    In the March 2009 issue of *Global Finance* magazine, an article entitled "Corporate Finance: Pfizer-Wyeth Merger May Set Off A Wave of Consolidation" stated the following: "Aracruz has historically been an active user of currency derivatives, and **it bet wrongly that the Brazilian real would continue to soar against the dollar**."

104.    On February 25, 2009, *Valor Economico* published an article entitled "Aracruz Brings Action Against Ex-Chief Financial Officer."[14]  The article provided the following regarding the Company's decision to initiate legal action in Brazil against Defendant Zagury:

Almost 3 months since the board of directors of Aracruz decided to file a court action against Isac Zagury and the general [shareholder's] meeting approved the measure, the Company finally opened a suit against its ex-chief financial officer

---

[14] *See* http://contabilidadefinanceira.blogspot.com/2009/02/aracruz-move-acao-contra-seu-ex-diretor.html.

on Friday, on account of the losses from high risk derivatives.  The suit was opened in the 2nd Business Court of Rio de Janeiro.

* * *

***The fact may have undesirable collateral effects, especially in the defense against the collective action brought in the United States by investors who wish to be reimbursed for their losses***, provoked by the devaluation of the company's shares since the episode with derivatives was brought to light.

105.    Thus, as a result of Aracruz's improper currency bets, the Company was saddled with a loss of over $2 billion, its plans for future growth were halted, and the contemplated merger with Votorantim Celulose e Papel S.A. was delayed for nearly a year, resulting in decreased consideration received by the Company's shareholders through the merger. Accordingly, Defendants' fraudulent currency scheme has resulted in millions of dollars in losses for the Company's unsuspecting shareholders.

### E.    Defendants' Omissions of Material Adverse Information

106.    Throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects.  Specifically, Defendants failed to disclose or indicate: (1) that Aracruz entered into currency derivative contracts to hedge against U.S. Dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's Corporate Governance, Financial and Disclosure Policies and contradicted Aracruz's public statements concerning the nature of such policies; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

107.    As a result of the materially false and misleading statements and failures to disclose described herein, Aracruz's securities traded at artificially inflated prices during the

Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Aracruz's securities relying upon the integrity of the market price of Aracruz's securities and market information related to Aracruz, and have been damaged thereby.

108.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Aracruz's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose the material adverse non-public information identified above and misrepresented the truth about the Company, its business and operations, as alleged herein.  The material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.

F.    **Loss Causation**

109.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aracruz's ADRs and operated as a fraud or deceit on Class Period purchasers of Aracruz's ADRs by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Aracruz's ADRs fell precipitously as the prior inflation came out of the Company's ADR price.  As a result of their purchases of Aracruz's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

110.    By failing to disclose the nature and extent of the Company's currency derivative contracts, as well as Aracruz's exposure to currency exchange rate fluctuations, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of Aracruz's business and prospects.  Thus, instead of disclosing during the Class Period the true state of the Company's business, Defendants caused Aracruz to conceal the truth about its currency hedging activities.

111.    Defendants' false and misleading statements had the intended effect and caused Aracruz's common stock to trade at artificially inflated levels throughout the Class Period.  However, as a direct result of the Company's problems coming to light, Aracruz's common stock price fell over 25% immediately following the announcement of the Company's exposure to currency derivative contracts, and continued to decrease over 50% in the following days and weeks.  In the wake of Defendants' currency speculation scheme, Aracruz's ADR price bottomed on December 1, 2008 at $7.16, a startling fall of nearly 80% from the Company's Class Period high of $90.74 reached on May 30, 2008.  This series of drops removed the inflation from the price of Aracruz's ADRs, causing real economic loss to investors who purchased the Company's securities during the Class Period, as demonstrated in the following ADR price chart:



112. The decline in the price of Aracruz's ADRs after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Aracruz's ADR declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Aracruz's securities and the subsequent decline in the value of Aracruz's ADRs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**G.     Presumption of Reliance: Fraud On The Market Doctrine**

113. At all relevant times, the market for Aracruz stock was an efficient market for the following reasons, among others:

45

a.    Aracruz ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b.    As a regulated issuer, Aracruz filed periodic public reports with the SEC and the NYSE;

c.    Aracruz securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.    Aracruz regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

114.    As a result, the market for Aracruz securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Aracruz's stock price.  Under these circumstances, all purchasers of Aracruz ADRs during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

