### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CIV. A. NO. 08-23317-CIV-LENARD

| | |
|---|---|
| CITY PENSION FUND FOR FIREFIGHTERS | ) |
| AND POLICE OFFICERS IN THE CITY OF | ) |
| MIAMI BEACH, Individually and On Behalf Of | ) |
| All Others Similarly Situated, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| ARACRUZ CELULOSE S.A., CARLOS | ) |
| ALBERTO VIEIRA, CARLOS AUGUSTO | ) |
| LIRA AGUIAR, and ISAC ROFFE | ) |
| ZAGURAY, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ARACRUZ CELULOSE S.A.'S  MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

NEWYORK 7354368 (2K)

Table of Contents

Page

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ..................................................................................................3

      1.    Background .......................................................................................3

      2.    Allegations .......................................................................................3

STANDARDS FOR DISMISSAL........................................................................................4

ARGUMENT .....................................................................................................................5

I.     THE COMPLAINT SHOULD BE DISMISSED
      BECAUSE PLAINTIFF FAILED TO EFFECT SERVICE OF PROCESS ......................5

     A.    Greenberg Is Not Aracruz's Agent For Service Of Process
          For ADR Holder Lawsuits ................................................................7

     B.    Puglisi Is Not Aracruz's Agent For Service Of Process
          For ADR Holder  Lawsuits ...............................................................8

     C.    W&C Is Not Aracruz's Agent For Service Of Process...........................................9

II.    THE COMPLAINT FAILS TO STATE A CLAIM
      UNDER SECTION 10(b) OR RULE 10b-5 ..................................................................10

     A.    Plaintiff Has Not Alleged With Particularity Any
          False Or Misleading Statements .........................................................10

         1.    Aracruz's Losses In September Have No Relation To Its Disclosures
             Months Earlier ...........................................................................12

         2.    The Alleged Reasons For Falsity Do Not Withstand Scrutiny .................14

             a.    Plaintiff Fails To Plead With Particularity Any False Or
                 Misleading Statements Regarding The "Necessary"
                 Size Of The Company's Derivative Exposure..............................14

             b.    Plaintiff Fails To Plead With Particularity Any False Or
                 Misleading Statements Regarding Compliance With The
                 Company's Financial And Internal Control Policies....................15

             c.    Plaintiff Fails To Plead With Particularity Any False Or
                 Misleading Statements Regarding The Company's
                 Purported Lack of Internal and Financial Controls.....................17

             d.    Plaintiff Fails To Plead With Particularity Any False Or
                 Misleading Statements Regarding The Company's Financial
                 Condition......................................................................19

## Table of Contents

Page

B.  The Complaint's Conclusory Allegations Do Not Satisfy The Stringent Requirements For Pleading Scienter Under The PSLRA Or Rule 9(b)................20

    1.  Plaintiff's Reliance On Purported Financial Motives Is Insufficient To Establish Scienter....................................22

    2.  Plaintiff's Allegations That Aracruz Tracked Its Derivative Purchases Does Not Show That Aracruz, With Intent To Defraud Or Severely Recklessly, Issued False Statements In The Disclosures.........................23

    3.  The Sources Relied Upon By Plaintiff Suggest A Lack Of Scienter.........26

C.  The Complaint Fails To Plead Causation Sufficiently ...........................27

D.  The Disclosures Are Protected By The Safe Harbor For Forward-Looking Statements And The "Bespeaks Caution" Doctrine................................29

    1.  The Challenged Disclosures Are Forward-Looking Statements .............30

    2.  Aracruz's Disclosures Are Accompanied By Meaningful Cautionary Language And Protected By The Safe Harbor Provisions And The Bespeaks Caution Doctrine......................................31

    3.  Plaintiff Fails To Plead With Sufficient Particularity That The Alleged Misstatements Were Made With Actual Knowledge................................33

E.  Plaintiff Fails To Plead Scheme Liability Under Rule 10b-5(a) and (c) ..............33

CONCLUSION.................................................................35

ii

# TABLE OF AUTHORITIES

## CASES

Page

Acito v. Imcera Group, Inc.,
  47 F.3d 47 (2d Cir. 1995) ...............................................................................23

Ahern v. Fidelity Nat'l. Title Ins.,
  2009 WL 3242017 (M.D. Fla. Oct. 6, 2009) ....................................................4

Amalgamated Bank v. The Coca-Cola Co.,
  2006 WL 2818973 (N.D. Ga. Sept. 29, 2006) ................................................15

Andropolis v. Red Robin Gourmet Burgers, Inc.,
  505 F. Supp. 2d 662 (D. Colo. 2007)...............................................................18

Ashcroft v. Iqbal,
  129 S.Ct. 1937 (2009)........................................................................................4

ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.,
  493 F.3d 87 (2d Cir. 2007)...............................................................................34

Bell Atlantic v. Twombly,
  550 U.S. 544 (2007)........................................................................................4, 5

Bryant v. Avado Brands, Inc.,
  187 F.3d 1271 (11th Cir. 1999) ..............................................................3, 21, 22

Cole v. Health Mgmt'Assoc., Inc.,
  2009 WL 2713178 (M.D. Fla. July 17, 2009) ............................................15, 28

Cordova v. Lehman Bros.,
  526 F. Supp. 2d 1305 (S.D. Fla. 2007) .......................................................21, 24

Cutsforth v. Renschler,
  235 F. Supp. 2d 1216 (M.D. Fla. 2002)...........................................................17

Darden v. DaimlerChrysler N. Am. Holding Corp.,
  191 F. Supp. 2d 382 (S.D.N.Y. 2002)................................................................5

Demarco v. Depotech Corp.,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001)............................................................14

Druskin v. Answerthink, Inc.,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...........................................5, 23, 25, 27

Dura Pharms. Inc. v. Broudo,
  544 U.S. 336 (2005).........................................................................................28

Page

Durgin v. Mon,
2009 WL 3055216 (S.D. Fla. Sept. 21, 2009) ...........................................................30

Ehlert v. Singer,
245 F.3d 1313 (11th Cir. 2001) .................................................................................33

Enola Contracting Sevs., Inc. v. URS Group, Inc.,
2008 WL 506324 (N.D. Fla. Feb. 21, 2008).................................................................4

Ezra Charitable Trust v. Tyco Int'l., Ltd.,
466 F.3d 1 (1st Cir. 2006).........................................................................................13

Fidel v. Rampell,
2005 WL 5587454 (S.D. Fla. Mar. 29, 2005) ...........................................................25

Garfield v. NDC Health Corp.,
466 F.3d 1255 (11th Cir. 2006) .................................................................10, 21, 25

Grossman v. Novell, Inc.,
120 F.3d 1112 (10th Cir. 1997) ................................................................................32

Harris v. IVAX Corp.,
182 F.3d 799 (11th Cir. 1999) ...................................................................29, 30, 31, 33

Hertzner v. United States Postal Service,
2007 WL 869585 (E.D.N.Y. Mar. 20, 2007)................................................................6

Hoffman v. Authentec, Inc.,
2009 WL 3109860 (M.D. Fla. Sept. 24, 2009) ............................................................3

Howard v. Klynveld Peat Marwick Goerdeler,
977 F. Supp. 654 (S.D.N.Y. 1997)..............................................................................6

Hubbard v. BankAtlantic Bancorp, Inc.,
625 F. Supp. 2d 1267 (S.D. Fla. 2008) .........................................................3, 25, 26

In re BellSouth Corp. Sec. Litig.,
355 F. Supp. 2d 1350 (N.D. Ga. 2005) .....................................................................17

In re Blockbuster Inc. Sec. Litig.,
2004 WL 884308 (N.D. Tex. April 26, 2004) ............................................................32

In re Citigroup, Inc. Sec. Litig.,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).......................................................................17

In re Columbia Labs, Inc. Sec. Litig.,
144 F. Supp. 2d 1362 (S.D. Fla. 2001) ...............................................................29, 31

Page

In re Donald J. Trump Casino Sec. Litig.,
    7 F.3d 357 (3d Cir. 1993) ...................................................................29

In re FARO Techs. Sec. Litig.,
    2007 WL 430731 (M.D. Fla. Feb. 3, 2007) ........................................28

In re FBR Inc. Sec. Litig.,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)..................................................20

In re Interpool, Inc. Sec. Litig.,
    2005 WL 2000237 (D.N.J. Aug. 17, 2005) ..........................................18

In re J.P. Morgan Chase Sec. Litig.,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................23

In re John Alden Fin. Corp. Sec. Litig.,
    249 F. Supp. 2d 1273 (S.D. Fla. 2003) ...............................................13

In re Med/Waste, Inc. Sec. Litig.,
    2000 WL 34241099, at *8 (S.D. Fla. Aug. 30, 2000) .........................13

In re Nat'l Auto Credit, Inc. Sec. Litig.,
    1999 WL 33919791 (N.D. Ohio Oct. 12, 1999) ...................................16

In re NDCHealth Corp., Inc. Sec. Litig.,
    2005 WL 6074918 (N.D. Ga. July 27, 2005)........................................15

In re Nokia OYJ (Nokia Corp.) Sec. Litig.,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)..................................................25

In re Noven Pharms., Inc. Sec. Litig.,
    238 F. Supp. 2d 1315 (S.D. Fla. 2002) ...............................29, 30, 33

In re Recoton Corp. Sec. Litig.,
    358 F. Supp. 2d 1130 (M.D. Fla. 2005)..............................................33, 35

In re Republic Sevs, Inc. Sec. Litig.,
    134 F. Supp. 2d 1355 (S.D. Fla. 2001) ...............................................30

In re Rexall Sundown, Inc. Sec. Litig.,
    2000 WL 33539428 (S.D. Fla. Mar. 29, 2000)..................................26, 30

In re Sadia, S.A. Sec. Litig.,
    2009 WL 2356181 (S.D.N.Y. July 29, 2009) ..................................18, 19

In re Smith Gardner Sec. Litig.,
    214 F. Supp. 2d 1291 (S.D. Fla. 2002) ...........................................21, 26, 33

Page

In re Sportsline.com Sec. Litig.,
    366 F. Supp. 2d 1159 (S.D. Fla. 2004) ........................................................... passim

In re Technical Chems. Sec. Litig.,
    2001 WL 543769 (S.D. Fla. Mar. 20, 2001)..................................................31

In re TECO Energy, Inc. Sec. Litig.,
    2006 WL 845161 (M.D. Fla. Mar. 30, 2006) ...............................................28

In re Versant Object Tech. Corp. Sec. Litig.,
    2000 WL 33960105 (N.D. Cal. May 18, 2000).............................................16

In re Winn-Dixie Stores, Inc. Sec. Litig.,
    531 F. Supp. 2d 1334 (M.D. Fla. 2007)................................................... passim

Krepps v. Reiner,
    2005 WL 1793540 (S.D.N.Y. July 27, 2005) .................................................6

Leonard v. Stuart James Co., Inc.,
    742 F. Supp. 653 (N.D. Ga. 1990) .................................................................9

Marrari v. Medical Staffing Network Holdings, Inc.,
    395 F. Supp. 2d 1169 (S.D. Fla. 2005) ........................................................31

Miller v. Champion Enters., Inc.,
    346 F.3d 660 (6th Cir. 2003) .......................................................................32

Mizzaro v. Home Depot, Inc.,
    544 F.3d 1230 (11th Cir. 2008) .............................................................21, 22

Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.,
    526 U.S. 344 (1999)........................................................................................5

Nadoff v. Duane Reade, Inc.,
    2004 WL 1842801 (2d Cir. Aug. 17, 2004)..................................................20

Pfizer, Inc. Sec. Litig.,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008)..........................................................33

Polskie Linie Oceaniczne v. Seasafe Transport,
    795 F.2d 968 (11th Cir. 1986) .......................................................................6