**H.    <u>Class Action Allegations</u>**

115.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Aracruz ADRs on the NYSE during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Aracruz and the directors, officers and

employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

116.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Aracruz ADRs were actively traded on the NYSE (an open and efficient market).  As of March 12, 2008, the Company had over 549 million shares outstanding, of which ADRs represented over 359 million shares.  Record owners and other members of the Class may be identified from records maintained by Aracruz and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

117.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

118.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

119.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

      b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

      c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Aracruz;

      d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Aracruz;

      e.     whether the market price of Aracruz ADRs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

      f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## V.    <u>JURISDICTION AND VENUE</u>

121.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78(i)(b), 78(t) and 78t-1(a), and Rule 10b-5 promulgated thereunder.

122.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§1331 and 1307 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

123.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391.  Aracruz operates a wholly owned subsidiary, Aracruz Celulose (USA) Inc. in this

District and maintains offices at Aventura Harbour Centre, 18851 NE 29th Ave., Suite 530

Aventura, FL 33180.

124.     In connection with the acts and omissions alleged in this complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

## VI.     EXCHANGE ACT CLAIMS

### COUNT I
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder
Against All Defendants**

125.     Plaintiff repeats and realleges the allegations set forth above as though fully set

forth herein.  This claim is asserted against all Defendants.

126.     During the Class Period, Aracruz and the Individual Defendants, and each of

them, carried out a plan, scheme and course of conduct which was intended to and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of Aracruz

ADRs; and (iii) cause Plaintiff and other members of the Class to purchase Aracruz ADRs at

artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct,

Defendants Aracruz and the Individual Defendants, and each of them, took the actions set forth

herein.

127.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Aracruz ADRs in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Aracruz, as alleged herein.

128.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded ADRs would be based on truthful, complete and accurate information.

129.    Aracruz and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Aracruz as specified herein.  Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of Aracruz's value and

performance and substantial growth, which included the making of, or the participation in the

making of, untrue statements of material facts and omitting to state material facts necessary in

order to make the statements made about Aracruz and its business, operations and future

prospects, in light of the circumstances under which they were made, not misleading, as set forth

more particularly herein, and engaged in transactions, practices and a course of business which

operated as a fraud and deceit upon the purchasers of Aracruz's ADRs during the Class Period.

130.    Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (i) each of the Individual Defendants was a high-level

executive, director and/or committee member at the Company during the Class Period; (ii) each

of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive

officer, director and/or committee member of the Company, was privy to and participated in the

creation, development and reporting of the Company's operational and financial projections

and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and

familiarity with each other and were advised of and had access to other members of the

Company's management team, internal reports, and other data and information about the

Company's financial condition and performance at all relevant times; and (iv) the Individual

Defendants were aware of the Company's dissemination of information to the investing public

which they knew or recklessly disregarded was materially false and misleading.

131.    These Defendants had actual knowledge of the misrepresentations and omissions

of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

to ascertain and to disclose such facts, even though such facts were readily available to them.

Such Defendants' material misrepresentations and/or omissions were done knowingly or

recklessly and for the purpose and effect of concealing Aracruz's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its ADRs.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

132.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aracruz ADRs was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Aracruz ADRs was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Aracruz securities during the Class Period at artificially inflated high prices and were damaged thereby.

133.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Aracruz, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Aracruz securities during the Class Period, or, if they had acquired such securities

during the Class Period, they would not have done so at the artificially inflated prices which they paid.

134.    By virtue of the foregoing, Aracruz and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## COUNT II
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

136.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

137.    The Individual Defendants were and acted as controlling persons of Aracruz within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

138.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

139.     As set forth above, Aracruz and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## VII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs and expenses; and

d)     Awarding such other relief as this Court deems appropriate.

## VIII.   <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: October 5, 2009                    By: */s/ Maya Saxena*

                                          **SAXENA WHITE P.A.**
                                          Maya Saxena
                                          Joseph E. White III
                                          Christopher S. Jones
                                          Lester R. Hooker
                                          2424 N. Federal Highway
                                          Suite 257
                                          Boca Raton, FL 33431
                                          Tel: 561 394-3399
                                          Fax: 561 394-3082

                                          ***Counsel for Lead Plaintiff City Pension Fund
                                          for Firefighters and Police Officers in the
                                          City of Miami Beach***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 5, 2009, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.

<u>*/s/Maya Saxena*</u>
Maya Saxena