Raab v. Gen. Physics Corp.,
    4 F.3d 286 (4th Cir. 1993) ...........................................................................15

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004)..........................................................................24

Page

Romero v. Kenney,
  168 F.R.D. 483 (S.D.N.Y. 1996) ...........................................................................6

Rosenberg v. Gould,
  554 F.3d 962 (11th Cir. 2009) ...........................................................................20

Saltzberg v. TM Sterling/Austin Assocs., LTD.,
  45 F.3d 399 (11th Cir. 1995) ..............................................................................29

Santa Fe Indus. v. Green,
  430 U.S. 462 (1977)............................................................................................34

Scaturro v. Seminole Casualty Ins. Co.,
  542 F. Supp. 2d 1290 (S.D. Fla. 2008) ...............................................21, 22, 25

Schnell v. Conseco, Inc.,
  43 F. Supp. 2d 438 (S.D.N.Y. 1999).................................................................34

Schultz v. Applica Inc.,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) ...............................................................30

Shields v. Citytrust Bancorp, Inc.,
  25 F.3d 1124 (2d Cir. 1994)...............................................................................23

Sinaltrainal v. Coca-Cola Co.,
  578 F.3d 1252 (11th Cir. 2009) .............................................................................4

Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,
  365 F.3d 353 (5th Cir. 2004) ..............................................................................22

Slayter v. DC 701, LLC, et al.,
  2008 WL 2695645,  (M.D. Fla. July 3, 2008) .....................................................4

TAAM Assocs., Inc. v. Housecall Med. Res., Inc.,
  1998 WL 1745361 (N.D. Ga. Mar. 30, 1998)......................................................18

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  551 U.S. 308 (2007).......................................................................................5, 22

Tippens v. Round Island Plantation, LLC,
  2009 WL 2365347 (S.D. Fla. July 31, 2009).........................................................4

TSC Capital Mgmt., LLC v. Apax Partners, L.P.,
  2008 WL 650385 (S.D.N.Y. Mar. 7. 2008) ..................................................34, 35

Washington Capital Corp. v. Milandco,
  665 So. 2d 375 (Fla. 4th App. 1996)....................................................................6

<u>Page</u>

<u>Youngblood</u> v. <u>Citrus Assocs. Of the N.Y. Cotton Exchange, Inc.</u>,
   276 So.2d 505 (Fla. 4th), <u>cert. denied</u>, 285 So.2d 26 (Fla. 1973)..................................6

## STATUTES AND OTHER AUTHORITY

15 U.S.C. § 77k(a) ..............................................................................................................8

15 U.S.C. § 78u-4(b)(2) ....................................................................................................20

15 U.S.C. § 78u-5(i)(C) .....................................................................................................30

N.Y. CPLR § 311.................................................................................................................6

Fed. R. Civ. P. 4(h)(1)...............................................................................................6, 7, 8

Fed. R. Civ. P. 9(b) ...........................................................................................1, 5, 16, 25, 34

Fed. R. Civ. P. 12(b)(5) ...............................................................................................1, 6, 10

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 5, 21

## SEC FORMS

Forms F-8, F-9, F-10, F-80 and 40-F .................................................................................9

Defendant Aracruz Celulose S.A. ("Aracruz" or the "Company") submits this memorandum of law in support of its motion to dismiss the Amended Class Action Complaint for Violation of the Federal Securities Law ("Complaint" or "Compl.") of Plaintiff City Pension Fund For Firefighters and Police Officers in the City of Miami Beach ("Plaintiff") pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rules of Civil Procedure 9(b), 12(b)(5), and 12(b)(6).

## PRELIMINARY STATEMENT

In an attempt to use the federal securities laws as an insurance policy against unanticipated market losses, Plaintiff asserts an illogical and legally insufficient claim against Aracruz, a Brazilian company not amenable to service of process in the United States. Plaintiff's theory of the case is a <u>non</u> <u>sequitur</u>. In September 2008, due to the worldwide financial crisis, the Brazilian *real* underwent rapid unanticipated depreciation against the U.S. dollar. As a result, on September 26, 2008, Aracruz announced it had incurred significant market losses based on its foreign currency derivative positions. From these facts, Plaintiff makes the unsupported and illogical leap that Aracruz intentionally misled securities investors in public statements made months earlier, in April and early July, "[b]y failing to disclose the nature and extent of the Company's currency derivative contracts, as well as Aracruz's exposure to currency exchange rate fluctuations." (Compl. ¶ 110) Among the flaws in its claim, Plaintiff fails to plead with particularity that anything stated in April and July was untrue. Rather, Plaintiff guesses that losses in September mean that the Company's exposure must have been higher than disclosed three and six months earlier. Such allegations of fraud by hindsight are insufficient to state a claim.

Plaintiff also fails to plead any rational theory of scienter or causation. Plaintiff agrees that when Aracruz incurred losses it promptly disclosed them, but nevertheless asserts that the Company had some unstated plot not to inform investors of the <u>scope</u> of its derivative activities (while promptly reporting the accurate <u>results</u> of such activities) to inflate the value of its stock for some unspecified reason. Such allegations fall well-short of the exacting pleading

requirements for scienter under the PSLRA.  Indeed, such allegations fail to show that there is any causation between alleged misstatements about the scope of trading activities and the alleged loss.  Simply put, Aracruz's American Depositary Receipts ("ADRs") declined in value when the Company lost money, not because the Company disclosed that it had entered into derivative contracts that, based on changes in market conditions, could lose (or make) it money.

Nor is it reasonable to believe, as Plaintiff's theory requires, that Plaintiff's alleged losses could have been avoided if only Aracruz had made some other or additional disclosures that it could have incurred material losses based on exchange rate fluctuations.  To the contrary, Aracruz explicitly warned in its public statements, inter alia, that it was "exposed to various market risks, particularly the variation of the U.S. dollar against the *real*."  Under the "bespeaks caution" doctrine, such disclosures require the dismissal of the Complaint, especially because of the forward-looking nature of the April and July statements.

In a tacit admission that Plaintiff's claim of securities fraud as a result of material misrepresentations or omissions is too weak to stand on its own, Plaintiff asserts claims under Rule 10b-5(a) and (c), the so-called market manipulation sections of Rule 10b-5.  Such claim is even weaker than the 10b-5(b) claim as it relies on the same allegations of alleged misstatements and points to no allegations of market manipulation.

In short, the Complaint should be dismissed because: (1) Aracruz is not amenable to service of process in the United States (see infra at pp. 5-10); (2) Plaintiff fails to particularize any misstatements, instead it assumes that because the Company lost money in September its statements months earlier must have been misleading (see infra at pp. 10-20); (3) Plaintiff makes no reasonable showing of scienter and instead relies upon boilerplate assertions of knowledge and motive (see infra at pp. 20-27); (4) Plaintiff can show no connection between the alleged misstatements and omissions concerning the scope of Aracruz's derivative trading and any loss actually suffered when Aracruz announced it lost money (see infra at pp. 27-29); (5) Aracruz provided ample and meaningful cautionary statements concerning its derivative trading activities, all of which were described in non-actionable forward-looking statements (see infra at

pp. 29-33); and (6) Plaintiff's market manipulation claim is without any factual basis (see infra at pp. 33-35).

## STATEMENT OF FACTS

### 1.   Background

Defendant Aracruz is a Brazilian company and the world's leading producer of bleached eucalyptus pulp.  (Compl. ¶4)  Aracruz exports its products throughout the world with substantially all its revenue tied to the U.S. dollar and its costs incurred in the local currency, the Brazilian *real*.  (See Declaration of Glenn M. Kurtz, Esq. ("Kurtz Decl."), Ex. 2, at 82)[1]  As a result, Aracruz employed the use of foreign currency "derivative and non-derivative instruments to implement a risk management strategy."  (Id.)  This strategy proved successful.  From 2003 to 2008, Aracruz earned as much as $350 million from derivative exchange transactions to offset its rising costs.  (Kurtz Decl., Ex. 3, at 1)  In the second quarter of 2008 alone, Aracruz earned over $72 million through derivative exchange transactions.  (Compl. ¶ 84)

The success Aracruz and its shareholders long enjoyed from Aracruz's foreign currency derivative trading abruptly ended when the worldwide financial crisis in the Fall of 2008 resulted in the U.S. dollar appreciating rapidly and substantially against the *real*.  (See Chart Compl. ¶ 30).  All investors depending upon the continued rise of the *real* lost money.  In the wake of this unforeseen, widespread economic disruption, Aracruz announced material losses as a result of its derivative trading, the value of its ADRs decreased, and Plaintiff filed the instant Complaint.

### 2.   Allegations

Plaintiff asserts a securities fraud claim against Aracruz under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[2]  Plaintiff alleges that two sets of

---

[1] On a motion to dismiss a securities fraud claim, "the court may consider . . . documents incorporated by reference into the complaint and matters of which a court may take judicial notice . . . [indeed] the Eleventh Circuit has expressly held that a court may judicially notice relevant documents . . . publicly filed with the [SEC]."  Hubbard v. BankAtlantic Bancorp, Inc., 625 F. Supp. 2d 1267, 1279 (S.D. Fla. 2008) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-81 (11th Cir. 1999)); Hoffman v. Authentec, Inc., 2009 WL 3109860, at *13 (M.D. Fla. Sept. 24, 2009) (explaining that in deciding a motion to dismiss securities fraud claims the court may go beyond the four corners and take judicial notice of documents filed with the SEC) (citation omitted).

[2] The Plaintiff also alleges "controlling person" liability against each of the individual defendants under Section 20(a) of the Exchange Act.  Because, as Plaintiff acknowledges in the Complaint, none of the individual defendants have been served, that claim is not addressed here.

statements issued by Aracruz on April 7, 2008 (the "Q1 Disclosures") and July 7, 2008 (the "Q2 Disclosures" and collectively with the "Q1 Disclosures" the "Disclosures") were false and misleading with respect to their description of the Company's investment in derivative instruments.  Specifically, Plaintiff alleges that "[b]y failing to disclose the nature and extent of the Company's currency derivative contracts, as well as Aracruz's exposure to currency exchange rate fluctuations" the Disclosures were materially misleading and resulted in Plaintiff's incurrence of losses when Aracruz later announced it suffered losses from its derivative trading. (Compl. ¶ 110)

## STANDARDS FOR DISMISSAL

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." Id.  The court will not consider "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts." Tippens v. Round Island Plantation, LLC, 2009 WL 2365347, at *2 (S.D. Fla. July 31, 2009); Ahern v. Fidelity Nat'l. Title Ins., 2009 WL 3242017, at *1 (M.D. Fla. Oct. 6, 2009).  Factual allegations must "raise a right to relief above the speculative level" and "state a claim . . . that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 544, 555, 570 (2007); Slayter v. DC 701, LLC, et al., 2008 WL 2695645, at *3 (M.D. Fla. July 3, 2008) (applying the Twombly standard and dismissing certain securities fraud claims finding plaintiffs' vague allegations that "defendants knowingly made misrepresentations, [failed to] specif[y] what those statements were or why they were misleading.").  To be considered "plausible," factual allegations must "traverse the thresholds separating the 'conclusory' from the 'factual; and the 'factually neutral' from the 'factually suggestive.'" Enola Contracting Sevs., Inc. v. URS Group, Inc., 2008 WL 506324, at *1 (N.D. Fla. Feb. 21, 2008); see also Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir. 2009) ("The mere possibility the defendant acted unlawfully is insufficient....  The well-pled allegations

must nudge the claim 'across the line from conceivable to plausible.'") (citing Twombly, 550 U.S. at 570)).

Plaintiff's claims are also subject to heightened pleading requirements of Rule 9(b) and the PSLRA, which was passed "[i]n response to concerns that 'frivolous securities litigation unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news." In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1162 (S.D. Fla. 2004); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320 (2007) (noting that the PSLRA was "[d]esigned to curb perceived abuses of the §10(b) private-action," such as "nuisance filings, targeting of deep pocket defendants . . . and manipulation by class action lawyers").  In order to survive a motion to dismiss, a plaintiff must "specify each statement to have been misleading and the specific reason or reasons why such statement is misleading" and "for each alleged misrepresentation, must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1321 (S.D. Fla. 2004); In re Sportsline.com, 366 F. Supp. 2d at 1162 ("The PSLRA has raised the pleading requirements in private securities lawsuits to require Plaintiffs to plead both falsity and scienter with particularity.").  "If these additional requirements are not met, the district court must dismiss the action."  Druskin, 299 F. Supp. 2d at 1321.

By contrast to the Rule 12(b)(6) standard, for a motion to dismiss based on Rule 12(b)(5) for insufficiency of process, "a Court must look to matters outside the complaint to determine whether it has jurisdiction."  Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002).

## ARGUMENT

### I.

### THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO EFFECT SERVICE OF PROCESS

Proper service of process is the sine qua non of a court's ability to exercise personal jurisdiction over a defendant.  Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc., 526 U.S.

344, 350 (1999). Absent service of process, a court may not exercise personal jurisdiction over a defendant. Plaintiff has the burden of establishing the validity of its service of process. Polskie Linie Oceaniczne v. Seasafe Transport, 795 F.2d 968, 972 (11th Cir. 1986) ("A plaintiff has the burden of sustaining validity of service to invoke long arm-jurisdiction in the Florida courts."); Youngblood v. Citrus Assocs. of the N.Y. Cotton Exchange, Inc., 276 So.2d 505, 509 (Fla. 4th), cert. denied, 285 So.2d 26 (Fla. 1973) ("the burden of proof to sustain the validity of service of process is upon the person who seeks to invoke the jurisdiction of the court"); Washington Capital Corp. v. Milandco, 665 So. 2d 375, 376 (Fla. 4th App. 1996) (same). "Conclusory statements" that service was properly effected are insufficient to carry that burden. Howard v. Klynveld Peat Marwick Goerdeler, 977 F. Supp. 654, 658 (S.D.N.Y. 1997); Hertzner v. United States Postal Service, 2007 WL 869585, at *4 (E.D.N.Y. Mar. 20, 2007) (finding insufficient service of process as "Plaintiff offers no competent evidence that overcomes the Declaration submitted by the Moving Defendants" that service was not properly effected).

Federal Rule 4(h)(1)(B) governs service of process on a foreign corporation and allows service upon delivery of the summons and complaint "to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B).[3] Plaintiff attempted to serve Aracruz with process by delivering a copy of the original complaint to Greenberg Traurig LLP ("Greenberg"), Puglisi & Associates ("Puglisi"), and White & Case LLP ("W&C"), none of which are authorized by law, appointment, or otherwise to accept service on behalf of Aracruz. As a result, the Complaint should be dismissed under Rule 12(b)(5) for insufficiency of process.

---

[3] Rule 4(h)(1)(A), which also governs service of process over a foreign corporation, is not applicable here. It provides that service may be effected in the manner prescribed for individuals under the state law where the district court sits or where service is made, which in this case, implicates Florida and New York. Florida Statute § 48.081 allows for service on an agent who transacts business for it in Florida or any employee of the registered agent. As Plaintiff did not serve anyone who transacts business in Florida, or on any employee of their registered agent in Florida, this provision is inapplicable. New York Statute § 311(a)(1) mirrors Federal Rule 4(h)(1)(B) by providing that service is effectuated by delivering the summons "to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or law to receive service." Krepps v. Reiner, 2005 WL 1793540, at *2-3 (S.D.N.Y. July 27, 2005) (enunciating the mirrored requirements for effective service of process as provided by Fed. R. Civ. 4(h)(1), and NY CPLR 311(a)(1)); Romero v. Kenney, 168 F.R.D. 483, 484 (S.D.N.Y. 1996) (discussing CPLR § 311 and noting that "the relevant state law provision is generally comparable to Fed. R. Civ. P. 4(h)(1)). Accordingly, the same analysis applies under the New York rule and Rule 4(h)(1)(B).

### A.    Greenberg Is Not Aracruz's Agent For Service Of Process For ADR Holder Lawsuits

Plaintiff served Greenberg on the apparently mistaken belief that Greenberg is Aracruz's agent "authorized by appointment or by law to receive service of process" for this lawsuit under Rule 4(h)(1)(B).  (See Dkt 25 at 2)  Plaintiff's basis for serving Greenberg is a general statement in Aracruz's Form 20-F that "[o]ur agent for service of process in the United States is Greenberg Traurig, LLP." (Kurtz Decl., Ex. 2, at 16)  The same 20-F, however, shows that Aracruz did not authorize Greenberg, or anyone else, to accept service of process for this or any like lawsuits:

> We are incorporated under the laws of Brazil.  All of our directors and executive officers, and the experts named in this annual report, reside outside the U.S. [S]ubstantially all of our assets, and our directors' and officers' assets and such experts' assets are located outside the U.S.  As a result, it may not be possible for investors to effect service of process within the U.S. upon us or our directors, executive officers or such experts, or to enforce against them or us, judgments obtained in U.S. courts based upon the civil liability provisions of the federal securities laws of the U.S. In addition, we have been advised by our Brazilian counsel, that there is doubt that the courts of Brazil will enforce against us, our officers, directors and experts named herein, judgments obtained in the U.S. based upon the civil liability provisions of the federal securities laws of the U.S.  (Kurtz Decl., Ex. 2, at 12) (emphasis added)

The scope of Greenberg's agency with respect to service of process is governed by the 2007 Amended and Restated Deposit Agreement between Aracruz and Citibank N.A ("Citi"), as Depository (the "Deposit Agreement").  (Kurtz Decl., Ex. 4)  The Deposit Agreement expressly limits Greenberg's authority to accept service on Aracruz's behalf to the following two circumstances: (1) in New York actions brought by Citi for disputes arising out of the Deposit Agreement, and (2) in lawsuits brought by an ADR holder in which Citi and Aracruz have an indemnification or other claim against each other for purposes of pursuing those claims.

The relevant provision of the Deposit Agreement states that Aracruz "hereby irrevocably designates, appoints and empowers Greenberg Traurig, LLP (the 'Agent'), as its authorized agent to receive and accept for and on its behalf . . . in any suit, action, or proceeding brought against the Company in any federal or state court as described in the preceding sentence or in the next paragraph of this Section 7.6."  (Kurtz Decl., Ex. 4, at 41) (emphasis added)  The "preceding sentence" is a venue clause in which Aracruz and Citi agree that any disputes arising

between them in connection with the Deposit Agreement would be brought in "the federal or state courts in the City of New York."  (Id.)

The "next paragraph" of Section 7.6 of the Depository Agreement refers to the agreement between Aracruz and Citi that in the event an ADR holder brings suit and the parties have an indemnity claim against each other arising out of that lawsuit, the parties would submit to jurisdiction of that court for purposes of pursuing such indemnification or other claims.[4]  This provision applies solely to cross claims between Aracruz and Citi, not to claims initiated by an ADR holder.

Significantly, Greenberg confirms that its authority was limited by the Deposit Agreement and thus, did not agree to accept service of process and so informed Plaintiff that Greenberg was not authorized to do so.  (See Declaration of Ross Kaufman (Greenberg) ¶¶ 2-4)

## B.     Puglisi Is Not Aracruz's Agent For Service Of Process For ADR Holder Lawsuits

Plaintiff's attempt to serve process on Puglisi is equally flawed.  Puglisi is neither a "general agent" nor an "agent authorized by appointment or by law to receive service of process" under Rule 4(h)(1)(B).  Rather, Aracruz has designated Puglisi solely as its "duly authorized representative in the United States" under Section 6(a) of the Securities Act of 1933 (the "1933 Act").  Under Section 6(a) the only requirement and obligation of the "duly authorized representative in the United States" is to sign the registration statement (and potentially, to be liable for claims arising out of such registration statement, a claim Plaintiff has not alleged here). 15 U.S.C. § 77k(a).  Indeed, pursuant to the appointment letter, the scope of Puglisi's appointment as Aracruz's "duly authorized representative" is limited to claims initiated under the 1933 Act.  (See Declaration of Gregory F. Lavelle (Puglisi) ("Lavelle Decl.") at Ex. 1

---

[4] The relevant provision states "Notwithstanding the foregoing, the Depository and the Company unconditionally agree that in the event that a Holder or Beneficial Owner brings a suit, action, or proceeding against (a) the Company, (b) the Depository . . . or (c) against both the Company and the Depository; in any such case, in any state or federal court of the United States, and the Depository or the Company have a claim, for indemnification or otherwise, against each other arising out of the subject matter of the suit, action, or proceeding, then the Company and the Depository may pursue such claim against each other in the state or federal court of the United States in which such suit, action, or proceeding is pending, and for such purposes, the Company and the Depository irrevocably submit to the non-exclusive jurisdiction of such courts."  (See Kurtz Decl., Ex 4, at 41) (emphasis added)

(identifying the scope of obligations as requiring that "[Puglisi] will perform [its] duties as Authorized Representative as necessary pursuant to the [1933] Act.").

The SEC forms also specify that a "duly authorized representative" serves a separate and distinct role than an agent for service of process in the United States.  The SEC forms explicitly refer to the obligation of a foreign issuer filing a registration statement to designate a "duly authorized representative," but do not require the designation of an agent for service of process. If the SEC intended a foreign issuer to designate an agent for service of process when filing a registration statement, it would have expressly so required as it does in other circumstances.  See SEC Forms F-8, F-9, F-10, F-80 and Form 40-F (I FEDERAL SECURITIES LAWS REGULATION – FORMS (CCH) ¶779 (1) & (3) (1993) (pertaining to Form FX)) (specifically requiring certain foreign registrants to designate an agent for service of process).  Thus, SEC forms refer to both "duly authorized representatives" and "agents for service of process," showing that the terms are not synonymous and cannot be used interchangeably.  Accordingly, the fact that Puglisi is Aracruz's "duly authorized representative" does not transform Puglisi into an agent authorized to accept service of process.  Notably, Puglisi confirms that as Aracruz's duly authorized representative, he was not permitted to accept service of process here.  (See Lavelle Decl. at ¶ 4).

### C.    W&C Is Not Aracruz's Agent For Service Of Process

In a last ditch effort to effect proper service of process, Plaintiff also served a copy of the complaint on Glenn M. Kurtz, presumably based on W&C's legal representation of Aracruz.  As Mr. Kurtz expressly advised Plaintiff's counsel, he is not an agent by law or appointment authorized to accept service of process on behalf of Aracruz.  (Kurtz Decl., Ex. 1 at 1)  It is black letter law that service on a party's attorney is ineffective unless he has been authorized to accept service of process.  See Leonard v. Stuart James Co., Inc., 742 F. Supp. 653, 662 (N.D. Ga. 1990) (dismissing claims based on improper service of process on party's attorney).

9

Because Plaintiff's service of the Complaint on Greenberg, Puglisi and W&C were improper under Rule 4(h), this Court lacks personal jurisdiction over Aracruz and the Complaint should be dismissed for insufficiency of service of process under Rule 12(b)(5).

## II.

## THE COMPLAINT FAILS TO STATE A
## CLAIM UNDER SECTION 10(b) OR RULE 10b-5

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission, Plaintiff must allege: "1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006).

### A.      Plaintiff Has Not Alleged With Particularity
### Any False Or Misleading Statements

Plaintiff fails to plead with sufficient particularity any actionable misstatement. Plaintiff asserts misrepresentations in just two sets of disclosures, the Q1 Disclosures and the Q2 Disclosures. Specifically, Plaintiff identifies the following statements, with Plaintiff's emphasis shown.

Q-1 Disclosures:

- The Company's foreign currency risk and interest rate management strategy may use derivative instruments *to protect* against foreign exchange and interest rate volatility. (Compl. ¶ 33)

- At the end of the 1Q08, *we increased the level of our cash flow currency protection, to a $270 million short position in dollars, representing 5 months of future exposure, which generated a positive impact of $4 million in the quarter*. (Compl. ¶ 34)

- The "Financial Income" in the quarter was $10.2 million higher than in the 4Q07, *mainly due to the favorable results of our gains on derivative transactions, which amounted to $13.1 million in the 1Q08* (4Q07: $3.5 million). When compared to the same period of last year, it was $21.1 million lower, mainly due to lower gains on derivative transactions (1Q07: $33.1 million). *At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 270 million, which represented approximately 5 months of cash flow exposure to the local currency* (real - R$). (Compl. ¶ 35)

Q2 Disclosures:

- *The exposure of U.S. Dollar denominated liability does not represent a risk from an economic and financial standpoint*, because the future payment in local currency of such liability is offset by operating revenue which is expressed in U.S. Dollars since almost all

sales originate from exportation. The Company's foreign currency risk and interest rate management strategy may use derivative instruments *to protect* against foreign exchange and interest rate volatility.  (Compl. ¶ 55)

- ***Despite the impact of a 45% stronger R$ against the US$*** and 28% domestic inflation on our cost structure since the end of 2003, which has been one of the main reasons for the stability of the EBITDA margin in the low 50's/high 40's, the EBITDA/ton has increased by 30% over the same period, from $224/t in the 4Q03 to $291/t in the 2Q08, demonstrating that the company has benefited from the higher net pulp prices and the competitive additional capacity.  (Compl. ¶ 56)

- ***We increased the level of our cash flow currency protection to a short position of $360 million at the end of the 2Q08 ($270 million at the end of 1Q08), representing 6 months of future exposure, which generated a positive impact of $46 million in the quarter***. *In the first half of the year, the cash flow protection provided a gain of $15/t (when divided by the targeted full year production volume), thereby mitigating the negative impact of the Brazilian currency's appreciation against the dollar*.  (Compl. ¶ 56)

- ***Protecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure.***  (Compl. ¶ 57)

- ***The company has also been protecting its cash flow exposure to the local currency by taking short positions in dollars, which involves negligible transaction costs and has a positive carry. At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 360 million, which represented approximately 6 months of cash flow exposure to the local currency*** (real - R$).  (Compl. ¶ 57)

In boilerplate[5] fashion, Plaintiff asserts that the above statements were false or misleading because the Company failed to disclose that: (1) Aracruz entered into currency derivative contracts to hedge against the U.S. Dollar that were "far larger than necessary," (2) such contracts violated the Company's financial and internal control policies and contradicted Aracruz's public statements concerning the nature of such policies, (3) the Company lacked adequate controls, and (4) as a result, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.  (See Compl. ¶¶ 36, 60)  For the reasons set forth below, Plaintiff's allegations fail to plead actionable false and misleading statements or omissions with the requisite particularity to state a claim.

---

[5] The boilerplate nature of the allegations is made clear by the fact that Plaintiff does not actually allege that the Q2 Disclosures were false, but in the Paragraph following its description of the Q2 Disclosures, in an apparent pleading error, it merely repeats that the <u>Q1 Disclosures</u> were false and misleading.  (Compl. ¶ 60)

1.      **Aracruz's Losses In September Have No**
        **Relation To Its Disclosures Months Earlier**

Plaintiff does not particularize anything that was false or misleading in the Disclosures <u>at</u> <u>the time they were made</u>.  Instead, Plaintiff leaps to the conclusion that the Company's Disclosures were false or misleading because "[j]ust five months after the April 7, 2008 Statements, the Company reported a loss of $2.13 billion."  (Compl. ¶ 39)  Plaintiff alleges no facts that show that on March 31, 2008 and June 30, 2008, the effective dates of the Q1 Disclosures and Q2 Disclosures respectively, Aracruz had entered the derivative contracts that resulted in losses and were supposedly "larger than necessary," violated its own internal policies, lacked adequate controls and lacked a basis to make forward-looking statements.  Such failure is fatal.  <u>See, e.g.</u>, <u>In re Winn-Dixie Stores, Inc. Sec. Litig.</u>, 531 F. Supp. 2d 1334, 1348 (M.D. Fla. 2007) (rejecting fraud allegation because allegation "does not explain how any challenged statement… was false or misleading when made.").  Indeed, the only plausible explanation is that Aracruz increased its derivative positions at some point after June 30, 2008.

The November 26, 2008 article in *Valor Economico*, upon which Plaintiff relies extensively, makes clear that many of the derivative transactions had a "knock-out" whereby "under normal conditions, the structures would knock-out and the contract expire."  (Kurtz Decl., Ex. 5, at 3, <u>see also</u>, <u>id</u> ("When the accumulated gain reached R$0.40 the contract would automatically expire, or knock-out."))  Plaintiff points out and does not contest that Aracruz reported profits from derivative transactions in the amount of $13.1 million for the first quarter 2008 and $72.3 million for the second quarter 2008 (Compl. ¶ 85) and the *real* continued to appreciate or hold steady against the dollar for the period immediately after June 30, 2008 (<u>See</u> Chart at Compl. ¶ 30).  Accordingly, by Plaintiff's own pleadings it is clear that many of the derivative positions disclosed in the Disclosures would have been "knocked out" by the time Aracruz announced losses months later in late September, and positions entered into subsequent to June 30, 2008 would have been the ones that led to Aracruz's losses.  The documents Plaintiff rely upon confirms this.  "<u>The first 15 contracts were successful</u>: with them, <u>the company earned</u> <u>US$50 million</u>, at a time when the exchange rate was relatively stable, <u>between April and August</u>

of this year." (Kurtz Decl. Ex. 5 at 3) (emphasis added).  Thus, Plaintiff's allegation that the Q1 and Q2 Disclosures falsely stated anything is not plausible because it is clear that Aracruz's losses arose from derivative trading activity that took place after the Disclosures.

The only statement Plaintiff identifies to try to show that Aracruz was misrepresenting its derivative trading activities at the time of the Q1 and Q2 Disclosures is its allegation that Aracruz's former CFO, Isac Zagury, stated with respect to transactions with derivatives called a "sell target forward" that "[t]hey began in the first quarter of 2008 in Brazil."  (Compl. ¶ 44) Such allegation is completely consistent with, and bolster's the truthfulness of, Aracruz's disclosures that "we increased the level of our cash flow currency protection, to a $270 million short position in dollars" and that "the 'financial income' in the quarter was $10.2 million higher than in the 4Q07, mainly due to the favorable results of our gains on derivative transactions, which amounted to $13.1 million in the 1Q08 (4Q07: $3.5 million)."  (Compl. ¶ 35)  In addition to showing that Aracruz's statements were not false when made, Plaintiff's allegation that some derivative positions were entered into before the end of the first and second quarter has no bearing whatsoever on the extent of Aracruz's activities by September 26, 2008, let alone that such transactions were "larger than necessary," violated company policy or that Aracruz was aware of inadequate controls at the time any disclosure was made.  Simply, Plaintiff fails to show how the adverse results announced on September 26, 2008 show that Aracruz misled investors months earlier.  Such pleadings of "fraud by hindsight" are routinely dismissed.  See Ezra Charitable Trust v. Tyco Int'l., Ltd., 466 F.3d 1, 6 (1st Cir. 2006) ("Pleading 'fraud by hindsight,' essentially making general allegations 'that defendants knew earlier what later turned out badly,' is not sufficient."); In re Winn-Dixie Stores, 531 F. Supp. 2d at 1350 (rejecting argument as "fraud by hindsight" where "[c]onspicuously absent from the Consolidated Complaint is any specific factual allegation that Defendants knew that the challenged statements were false when the statements were made."); In re Med/Waste, Inc. Sec. Litig., 2000 WL 34241099, at *8 (S.D. Fla. Aug. 30, 2000) (rejecting argument as "fraud by hindsight" where "Plaintiffs' argument is that [defendant] disclosed through its restatements what it should have discovered and disclosed in the original quarterly reports."); In re John Alden Fin. Corp. Sec. Litig., 249 F. Supp. 2d 1273,

1277 (S.D. Fla. 2003) ("An inability to foresee the future does not constitute fraud, because the securities laws approach matters from an ex ante perspective.  Therefore, so long as those statements had a reasonable basis when made, they do not constitute fraud."); <u>Demarco</u> v. <u>Depotech Corp.</u>, 149 F. Supp. 2d 1212, 1226 (S.D. Cal. 2001) (dismissing securities fraud claim where "[d]efendants clearly had a reasonable basis for their statements").

**2.      <u>The Alleged Reasons For Falsity Do Not Withstand Scrutiny</u>**

**a.      Plaintiff Fails To Plead With Particularity Any
False Or Misleading Statements Regarding The
<u>"Necessary" Size Of The Company's Derivative Exposure</u>**

Plaintiff's attempt to argue that the Disclosures were false because they failed to state that Aracruz's derivative positions at the time were "larger than necessary" fails for additional reasons.  <u>First</u>, Plaintiff does not allege with particularized facts that the actual disclosures of Aracruz's positions (<u>i.e.</u>, that "[a]t the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 270 million, which represented approximately 5 months of cash flow exposure to the local currency (real - R$)" (Compl. ¶ 35) and "[a]t the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 360 million, which represented approximately 6 months of cash flow exposure to the local currency (real - R$)" (Compl. ¶ 57)) were incorrect.  Plaintiff makes no particularized allegation that Aracruz's exposure was different at that time.  Nor is the statement in the Q2 Disclosures that "[t]he exposure of U.S. Dollar denominated liability does not represent a risk from an economic and financial standpoint" accompanied by any particularized allegations of falsity. (Compl. ¶ 55)  Indeed, Plaintiff makes no particularized allegation that any or all of the then-existing potential liability from the derivative contracts were "U.S. Dollar denominated" as opposed to *real* denominated, further demonstrating their lack of particularized allegations of misstatements.

<u>Second</u>, Plaintiff's own standard, "larger than necessary," is vague and non-specific and Plaintiff does not identify an Aracruz statement as to the "necessary" limits of derivative trading.

Third, Plaintiff's allegations that Aracruz misled investors by stating that it engaged in derivative transactions "*to protect* against foreign exchange and interest rate volatility" (Compl. ¶¶ 33 and 55) and "*to minimize currency risk exposure*" (Compl. ¶ 59) does not provide a basis as to determine the "necessary" or permissible size of the derivative transactions.  The words "to protect" and "to minimize" are in the context of an explanation of why transactions are entered into, not to provide a limitation as to the amount of protection that could be sought, and not sufficiently determinate to permit a finding of falsity.  See Raab v. Gen. Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993) (defendant's statements that certain delays in finalizing government contracts were "administrative" and "temporary" and that financial "results during the remainder of 1992 should be in line with analysts' current projections" were inactionable; "'[T]emporary' is an indeterminate term:  it could mean weeks, it could mean months, it could mean years.  It is not clear from the complaint that there was a misstatement at all, much less a material one."); see also Cole v. Health Mgmt'Assoc., Inc., 2009 WL 2713178, at *7 (M.D. Fla. July 17, 2009) (defendant's statement that the company had adequate reserve such that it would "'minimize the likelihood of any large write-offs in the future' [was] a statement of expectation," not a false and misleading statement); Amalgamated Bank v. The Coca-Cola Co., 2006 WL 2818973, at *7 (N.D. Ga. Sept. 29, 2006) (finding statements which characterize defendant's "marketing programs in a positive manner" are not actionable because "such statements are not capable of empirical verification, they cannot be the basis for securities fraud.").

      b.    **Plaintiff Fails To Plead With Particularity Any False Or Misleading Statements Regarding Compliance With The Company's Financial And Internal Control Policies**

In addition to Plaintiff's failure to allege that the Company had violated its internal trading policies at the time of the Disclosures, Plaintiff's allegations that the Disclosures were false because the Company violated its financial and internal controls policies should be rejected for two additional reasons.  (Compl. ¶¶ 36, 60)  First, Plaintiff fails to plead with any particularity both *how* those policies were violated and *when* such violations occurred, which is a necessary part of any properly pled claim for securities fraud.  See, e.g., In re NDCHealth Corp.,

Inc. Sec. Litig., 2005 WL 6074918, at *10 (N.D. Ga. July 27, 2005) (dismissing complaint for securities fraud based, in part, on perceived violations of "publicly-stated policies" where the complaint "does not allege sufficiently why each statement or omission was misleading, or sufficiently identify or contextualize information to meet the particularity requirement of Rule 9(b) or the PSLRA in securities cases."); In re Versant Object Tech. Corp. Sec. Litig., 2000 WL 33960105, at *11 (N.D. Cal. May 18, 2000) (dismissing securities fraud claim based, in part, on purported violation of company policy because "Plaintiffs' allegations merely state the legal conclusion that whatever happened was contrary to whatever should have happened, and therefore are insufficient to defeat Defendant's motion to dismiss."); In re Nat'l Auto Credit, Inc. Sec. Litig., 1999 WL 33919791, at *17 (N.D. Ohio Oct. 12, 1999) (dismissing 10(b)-5 claim where "Plaintiffs also do not explicitly and specifically state which of [the company's] own accounting policies the company is supposed to have violated, much less how [the company] is alleged to have violated those policies.").

Plaintiff's only factual allegations consist of excerpts from Aracruz's financial policies governing hedging practices that they are "designed to protect the company's cash generation exposure… to market risks associated with fluctuations in exchange rates," and to that end, the policy "provides various parameters regulating [their] use, including that there must be 'linkage to an effective exposure (non-speculative hedging),' that there is 'no leveraging involved,' that the 'asset side objective is the same as the risk factor that is to be protected,' and that the 'engaging of structured financial transactions with built-in derivatives is strictly prohibited.'" (Compl. ¶58)  Plaintiff then leaps to the conclusory allegation that Aracruz violated the Company's policy at the time of the Disclosures.  (See, e.g., Compl. ¶¶ 8, 36, 40, 58-59, 60) Entirely lacking from the Complaint is any specific factual allegation explaining the manner in which these policies were violated as well as any allegation of when such occurred.  Plaintiff's allegations, if anything, support the conclusion that any violation of the Company's hedging policy began subsequent to the Q2 Disclosures.[6]  Additionally, Plaintiff's assertions concerning

---

[6] Plaintiff's reference to the *Valor Economico* article in which Zagury notes that the Company's exposure limit was raised to $1 billion "after the board of directors meeting in June of 2008" merely suggests that the exposure limit was raised subsequent to the Board's meeting.  (Compl. ¶ 63)  It does not mean that the exposure limit was raised

the financial policy again show Plaintiff's disregard for the timing at issue.  The policy that

Plaintiff quotes from Aracruz's website, which discusses, for example, "non-speculative

hedging," is clear that it was updated <u>on June 26, 2009</u>, a year <u>after</u> the alleged misstatements.

<u>See</u> <u>http://www.aracruz.com/show_arz.do?act=stcNews&id=309&lang=2#fp</u>.  Plaintiff does not

allege that the policy was substantially identical at the time of the Disclosures.

     <u>Second</u>, assuming <u>arguendo</u> that Plaintiff sufficiently pled that the Company engaged in

transactions in violation of its own policies at the time of the Disclosures, such allegations

establish only mismanagement and are insufficient to state a claim for securities fraud.  <u>In re</u>

<u>Citigroup, Inc. Sec. Litig.</u>, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) ("Plaintiff's section 10(b)

claim. . . that participation in such transactions was inconsistent with Citigroup's stated risk

management policies and historical business practices – amounts to nothing more than a charge

that Citigroup's business was mismanaged.").  Indeed, a failure to disclose mismanagement is

insufficient to sustain a claim for securities fraud.  <u>See, e.g.</u>, <u>In re Winn-Dixie Stores</u>, 531 F.

Supp. 2d at 1345 ("Several cases have discussed the duty to disclose mismanagement and have

determined that corporate officers do not have a duty to disclose internal management problems

to shareholders."); <u>Cutsforth</u> v. <u>Renschler</u>, 235 F. Supp. 2d 1216, 1242-43 (M.D. Fla. 2002)

("courts generally hold that the failure to disclose possible corporate mismanagement does not

state a federal securities law claim.").

           c.      **Plaintiff Fails To Plead With Particularity Any
False Or Misleading Statements Regarding The
<u>Company's Purported Lack Of Internal and Financial Controls</u>**

     Plaintiff cannot establish a claim for securities fraud by asserting that various disclosures

were false or misleading by virtue of an alleged failure to warn investors that the Company

supposedly lacked adequate controls to monitor its exposure to currency exchange rate volatility.

<u>See, e.g.</u>, <u>In re BellSouth Corp. Sec. Litig.</u>, 355 F. Supp. 2d 1350, 1373 (N.D. Ga. 2005)

("Plaintiffs claim [defendant] 'lack of internal controls' permitted much of this misconduct to take

place. These allegations are nothing more than criticism of BellSouth's management structure and

---

before the Q2 Disclosures.  Moreover, the fact that a policy was changed provides no basis to conclude that the
policy was violated.

management decisions, and cannot form the basis for a securities violation."); Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 683 (D. Colo. 2007) ("[I]mplicit in Plaintiff's averments is that had management evaluated the Company's disclosure and financial reporting controls correctly, it would have or should have found them to be deficient considering the widespread abuse.  At base, this allegation is of mismanagement, which is not actionable under federal law."); In re Interpool, Inc. Sec. Litig., 2005 WL 2000237, at *19 n.11 (D.N.J. Aug. 17, 2005) (rejecting claim of securities fraud based, in part, on lack of internal controls concluding that "the Third Circuit has explicitly found the concerns underlying the securities act are not implicated simply because management has failed to characterize . . . its financial reporting and accounting controls [as] inadequate and ineffective." (citation omitted)); TAAM Assocs., Inc. v. Housecall Med. Res., Inc., 1998 WL 1745361, at *7 (N.D. Ga. Mar. 30, 1998) ("[W]hat plaintiffs' claim amounts to is that the defendant should have had a better system by which to track its expenditures in relation to reimbursements . . . .  Such allegations of poor management and decision-making, however, are not actionable under the federal securities laws.").

In any case, Plaintiff's claims of inadequate controls are belied by their allegations that suggest substantial controls were in place.  Plaintiff repeatedly asserts that both the finance committee and the Board were kept informed of the Company's investments in derivative instruments through out the class period.  (See, e.g., Compl. ¶¶ 12, 41-47)  Such statements completely undercut the allegations of inadequate controls.  See In re Sadia, S.A. Sec. Litig., 2009 WL 2356181, at *9 (S.D.N.Y. July 29, 2009) (rejecting claims that statements concerning foreign derivative exposure were false because company lacked adequate controls where plaintiff alleged that management was aware of the scope of exposure).[7]

---

[7]  Plaintiff, who is represented by the same counsel as the plaintiff in Sadia, will undoubtedly rely upon that case, which sustained some claims against a Brazilian company that announced that it lost money on foreign exchange derivative contracts on September 26, 2008, the same date Aracruz announced its losses.  Sadia, however, in no way disposes of this Motion.  Indeed, the very existence of the Sadia case shows that losses as a result of foreign currency derivative trading were common throughout Brazil, indicative that there may have been widespread mismanagement or negligence in connection with the understanding and managing of derivative exposure, but not widespread fraud.  Indeed, the documents Plaintiff cites showing widespread losses indicate that a herd mentality may have led to common poor judgment, but not common individualized efforts to defraud.  (See Kurtz Decl., Ex. 5, at 1 ("I don't think the [Brazilian] lawsuit makes sense.  Not against me, or anyone else.  It was something completely unpredictable that affected approximately 400 companies in Brazil.  It is nobody's fault, not the fault of any officer not the fault of any advisory board.").  (Footnote continued on next page.)

**d.      Plaintiff Fails To Plead With Particularity
Any False Or Misleading Statements Regarding
The Company's Financial Condition**

Finally, Plaintiff's allegations that the Disclosures were false or misleading because "the Company's statements about its financial well-being and future prospects were lacking in any reasonable basis when made" are insufficient to support a claim for several reasons. <u>First</u>, the Complaint makes clear that the Company's relative financial condition went unaffected until the Brazilian *real* began to decline rapidly against the U.S. dollar shortly before the September 26, 2008 disclosures. <u>See</u> <u>In re Sadia</u>, at *9 (rejecting claims that Sadia had misstated its financial condition because "the Company's relative financial condition was not affected until the Brazilian real began its decline against the dollar . . ."). Plaintiff's failure to explain how any of the Disclosures lacked any reasonable basis "when made" is fatal to its claim. <u>See, e.g.</u>, <u>In re Winn-Dixie Stores</u>, 531 F. Supp. 2d at 1348 (rejecting fraud allegation because allegation "does not explain how any challenged statement… was false or misleading when made."). Plaintiff merely points to statements describing why the Company purchased derivatives and then leaps to the conclusion that those statements were fraudulent because Aracruz lost money through derivative investments.

<u>Second</u>, to the extent Plaintiff appears to rely upon Company disclosures relating to gains earned from foreign exchange derivatives (<u>see, e.g.</u>, Compl. ¶ 33 ("During the three month period ended March 31, 2008, the Company recognized gains of US$ 7.0 million on swap transactions"), ¶ 35 ("The 'Financial Income' in the quarter was $10.2 million higher than in the 4Q07 mainly due to the favorable results of our gains on derivative transactions, which amounted to $13.1 million in 1Q08"), ¶ 55 ("During 2008 the Company has recognized, in

---

Moreover, <u>Sadia</u> is distinguishable. <u>First</u>, <u>Sadia</u> does not even address the timing issue raised here, which show that it is not plausible to believe that the exposure and condition of the Company as of March 31 and June 30, 2008 was the same exposure that led to losses in late September. <u>Second</u>, in <u>Sadia</u>, the company had specifically stated in public statements issued <u>prior</u> to the announced losses (unlike the policy that Plaintiff cites here in paragraph 58 of the Complaint, which was adopted in 2009), that the policies prohibited "speculative trading" and using swap contracts for "speculative purposes" (<u>In re Sadia</u>, 2009 WL 2356181, at *5) and the court in <u>Sadia</u> specifically found that the company mischaracterized "its currency hedging activity as risk-reducing and non-speculative." <u>Id.</u> at *6. No such contemporaneous statements are alleged here. <u>Third</u>, <u>Sadia</u> does not address the lack of causation shown below. In any event, <u>Sadia</u> is not binding on this Court and, to the extent it would lead to a result other than dismissal here, it is wrongly decided for the reasons set forth herein.

financial income, gains of US$ 25.5 million on derivative instruments registered at the BM&F")), Plaintiff does not allege that such statements are incorrect statements of past performance.  Accordingly, they cannot form the basis of a securities fraud claim.  See, e.g., Nadoff v. Duane Reade, Inc., 2004 WL 1842801, at *2 (2d Cir. Aug. 17, 2004) ("Accurate statements about past performance are self-evidently not actionable under the securities laws"); In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) ("Accurate statements of past earnings figures are not themselves actionable under Section 10(b).").

Third, the Company's recently reported gains from derivative trading undercuts any suggestion that investors were unaware of Aracruz's derivative trading activity.  As Plaintiff makes clear, publicly available material from Aracruz provides that "over the eight quarters prior to the start of the Class Period, Aracruz averaged a gain of $15.3 million per quarter on its currency derivative transactions," and even earned more than $72 million in the second quarter of 2008 from the same transactions. (Compl. ¶¶ 83-84)  And despite Plaintiff's suggestion that "for years" the Company's use of derivative investments was "conservative"[8] (Compl. ¶23), Plaintiff's Complaint highlights a rather substantial increase in gains under derivative contracts from $2.7 million in June 2006 to $72.3 million only two years later.  (Compl. ¶84)  Indeed, as the *Portal Exame* Article highlights, since 2003, Aracruz had earned as much as $350 million through derivative trading.  (Kurtz Decl., Ex 3, at 1)  Thus, investors knew that Aracruz and its shareholders made substantial sums from derivative investments from which a reasonable investor would conclude that there was attendant risk.

**B.    The Complaint's Conclusory Allegations Do Not
Satisfy The Stringent Requirements For Pleading
Scienter Under The PSLRA Or Rule 9(b)**

The PSLRA "imposes a heightened standard for pleading scienter."  Rosenberg v. Gould, 554 F.3d 962, 965 (11th Cir. 2009).  Under the PSLRA, a complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

---

[8] While Plaintiff repeatedly employs the word "conservative" to describe Aracruz's public strategy, it fails to allege a single instance when Aracruz so described its derivative trading.

"This statutory requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones."  Garfield, 466 F.3d at 1264.  Thus, to survive a motion to dismiss, a plaintiff must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements."  Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008) ("In this Circuit it is by now well-established that §10(b) and Rule 10b-5 require a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness.") (citation omitted); Scaturro v. Seminole Casualty Ins. Co., 542 F. Supp. 2d 1290, 1301 (S.D. Fla. 2008).  Although some courts look to a "motive and opportunity" test to find allegations of scienter sufficient, in the Eleventh Circuit, only allegations showing an intent to defraud or severe recklessness will suffice.  See Bryant, 187 F.3d at 1285-1286 ("While allegations of motive and opportunity may be relevant to a showing of severe recklessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter in our Circuit.  We quantify scienter as encompassing at least a showing of severe recklessness, and although motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness, we decline to conclude that they, standing alone, are its equivalent.").

     Under the Eleventh Circuit's standard for scienter, the meaning of "severe recklessness" is quite narrow and is:

>  [L]imited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Garfield, 466 F.3d at 1264; In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1298 (S.D. Fla. 2002).  "Severe recklessness" must "approximate actual intent to aid in the fraud and must be shown to such an extent that a reasonable finder of fact could actually infer fraudulent intent from it."  Cordova v. Lehman Bros., 526 F. Supp. 2d 1305, 1319 (S.D. Fla. 2007).

Moreover, in order to constitute a "strong inference" of scienter, plaintiff must draw an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Mizzaro, 544 F.3d at 1238; Tellabs, 551 U.S. at 324 ("[A] court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff…. Yet the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."). Thus, the question is whether "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 325. "[I]f the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial inference of scienter, then that plaintiff's facts cannot be fairly said to raise a 'strong inference' that the defendant acted with the requisite state of mind." In re Sportsline.com, 366 F. Supp. 2d at 1164. To determine whether a statement made by a corporation was made with the requisite scienter to support a 10(b) claim, a court should "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004); Mizzaro 544 F.3d at 1254 (a court should "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like).").

1.   **Plaintiff's Reliance On Purported Financial
      Motives Is Insufficient To Establish Scienter**

Plaintiff's attempt to establish scienter on the part of Aracruz by alleging that the Individual Defendants were motivated by some unspecified personal gain is plainly deficient. (Compl. ¶ 52) "The Eleventh Circuit has rejected the simple pleading of motive and opportunity as fulfilling the requirement that plaintiffs allege facts giving rise to a strong inference of fraudulent intent." Scaturro, 542 F. Supp. 2d at 1301; Bryant, 187 F.3d at 1283 ("hold[ing] that the Reform Act does

not codify the 'motive and opportunity' test formulated by the Second Circuit."). Here, Plaintiff has failed to provide anything other than boilerplate non-particularized allegations that Aracruz management was motivated "for self-serving interests aimed at increasing their own personal compensation through bonuses and other financial rewards."[9] (Compl. ¶ 52)  Such non-specific allegations of potential personal gain, applicable to all employees everywhere, are routinely found to be insufficient to establish scienter.  See Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (rejecting scienter argument that defendants "were motivated to defraud the public because an inflated stock price would increase their compensation" because "[i]f scienter could be pleaded on that basis alone, virtually every company. . . that experiences a downturn in stock price could be forced to defend securities fraud actions."); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) (allegations that defendants sought to prolong and benefit from their corporate positions insufficient to demonstrate scienter); In re J.P. Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 620-23 (S.D.N.Y. 2005) (finding that alleged motives were insufficient to demonstrate scienter where "each is a type of benefit that most corporations and corporate insiders seek"); In re Sportsline.com., 366 F. Supp. 2d at 1171 ("[A]llegations of a motive to maintain stock price or enhance a Company's business prospects cannot support a strong inference of scienter."); Druskin, 299 F. Supp. 2d at 1338 ("General allegations of motive, such as maintaining a company's stock price or meeting analyst estimates, do not support a strong inference of scienter.").

2.    **Plaintiff's Allegations That Aracruz Tracked Its Derivative Purchases Does Not Show That Aracruz, With Intent To Defraud Or Severely Recklessly, Issued False Statements In The Disclosures**

The allegations in the Complaint, taken together, at most show that people at the Company received periodic information concerning its foreign exchange derivative position, not that anyone knowingly or with severe recklessness misled anyone about the extent of such trading.  Specifically, Plaintiff alleges that Zagury began entering into certain derivative contracts in the first quarter of 2008 (Compl. ¶¶ 37, 44), that "[e]verything that happened in the financial department was reported monthly to the financial committee" (Id. at ¶ 42), that the

---

[9] In a feeble attempt to mask the defects of its failure to particularize, Plaintiff alleges that the fact that Aracruz did not disclose management's compensation "contributed to their brazen act of self-indulgence."  (Compl. ¶ 52)

hedging contracts at issue "were backed by the green light of the financial committee and the board" that "the financial committee was informed in writing of the operations," (id. at ¶¶ 43, 50), that later on the finance department "each day" provided "[its] exposure to the finance committee" which included "the operations contracted by the company, the results to date, etc.," (id. at ¶ 44), and that, sometime after the June 2008 meeting of the Aracruz Board of Directors, Aracruz raised its limit on derivative exposure from $600 million to $1 billion.[10] (id. at ¶ 63) Significantly, none of this information bears any relation to Plaintiff's allegations that as of March 31 and June 30, 2008, Aracruz (i) had entered into derivative contracts that were "larger than necessary," (ii) violated its own internal policies, (iii) lacked adequate controls and (iv) lacked a basis to make statements concerning its financial condition.  To the contrary, Plaintiff's allegations show that Aracruz believed it had adequately monitored its position, which, as discussed, was not the same at the time of the Disclosures as it was on September 26, 2008.[11]

Indeed, further undercutting any allegation of scienter is the fact that Aracruz made a disclosure on September 26, 2008, before its normal reporting cycle at the end of the third quarter and directly in the midst of the *real's* plunge against the dollar, to report immediately the adverse results of its derivative trading activity.  See, e.g., Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004) ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements."); In

_____

[10] Notably, the Complaint alleges that the Board was made aware of the Company's relevant hedging activities during a meeting in June 2008.  (Compl. ¶ 46)  Thus, Plaintiff fails to allege that the Board was presented with any material before the Q1 Disclosures which would have informed them of the Company's exposure.

[11] Additionally, assuming arguendo that Plaintiff has adequately pled that the Q1 and Q2 Disclosures' statements concerning the extent of Aracruz's derivative exposure was incorrect at the time (and they have not), the documents Plaintiff relies upon show the only other plausible explanation, that Aracruz negligently miscalculated the extent of its exposure.  In the *Valor Economico* article, Zagury explains that the calculation of exposure "is a question of interpretation" because "the contracts were long-term, up to twelve months.  However, depending on the exchange rate, the contract would automatically expire in the first two months.  Therein lies the difficulty in estimating the company's exposure in foreign currency contracts."  (Kurtz Decl., Ex. 5, at 2) (emphasis added).  The subjective nature of the calculations shows that, even if Aracruz calculated and disclosed its exposure incorrectly, such miscalculations fall short of establishing scienter.  See, e.g., Cordova v. Lehman Bros., Inc., 526 F. Supp. 2d 1305, 1319 (S.D. Fla. 2007) (dismissing securities fraud claim where the allegations "would probably support a showing of negligence or even inexcusable negligence on the part of Defendants, but is not strong enough to show that Defendants acted in so severely reckless a manner that a reasonable finder of fact could infer that Defendants intended for investors to be defrauded."); In re Sportsline.com, 366 F. Supp. 2d at 1172 (dismissing securities fraud claim where "[t]he allegations pled could be used to argue that Defendants were negligent" but not "an extreme departure from the standards of ordinary care" necessary to sustain a claim).

re Nokia OYJ (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 407 n.16 (S.D.N.Y. 2006)

("[S]ince intent is an important factor in this analysis, regardless of how early it was announced,

any early disclosure of negative results tends, at least to some degree, to disprove alleged

recklessness.").  In fact, as the *Valor Economico* Article relied upon by Plaintiff explains,

Aracruz's losses on derivative contracts accrued quickly.  (Kurtz Decl., Ex. 5, at 3) ("It blew up

in one week" and "I don't think anybody is guilty of anything" because "several companies

incurred losses and nobody is to blame when the increase of the dollar goes from R$1.65 to

R$2.30, in about ten days, in an international crisis that is the biggest crisis in history.")).

Aracruz's prompt public announcements show that it was not acting severely recklessly or

knowingly trying to defraud its shareholders.

Moreover, Plaintiff's allegations of intent to defraud and severe recklessness are

insufficiently particularized.  In order to establish scienter in the Eleventh Circuit as a result of

information supposedly conveyed, Plaintiff must allege specific facts regarding (i) what

information was conveyed, (ii) in which reports it was presented, (iii) when, and (iv) how such

information demonstrate that "these Defendants knew or should have known about the

Company's… practices."  Hubbard, 625 F. Supp. 2d at 1287; Garfield, 466 F.3d at 1264

(scienter inadequately pled where it was alleged that defendants "attended monthly operations

meetings in Arizona and 'every aspect of the Physician Services business was discussed in detail,

including the aggressive channel stuffing and mounting problems with accounts receivable.'");

Scaturro, 542 F. Supp. 2d at 1299 (rejecting scienter argument based upon allegations that

'conversations' occurred 'regularly' between May 2002 and early 2007, with no specifics as to

exactly when they spoke, where they spoke, and what 'precisely' was said, as required by Rule

9(b)."); In re Winn-Dixie Stores, 531 F. Supp. 2d at 1350-51 (allegations that defendants "had

access to information about the company through business meetings is not sufficient to plead

scienter."); Fidel v. Rampell, 2005 WL 5587454, at *4 (S.D. Fla. Mar. 29, 2005) (rejecting

scienter argument based on allegation that defendant has "attended meeting in 1997 and 1998

that discussed 'each office's progress and needs' and that 'the projected numbers anticipated

[company] would be running at a loss for 1998 and 1999.'"); Druskin, 299 F. Supp. 2d at 1331

(finding scienter inadequately pled because "the mere existence of [certain reports] and the purported observations of confidential witnesses do not sufficiently allege that Defendants were privy to specific information that revealed statements were false at the time they were issued or that Defendants benefitted personally from alleged misrepresentations."); In re Rexall Sundown, Inc. Sec. Litig., 2000 WL 33539428, at *3 (S.D. Fla. Mar. 29, 2000) (concluding that "Plaintiff's Complaint fails on the issue of *why* the statements are false or misleading" because reliance on "unspecified internal reports" are "the type of conclusory allegations Congress sought to prevent from sustaining a securities fraud action under the PSLRA.").

Even Plaintiff's most particularized allegation, that the finance committee "each day" was provided with Aracruz's exposure, including "the operations contracted by the company, the results to date, etc.," is insufficient.  (Compl. ¶ 44)  Plaintiff fails to identify, specifically, what data and other information was presented to the finance committee and the Board, as well as when and how such information would have informed anyone that Aracruz had misled anyone about the current extent of its foreign exchange derivative position as of the end of the first and second quarters of 2008.[12]

### 3.    The Sources Relied Upon By Plaintiff Suggest A Lack Of Scienter

Not only does Plaintiff fail to allege scienter with sufficient particularity, but the sources relied upon by Plaintiff, if anything, demonstrate that Aracruz lacked an intent to defraud.  The thrust of the newspaper articles relied upon by Plaintiff is that Aracruz's losses were nobody's fault, in no manner predictable, and that the people involved conducted themselves properly. (Kurtz Decl., Ex. 5, at 1) ("I don't think the [Brazilian] lawsuit makes sense.  Not against me, or

---

[12] To the extent Plaintiff seeks to allege scienter through conclusory references to the positions held by Aracruz executives, such is improper under Eleventh Circuit case law.  See, e.g., In re Sportsline.com, 366 F. Supp. 2d at 1172 ("While Plaintiffs have pled that Defendants were privy to all Company internal information, they have not pled that Defendants were privy to specific information that revealed the inaccurate nature of the misstatements. The allegations pled could be used to argue that Defendants were negligent in not making sure that the subsequent restated statements were accurate when first made."); In re Smith Gardner, 214 F. Supp. 2d at 1303 ("Mere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter.").  "Because allegations such as these can be ascribed to virtually all corporate officers and directors, they fail to raise a strong inference."  Hubbard, 625 F. Supp. 2d at 1286.  So too here.

anyone else.  It was something completely unpredictable that affected approximately 400 companies in Brazil.  It is nobody's fault, not the fault of any officer not the fault of any advisory board.")).  The *Valor Economico* article referenced by Plaintiff quotes Zagury explaining that "export companies bought the product [sell target forward contracts] betting it would provide protection since the economic authorities were giving assurances in terms of currency.  And Aracruz was making its foreign exchange projections based on the Central Bank's Focus market report, an averaging of the opinions of 115 financial institutions."  (Kurtz Decl., Ex. 5, at 4-5).  The articles relied upon by Plaintiff, at most, indicate that Aracruz's derivative trading may have been the result of poor judgment or mismanagement, but in no way was intentional or severely reckless, and therefore show the inadequacy of the Complaint.  See Druskin, 299 F. Supp. 2d at 1324 ("At best, some of the Plaintiff's allegations may rise to the level of poor business judgment or even mismanagement, but do not to the level of fraud.").

## C.      **The Complaint Fails To Plead Causation Sufficiently**

Plaintiff's theory of causation does not make sense and is contradicted by other allegations in the Complaint.  Plaintiff argues that "[b]y failing to disclose the nature and extent of the Company's currency derivative contracts, as well as Aracruz's exposure to currency exchange rate fluctuations, investors were not aware of the true state of the Company's financial status."  (Compl. ¶ 110)  Significantly, Plaintiff does not allege that Aracruz ever misreported its gains or losses from derivative trading.  So, if one were to assume (contrary to any particularized or plausible reading of the allegations in the Complaint, supra at pp. 10-20) that Aracruz intentionally or severely recklessly misrepresented its exposure and risk as of March 31 and June 30, 2008, Plaintiff's theory would mean that there would be no fraud and damages had Aracruz merely stated (as it did, infra at pp. 31-33) that it could suffer material losses from engaging in foreign currency derivative trading.  The allegations in the Complaint, however, do not attribute the decline in Aracruz's ADR price to the market's understanding of the scope or risk arising from the Company's currency derivative contracts.  Rather, Plaintiff attributes the decline in stock price to the Company's announcements that it had lost money.  (See Compl. ¶¶ 67-68

(noting the decline in ADR price was accompanied by announced losses that would "materially affect the Company's cash account," ¶¶ 72-73 (noting additional decline in ADR price in the wake of Company's disclosure "that the fair value of the Company's currency-related derivative contracts . . . was negative 1.95 billion Reals, or $1.02 billion.")).  Simply, the value of the Company's stock declined as a result of announced losses, not as the result of announced foreign currency derivative positions.[13]  See In re FARO Techs. Sec. Litig., 2007 WL 430731, at *12 (M.D. Fla. Feb. 3, 2007) (rejecting loss causation argument where "it is not apparent that the Complaint... adequately avers that the stock lost value *due to [defendant's] misrepresentations* regarding the value of its inventory, rather than simply because of the very fact (and accurate disclosure) that the Company was adjusting its inventory numbers downward.") (emphasis in original).

Thus, there is no plausible linkage, or proximate causation, between the alleged misstatement (i.e. about the exposure to exchange rate risk) and the loss in the value of Aracruz's ADRs, which went down when the company announced material financial losses.  See, e.g. Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 342-43 (2005) ("When the purchaser subsequently resells such shares . . . that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."); Cole, 2009 WL 2713178, at *11 ("The loss causation requirement forces a plaintiff to tie particular losses directly to specific alleged misconduct and, thus, the concept is akin to proximate cause in tort law to protect securities fraud defendants from assuming the role of insurer for all investment losses."); In re TECO Energy, Inc. Sec. Litig., 2006 WL 845161, at *5 (M.D. Fla. Mar. 30, 2006) ("To prove loss causation, Plaintiffs must allege that a misstatement

---

[13] For instance, had the value of the *real* not plummeted against the dollar in late September, and Aracruz had only announced that its exposure to currency fluctuations was higher than previously announced but that it had not lost any money (such being the only corrective disclosure to Plaintiff's alleged misstatements of a failure to disclose risk), the value of Aracruz stock likely would have been unaffected and there would not have been any lawsuit here. Or, to take the flip side, suppose that Aracruz had made some further announcement of its exposure to currency fluctuations in the Q1 and Q2 Disclosures (had such been the case then), it is clear that the value of Aracruz's shares would have diminished significantly when it announced in late September 2008 that, as a result of the depreciation of the *real*, it had suffered material losses.

or omission by Defendants concealed something from the market and that when information

related to that fraud was disclosed, the value of their securities were affected.").

**D.    The Disclosures Are Protected
By The Safe Harbor For Forward-Looking
Statements And The "Bespeaks Caution" Doctrine**

Under the PSLRA, a defendant "may avoid liability for forward-looking statements that

prove false if the statement is 'accompanied by meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the forward-

looking statement.'"  Harris v. IVAX Corp., 182 F.3d 799, 803 (11th Cir. 1999) (citing 15 U.S.C.

§ 78u-5(c)(1)(A)(i)).  "The Eleventh Circuit has taken an even more liberal approach" in that the

"cautionary language need not explicitly refer to [the] particular risk which ultimately came to

pass but must merely warn investors of risks similar to that actually realized to give sufficient

notice of the investment's potential danger."[14]  In re Columbia Labs, Inc. Sec. Litig., 144 F.

Supp. 2d 1362, 1369 (S.D. Fla. 2001); see also Harris, 182 F.3d at 803.  The safe harbor

provision applies in two situations: "(1) where the forward-looking statements are accompanied

by 'meaningful cautionary language,' or (2) where the plaintiff fails to plead with sufficient

particularity facts that give rise to a strong inference that defendants had actual knowledge of the

falsity of their statements when the statements were made."  In re Noven Pharms., Inc. Sec.

Litig., 238 F. Supp. 2d 1315, 1321 (S.D. Fla. 2002) (emphasis in original).

Even where a forward-looking statement lacks sufficient cautionary language, the burden

is on plaintiff who "must prove that the defendant made the statement with 'actual knowledge'

that it was 'false or misleading.'"  Harris, 182 F.3d at 803 (citing 15 U.S.C. § 78u-5(c)(1)(B)).

"If the complaint does not satisfy these pleading requirements, the court, upon motion of the

---

[14] Similarly, pursuant to the bespeaks caution doctrine, if forward-looking and soft information is accompanied or
qualified by cautionary language addressing the very risks of which a plaintiff complains, such statements are not
materially misleading as a matter of law.  Saltzberg v. TM Sterling/Austin Assocs., LTD., 45 F.3d 399, 400 (11th
Cir. 1995) ("[W]e accept and apply the 'bespeaks caution' doctrine as explained in In re Donald J. Trump Casino
Sec. Litig., 7 F.3d 357 (3d Cir. 1993).");  In re Donald J. Trump Casino, 7 F.3d 357, 371 (3d Cir.1993)("[C]autionary
language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.").  "Soft"
information is defined as "statements of subjective analysis or extrapolation, such as opinions, motives, and
intentions, or forward-looking statements, such as projections, estimates and forecasts."  Id., at 368 n.11.

defendant, must dismiss the complaint." In re Noven Pharms., 238 F. Supp. 2d at 1322 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

1.        **The Challenged Disclosures Are Forward-Looking Statements**

"Forward-looking statements include statements of future economic performance." Harris, 182 F.3d at 805 (citing 15 U.S.C. § 78u-5(i)(C)).  This includes "any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission."  15 U.S.C. § 78u-5(i)(C).  Regardless of "purely grammatical argument to the contrary," a statement concerns "future performance" if it is "about the state of a company whose truth or falsity is discernable only after it is made."  Harris, 182 F.3d at 805 (relevant inquiry is whether statement is only "verifiable… in the future.").  To the extent "such forward looking statements are mixed in with sentences describing known facts, the entire statement is treated as a forward-looking statement for purposes of the PSLRA safe harbor provisions." In re Republic Sevs, Inc. Sec. Litig., 134 F. Supp. 2d 1355, 1363 (S.D. Fla. 2001); In re Rexall Sundown, Inc. Sec. Litig., 2000 WL 33539428, at *4 (S.D. Fla. Mar. 29, 2000) (same).

Plaintiff alleges that statements in the Q1 Disclosures and Q2 Disclosures that Aracruz uses foreign currency derivative instruments "to protect" against potential exchange rate risk or "to minimize" the affect of changes in the exchange rate misrepresented material facts.  (Compl. ¶¶ 58-59) (describing the Company's strategy "to protect the company's cash generation exposure… to market risks associated with fluctuations in the exchange rate," "'To protect against [foreign exchange and interest rate] market risks' and 'to minimize currency risk exposure.'").  Such statements are forward-looking in that they inform investors of the Company's use of derivative instruments to reduce risk prospectively.  See Durgin v. Mon, 2009 WL 3055216, at *11 (S.D. Fla. Sept. 21, 2009) (concluding that "statements about the role of [an investment] in reducing risk" is protected under the PSLRA's safe harbor).  They are also forward-looking because they describe the "intended impact" of an investment (i.e., "to protect against… volatility" (Compl. ¶ 33)).  See Schultz v. Applica Inc., 488 F. Supp. 2d 1219, 1229

(S.D. Fla. 2007) (noting that statements regarding "the intended impact in creating long-term shareholder value fall[] within the safe harbor.").  Similarly, the statements concerning the "level of [the Company's] cash flow currency protection" and its relationship to "future exposure" are forward looking.  (Compl. ¶¶ 34-35, 56)  Whether a Company's position covers "future exposure" and "protects" against risk is only verifiable in the future.  See Harris, 182 F.3d at 805 (relevant inquiry is whether statement is only "verifiable . . .  in the future.").

   2.   **Aracruz's Disclosures Are Accompanied By Meaningful Cautionary Language And Protected By The Safe Harbor Provisions And The Bespeaks Caution Doctrine**

   The PSLRA's safe harbor also protects the Disclosures because the statements are accompanied by meaningful cautionary language warning of the exact risks that led to Aracruz's losses.  As an initial matter, the Disclosures contain cautionary language concerning investment in foreign currency derivative instruments.  Specifically, the Q2 Disclosures provide that the Company "is exposed to market risk from foreign exchange and interest rate volatility."  (Kurtz Decl., Ex. 7, at 30).  Similarly, the Q1 Disclosures warn that "foreign exchange and interest rate[s]" experience "volatility."  (Kurtz Decl., Ex. 6, at 34).  Foreign exchange volatility resulted in the losses sustained by Aracruz.  See In re Columbia Labs., 144 F. Supp. 2d at 1369 (cautionary language "must merely warn investors of risks similar to that actually realized to give sufficient notice of the investment's potential danger.").  Moreover, that these statements are not identified as "cautionary" is meaningless so long as each identifies the pertinent risks. See In re Technical Chems. Sec. Litig., 2001 WL 543769, at *8 (S.D. Fla. Mar. 20, 2001) (concluding that "a reasonable investor should be cautious" even though warning is "not explicit.") abrogated on other grounds recognized by, Marrari v. Medical Staffing Network Holdings, Inc., 395 F. Supp. 2d 1169 (S.D. Fla. 2005).

   In addition, both Disclosures explicitly provide that each "should be read in conjunction with the audited consolidated financial statements and notes… included in the Company's 2007 Annual Report on Form 20-F."  (Kurtz Decl., Ex. 6, at 12); (Kurtz Decl., Ex. 7, at 10).  It is well established that cautionary language may be incorporated by reference to another document.

See, e.g. Miller v. Champion Enters., Inc., 346 F.3d 660, 677 (6th Cir. 2003) (statements in letter accompanied by sufficient cautionary language where "it cited [defendant's] risk disclosures in its 1998 Form 10-K."); Grossman v. Novell, Inc., 120 F.3d 1112, 1122 (10th Cir. 1997) ("[W]hen actually faced with the issue, courts have not required cautionary language to be in the same document as the alleged misstatement or omission."); In re Blockbuster Inc. Sec. Litig., 2004 WL 884308, at *4 (N.D. Tex. April 26, 2004) ("[T]he PSLRA safe harbor for written forward-looking statements can be satisfied by meaningful cautionary language that is incorporated by reference.").

Here, Aracruz's 20-F is replete with cautionary language warning investors of the Company's risk exposure to foreign currency derivative investments.  Under the heading "Risk Factors," Aracruz cautions investors that "[t]he Company's business, *financial condition* and results of operations may be adversely affected by changes in policy… as well as other factors such as: *currency fluctuation*…."  (Kurtz Decl., Ex. 2, at 9)  Later, the Company again specifically warns about its exposure to market risks relating to currency fluctuations, stating, under the heading "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK," that the Company is "exposed to various market risks, particularly the variation of the U.S. dollar against the *real*."  (Id. at 81) (emphasis added)  Further, the 20-F also states that Aracruz "may use derivative and non-derivative instruments to implement risk management strategy." (Id. at 83) The 20-F then explicitly warns of the risks involved in its derivative trading activity, stating:

> [B]y using derivative instruments, the Company exposes itself to credit and market risk. Credit risk is the failure of a counterparty to perform under the terms of the derivative contract.  Market risk is the adverse effect on the value of a financial instrument that results from a change in interest rates, currency exchanges rates, or commodity prices. The Company addresses credit risk by restricting the counterparties to such derivative financial instruments to major financial institutions.  Market risk is managed by the Treasury.  The Company's foreign currency risk management strategy may use derivative instruments to protect against foreign exchange rate volatility, which may impair the value of certain of the Company's assets.

(Kurtz Decl., Ex. 2, at 83).  The Company thus repeatedly and clearly warned investors that it had derivative exposure subject to market risk.  The thrust of the Complaint is that the Company lost money from derivative trading as a result of a change in market conditions.  The point of

such warnings is to inform investors of potential risks and thereby protect the Company from meritless lawsuits when something goes wrong.  Because the Company gave appropriate and direct cautionary statements of its risk, it cannot be held liable when such risk comes to pass. See, e.g., Ehlert v. Singer, 245 F.3d 1313, 1320 (11th Cir. 2001) (holding that "Defendants are protected from liability under the safe-harbor" where "adequate cautionary language accompan[ied] the forward-looking statement."); Harris, 182 F.3d at 807 ("[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward…. it excuses [defendant] from liability."); see also In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1307 (S.D. Fla. 2002) (dismissing complaint where "the warnings at issue perhaps constitute little more than generic, boilerplate language but still meet the requirements of meaningful cautionary language.").[15]

> ### 3.   Plaintiff Fails To Plead With Sufficient Particularity That The Alleged Misstatements Were Made With Actual Knowledge

As explained above, supra at pp. 20-27, Plaintiff fails to plead actual knowledge that any statements, forward-looking or otherwise, were made with actual knowledge of their falsity. Accordingly, Aracruz cannot be liable for misstatements concerning forward looking statements. See In re Noven Pharms., Inc. Sec. Litig., 238 F. Supp. 2d at 1324 (to avoid safe harbor protection for forward-looking statements, Plaintiff must plead "actual knowledge" that statements were incorrect when made).

## E.   Plaintiff Fails To Plead Scheme Liability Under Rule 10b-5(a) And (c)

The Complaint also asserts a claim based on subsections (a) and (c) of Rule 10b-5, the so-called "market manipulation" sections of Rule 10b-5.  In re Recoton Corp. Sec. Litig., 358 F. Supp. 2d 1130, 1138 n.4 (M.D. Fla. 2005); Pfizer, Inc. Sec. Litig., 584 F. Supp. 2d 621, 640

---

[15] The Company also cautions investors from relying upon forward looking statements.  The first page of the 2007 20-F instructs the reader to be cautious with respect to discussions of future results, stating  "that all information included herein with respect to future operations, financial condition, financial performance or other financial or statistical matters constitute forward-looking statements.  Those forward-looking statements are necessarily dependant on assumptions, data or methods that may be incorrect or imprecise and that may not be realized."  (Kurtz Decl., Ex. 2, at 4) (emphasis added).

(S.D.N.Y. 2008) (classifying 10b-5(a) and (c) as "market manipulation" claims).  Subsections (a) and (c) of Rule 10b-5 prohibit the use of "any device, scheme or artifice to defraud" or participation "in any act, practice, or course of business" that would perpetuate fraud on investors."  As discussed <u>supra</u> at pp. 4-5, all Rule 10-b5 claims, whether premised on statements or conduct, must comply with the exacting pleading standards of Rule 9(b).

To state a claim under Rule 10b-5(a) and/or (c), Plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on the market for the securities at issue."  <u>ATSI Commc'ns, Inc.</u> v. <u>The Shaar Fund, Ltd.</u>, 493 F.3d 87, 102 (2d Cir. 2007); (quoting <u>In re Global Crossing</u>, 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004)).  "'Manipulation' is 'virtually a term of art when used in connection with securities markets' and 'refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'"  <u>Santa Fe Indus.</u> v. <u>Green</u>, 430 U.S. 462, 476-77 (1977) (<u>quoting Ernst</u> v. <u>Hochfelder</u>, 425 U.S. 185, 199 (1976)).  It "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of the securities."  <u>ATSI Commc'ns, Inc.</u>, 493 F.3d at 100.

Thus, a market manipulation claim cannot be based solely upon misrepresentations or omissions.  "There must be some market activity, such as 'wash sales, matched orders, or rigged prices . . .'"  <u>TSC Capital Mgmt., LLC</u> v. <u>Apax Partners, L.P.</u>, 2008 WL 650385, at *22 (S.D.N.Y. Mar. 7, 2008); <u>Schnell</u> v. <u>Conseco, Inc.</u>, 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999) (refusing to characterize allegations as market manipulation where alleged "schemes to defraud" consisted largely of an aggregation of material misrepresentations).

Here, the Complaint fails to allege facts concerning any "deceptive act" Aracruz undertook that is separate and distinct from the alleged misstatements and omissions.  Indeed, the so-called "fraudulent scheme" identified by Plaintiff involves the very same misrepresentations and omissions that underlie the Rule 10b-5(b) claim.  (<u>See</u> Compl. ¶ 51 ("Defendants, by virtue of their receipt of information reflecting the true facts regarding Aracruz, <u>their control over, receipt and/or modification of Ararcuz's material misrepresentations and omissions</u>, and/or their

positions within the Company which made them privy to confidential information concerning Aracruz, participated in the fraudulent scheme.") (emphasis added))  Further, Plaintiff's organization of the Complaint confirms that they are not alleging any "deceptive acts" beyond the alleged misrepresentations.  A substantial portion of the "Defendants' Fraudulent Scheme" section clearly sets forth the allegations concerning the purported "False and Misleading Statements."  Conspicuously absent from Plaintiff's "scheme" section are any separate allegations concerning the "deceptive acts" that provide the basis for Plaintiff's Rule 10b-5(a) and (c) claims.  Instead, Plaintiff "merely re-labels the alleged misstatements and omissions as 'manipulative and deceptive conduct.'"  See TSC Capital Mgmt., 2008 WL 650385, at *22 (refusing to allow plaintiffs to re-label alleged misstatements and omissions as "manipulative and deceptive conduct," and noting "[t]his sleight of hand does not magically transform its disclosure claims into a market manipulation claim."); see also In re Recoton Corp. Sec. Litig., 358 F. Supp. 2d 1130, 1138 n.4 (M.D. Fla. 2005) ("where the sole basis for [the Rule 10b-5 claims] is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim.") (citing Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177 (2d. Cir. 2005) (same)).  Accordingly, because Plaintiff fails to identify any deceptive act Aracruz employed separate and apart from the alleged misstatements or omissions, the Rule 10b-5(a) and (c) claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Aracruz respectfully requests that the Amended Class Action Complaint be dismissed with prejudice.

Dated: November 13, 2009                **WHITE & CASE LLP**

By: /s/ Rudolph F. Aragon
    Glenn M. Kurtz (limited appearance
    application to be filed)
    Douglas P. Baumstein (limited appearance
    application pending)
    1155 Avenue of the Americas
    New York, NY 10036-2787
    (212) 819-8200

Rudolph F. Aragon
Fla. Bar No. 286249
raragon@whitecase.com
Jason N. Zakia
Fla. Bar No. 698121
jzakia@whitecase.com
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
Telephone: (305) 995-5244
Facsimile: (305) 358-5744

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on November 13, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of notices of electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of electronic filing.

Christopher Steven Jones
cjones@saxenawhite.com

Joseph E. White, III
jwhite@saxenawhite.com

Lester Rene Hooker
lhooker@saxenawhite.com

Maya Susan Saxena
msaxena@saxenawhite.com

SAXENA WHITE P.A.
2424 North Federal Highway
Suite 257
Boca Raton, Florida  33431

/s/ Jason N. Zakia