**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO: 08-23317-CIV-LENARD**

| | |
|---|---|
| CITY PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS IN THE CITY OF MIAMI BEACH, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ARACRUZ CELULOSE S.A., CARLOS ALBERTO VIEIRA, CARLOS AUGUSTO LIRA AGUIAR, and ISAC ROFFE ZAGURY, | ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT ARACRUZ CELULOSE S.A.'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

I.        INTRODUCTION ................................................................................................... 1

II.       FACTUAL BACKGROUND ................................................................................. 3

III.      LEGAL STANDARDS .......................................................................................... 5

   A.    The Standard on a Rule 12(b)(5) & (6) Motion to Dismiss ........................................ 5

   B.    The Exchange Act Standard ...................................................................................... 6

   C.    The Legal Standard for Scienter ............................................................................... 7

IV.       ARACRUZ HAS BEEN SERVED ....................................................................... 9

V.        PLAINTIFF HAS ADEQUATELY PLED EXCHANGE ACT CLAIMS .............................. 12

   A.    Facts in the Complaint Raise a Strong Inference of Scienter .................................... 12

      1.   Aracruz Had Actual Knowledge That Its Statements Were False and Misleading .................. 12

      2.   Plaintiff's Sources Do Not Negate a Strong Inference of Scienter ........................................ 18

   B.    Plaintiff's Facts are Sufficiently Particularized ........................................................ 19

      1.   Aracruz's Losses Directly Relate to Its False Statements and Omissions ............................... 19

      2.   Aracruz's False Statements Were Directly Related to Its Scheme ......................................... 21

      3.   Plaintiff's Facts Supporting a Strong Inference of Scienter are Sufficiently Particularized ....... 23

      4.   Plaintiff's Facts Regarding Aracruz's Financial and Internal Controls are Sufficiently
            Particularized ................................................................................................................. 26

      5.   Plaintiff's Facts Regarding Aracruz's Financial Condition are Sufficiently Particularized ....... 28

   C.    Aracruz's Boilerplate Disclosures Are Not Protected by the PSLRA Safe Harbor ............... 30

      1.   Aracruz's Statements Were False When Made ..................................................................... 30

      2.   Aracruz's Statements Are Not Accompanied by Meaningful Cautionary Language ................. 31

   D.    The Complaint Establishes Loss Causation ............................................................. 33

VI.       CONCLUSION ..................................................................................................... 35

Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Plaintiff" or "Miami Beach") respectfully submits this Memorandum of Law in Opposition to Defendant Aracruz Celulose S.A.'s ("Aracruz" or the "Company") Motion to Dismiss the Amended Class Action Complaint (the "Complaint").

## I.   INTRODUCTION

In the early 1990s, a Brazilian pulp company called Aracruz Celulose S.A. began to raise money from U.S. investors.  In order to do so, it listed ADRs on the New York Stock Exchange, and as such was required to file forms and disclosures with the Securities and Exchange Commission ("SEC").  Aracruz ADRs traded in the US for nearly two decades without incident. But as time went on, the Company's executives developed a dark secret.  As 2008 approached, much of Aracruz's profits were coming not from the sale of pulp as investors believed, but instead from incredibly risky financial instruments that Aracruz was trading.  These instruments were complex in form, but simple in nature – they were high stakes wagers.  Aracruz explained these wagers as "hedging" in order to hide from investors the true nature of the incredible risks they were taking.  They lied to their own stakeholders, reassuring them that the Company had strict limits and controls on its hedging activity, and that the hedging was being done to offset possible currency fluctuations since Aracruz sold pulp in foreign markets.

For a while their bets paid off.  The money that Aracruz made as a result of these wagers fueled the greed and arrogance of Aracruz's executives, who placed these bets with the supposed "knowledge" that the Brazilian *real* would continue to rise in value against the dollar.  However, like any high risk bet, someday the bottom could (or more likely, will) fall out.  And it did.  In the summer of 2008, as shown in the figure below, the *real* began to plummet against the dollar,

1

exposing the scheme and causing catastrophic losses, which in turn devastated the value of investors' Aracruz ADRs.



The truth was as plain as day. Aracruz's executives had not been hedging, they had been gambling. They now say that they couldn't be expected to know the *real* would reverse course so quickly – and Plaintiffs agree. No one can repeatedly predict the future correctly in the long run. But that's not the point at all. The point is that they should have entered proper hedges (which are in essence nothing more than insurance policies) as they informed investors they were doing. But they chose to lie and enter into massive wagers that put the Company's assets, stakeholders, and employees at enormous risk. Indeed, the losses from these currency hedging contracts would grow to represent nearly *three times* the Company's quarterly revenue by the

end of the Class Period.  And to add insult to injury, Aracruz's former executives are evading service by remaining in Brazil and refusing to step forward to defend their names, let alone their actions.  Aracruz itself lodges a bizarre argument that it hasn't been served with this action, despite telling U.S. investors in repeated SEC filings who their agent for service of process is. Aracruz (and eventually the other Defendants) should be held accountable for the fraud they perpetrated and the lies they told to cover it up, both of which cost American investors such as Miami Beach *hundreds of millions of dollars* in losses that remain unpaid.

## II.    FACTUAL BACKGROUND

Companies that heavily export their products use currency hedging (also known as foreign exchange risk hedging) to reduce the risks that the foreign currency paid to them for future sales does not decline in value with respect to their native currency during the course of the transaction.  ¶27.[1]  Although exporting companies regularly engage in currency hedging, they do so as an insurance policy to ensure that they can effectively manage the future value of revenue to be received on the sale of goods—the aim being that their company will receive approximately the same value of revenue regardless of movements in currency exchange rates. *Id*.

Aracruz claimed it entered into currency derivative hedges to purportedly protect against foreign exchange and interest rate volatility.  ¶33.  The Company's own Financial Policy stated that its hedging practice was "designed to protect the company's cash generation exposure, as measured by the US$ EBITDA, to market risks associated with fluctuations in exchange rate." ¶58.  The Company's Financial Strategy further stated that Aracruz would enter into currency derivative contracts "to protect against . . . market risks" and "to minimize currency risk

---

[1] All "¶__" references are to the Plaintiff's Amended Class Action Complaint filed on October 5, 2009 (Docket No. 30).

exposure." ¶59.  Indeed, throughout the Class Period, the Company repeatedly assured investors that it used currency hedges "to protect" against exchange rate volatility and that its exposure to the U.S. Dollar through the hedges did "not represent a risk from an economic and financial standpoint." ¶¶33-35, 55-57.

Notwithstanding Aracruz's repeated promises of financial transparency and careful and controlled hedging practices, the Company instead engaged in an extremely high-risk currency wagering scheme during the Class Period.[2] ¶25.  As long as the dollar depreciated in value against the *real*, as it did from 2004 to mid-2008 (¶30), the Company would make money on its currency contracts. However, the truth began to emerge in August and September of 2008 when the dollar began to appreciate in value against the *real*.

On September 26, 2008, Aracruz announced that the amount lost due to its speculation "may have exceeded the limits set forth in [the] Company's Financial Policy . . . ." ¶67.  Over the next three days, the value of Aracruz's ADRs dropped 25%, to close at $33.16.  ¶68.  On October 3, Aracruz announced that the "fair value" of its currency derivative contracts was negative $1.02 billion, causing its ADRs to plummet a further 51% and close at $15.18.  ¶¶72-73.  It was not until November 4, however, that the full extent of the Company's losses on the currency derivative contracts became known.  On that day, Aracruz announced that it would unwind 97% of its currency derivative contracts, resulting in a $2.13 billion loss.  ¶78.

---

[2] Forbes explains the difference between hedging and speculation.  "Hedging involves taking an offsetting position in a derivative in order to balance any gains and losses to the underlying asset. Hedging attempts to eliminate the volatility associated with the price of an asset by taking offsetting positions contrary to what the investor currently has. The main purpose of speculation, on the other hand, is to profit from betting on the direction in which an asset will be moving. Hedgers reduce their risk by taking an opposite position in the market to what they are trying to hedge. The ideal situation in hedging would be to cause one effect to cancel out another. Depending on a company's policies and the type of business it runs, it may choose to hedge against certain business operations to reduce fluctuations in its profit and protect itself from any downside risk. Speculators make bets or guesses on where they believe the market is headed. Speculators are vulnerable to both the downside and upside of the market; therefore, speculation can be *extremely risky*. Overall, hedgers are seen as *risk averse* and speculators are typically seen as *risk lovers*. Hedgers try to reduce the risks associated with uncertainty, while speculators bet against the movements of the market to try to profit from fluctuations in the price of securities."  *See* Forbes Investopedia, retrieved at http://www.investopedia.com/ask/answers/06/hedgingversusspeculation.asp retrieved on December 20, 2009.

The fallout from Aracruz's secretive currency wagers was catastrophic. Aracruz's losses on its currency hedges would grow to represent nearly three times the Company's quarterly revenue. ¶¶85-86. Analysts have predicted that it could take ten years for the Company to pay off its losses. ¶100. The Company was publicly chided by Brazilian President Luiz Inácio Lula da Silva, who stated that Defendant's losses were "not because of the crisis, but because of speculation. They were speculating against the Brazilian currency. They were practicing, through greed, speculation that is in no way recommendable." ¶¶91, 97. Ratings agencies severely downgraded the Company's credit rating, in some instances to below investment grade. ¶¶94, 96, 99. Aracruz's acquisition by Grupo Votorantim was delayed for nearly a year, and it cancelled plans to pay $41 million in interest on capital to shareholders. ¶¶75, 100, 105. Defendant Isac Roffé Zagury was replaced as CFO by Valdir Roque, who himself resigned just over one month later. ¶¶74, 79. Resignations from seven members of the Board or its committees soon followed. ¶81. On November 25, 2008, Aracruz's Brazilian shareholders voted to institute a legal action in Brazil against Defendant Zagury for "engaging in derivative transactions above and beyond the limits provided for in the company's Financial Policy." ¶80.

## III.    LEGAL STANDARDS

### A.    The Standard on a Rule 12(b)(5) & (6) Motion to Dismiss

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (*Tellabs I*), 551 U.S. 308, 322 (2007). All reasonable factual inferences must also be resolved in favor of the plaintiff. *Kupke v. Orange County*, 293 Fed. Appx. 695, 696 (11th Cir. 2008).

The threshold for a complaint to survive a 12(b)(6) motion "is 'exceedingly low.'" *In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 113 (M.D. Fla. 2005) (*quoting United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir.2003)).  To survive dismissal, the complaint need only plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a 'speculative level'. . . ." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Once such a claim has been stated adequately, "it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Bell Atl. Corp.*, 550 U.S. at 563.

As with a motion to dismiss under Rule 12(b)(6), under Rule 12(b)(5), "the court must construe all reasonable inferences in favor of the plaintiff."  *Bell v. Integrated Health Services, Inc.*, No. 06-0356-WS-M, 2007 WL 274364, at *2 (S.D. Ala. Jan. 30, 2007) (*quoting Meier ex rel. Meier v. Sun International Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir.2002)).

### B.    The Exchange Act Standard

In order to state a claim under Section 10(b) of the Exchange Act, Plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter (a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[3] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

On a motion to dismiss a securities-fraud action, in addition to the Rule 12(b)(6) standards, the Court must also consider the heightened pleading standards of Rule 9(b) and the PSLRA.  *Catalina*, 390 F. Supp. 2d at 1113–14.  Under Rule 9(b), a securities-fraud complaint "need only provide a reasonable delineation of the underlying acts and transactions constituting the fraud."  *Id.* at 1115.  That is, a plaintiff must specify the time, place, and content of a

---

[3] Plaintiff alleges only violations of § 10(b) and Rule 10b-5(b) against Aracruz.  Plaintiff does not allege violations of Rule 10b-5(a) or (c), also known as "market manipulation" claims, and to the extent they are mentioned in Count I of the complaint, Plaintiff does not intend to bring a separate claim under these subsections.

defendant's alleged false representations.  *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).  "A sufficient level of factual support for a 10b claim may be found where the circumstances of the fraud are pled in detail.  This means the who, what, when where, and how: the first paragraph of any newspaper story."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

In a securities fraud case, the PSLRA provides that a plaintiff who alleges violations of §10(b) shall "specify each statement alleged to have been misleading, [and] the reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1).  The PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," instead requiring that the facts alleged are "sufficient . . . to support those beliefs" as to the misleading nature of the statement or omission.  *In re Theragenics Corp. Sec. Litig.*, 137 F. Supp. 2d 1339, 1345 (N.D. Ga. 2001) (*citing Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000)).

### C.      The Legal Standard for Scienter

The PSLRA provides that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In addition, Rule 9(b) requires fraud to be pled with particularity, and provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

As the U.S. Supreme Court has stated, under the "strong inference" of scienter standard set forth in the PSLRA, scienter allegations of a Section 10(b) claim will survive a motion to dismiss "if a reasonable person would deem the inference of  scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs I*, 551

U.S. at 324.  Thus, even if the inferences properly drawn from the facts are in equal balance, the allegations will survive a Rule 12(b)(6) motion.  When considering whether a complaint alleges facts that give rise to a strong inference that the defendant acted with scienter, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ."  *Id*. at 323 (emphasis original).  Even "vague or ambiguous" allegations must be considered, as "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."[4]  *Id.* at 324.

In the Eleventh Circuit, a showing of "severe recklessness" satisfies the scienter requirements.  *Sherleigh Assoc. LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1276 (S.D. Fla. 2000) (Lenard, J.) (*citing Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999)).  Severe recklessness includes situations where, as here, a defendant makes "highly unreasonable omissions or misrepresentations" that constitute "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Garfield*, 466 F.3d at 1264.  Scienter can also be established "by strong circumstantial evidence of conscious misconduct or severe recklessness."  *In re PSS World Med., Inc. Sec. Litig.*, 250 F.Supp.2d 1335, 1344 (M.D.Fla.2002) (*citing In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1239 (N.D. Ga. 2002)).

---

[4] Indeed, after the U.S. Supreme Court remanded *Tellabs I* for consideration of the scienter allegations under these new criteria, the United States Court of Appeals for the Seventh Circuit found that Plaintiffs' scienter allegations were "cogent" and "in conformity with the requirements of the" PSLRA.  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008 ("*Tellabs II*").  Moreover, after *Tellabs I*, "[v]ague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter," "the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective," and "Tellabs permits a series of less precise allegations to be read together to meet the PSLRA requirement."  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-785 (9th Cir. 2008).

## IV.    ARACRUZ HAS BEEN SERVED

After reviewing Aracruz's own clear statement in the Company's March 31, 2008 Form 20-F that its agent for service of process in the United States is Greenberg Traurig, LLP ("Greenberg")—a filing signed by Aracruz's CEO Carlos Augusto Lira Aguiar and CFO Isac Roffé Zagury—Plaintiff proceeded to serve the Company by serving Greenberg.[5]  As the Declaration of Greenberg partner Ross Kaufman shows, Plaintiff was successful in carrying out this task.[6]  *See* Dkt. # 35-3 ("Greenberg was served with a copy of the original complaint in this action by a process server.").  It is hard to imagine a more straightforward set of facts.  Yet Aracruz now claims that even though it told the world that Greenberg was its agent, that is not really what it meant.  This position has no basis in either law or fact.

One would not know from Aracruz's response, but the Company has actually maintained an agent for service of process in the United States for many years.  From 2003 to 2007, in every 20-F and 20F-A Aracruz has filed, the Company listed its "agent for service of process in the United States" as CT Corporation in New York, NY, a widely known and common agent for service in the U.S.  *See* Ex. A (attaching relevant portions of Form 20-F's).  In addition, it its January 29, 2003 Form 6-EF, Aracruz lists CT Corporation as its "agent for service."  *See* Ex. B. CT Corporation is continually listed as the agent for service until June 20, 2007, when Aracruz filed Form F-6,which listed Greenberg (instead of CT Corporation) as its "agent for service." *See* Ex. C.  Then, in its March 31, 2008 20-F, Aracruz made it even clearer for investors, listing Greenberg as its "agent for service of process in the United States."  *See* Ex. D. As was the case with CT Corporation, no qualifiers were given to investors or the public about any limited scope

---

[5] In addition, both Aguiar and Zagury certified under Section 906 of the U.S. Sarbanes-Oxley Act of 2002 that "this report does not contain any untrue statement of a material fact."  *See* 20-F at pp. 92, 93.

[6] The process server's affidavits showing service has been effected were filed with the Court on March 16, 2009. (*See* Dkt. #'s 22-24).

of authority of Greenberg.  Each entity was clearly listed so that investors would understand who was the agent for service of process.[7]

In June 2009, after Aracruz began claiming that Greenberg was not its agent for service of process, a curious change was added to Defendant's Form 20-F.  This year, it now reads "Our agent for service of process in the United States *with respect to the deposit agreement* for our ADSs is Greenberg Traurig, LLP, 200 Park Avenue, New York, NY 10166."  *See* Ex. E. (June 30, 2009 20-F (emphasis added).[8]  Perhaps this might limit plaintiffs attempting to serve Aracruz after June 2009, but the change can certainly not have any effect on past investors who were assured year after year by Aracruz itself that it was amenable to service of process in the U.S by serving CT Corporation and then Greenberg.

Aracruz does not cite a single case or authority (other than Fed. R. Civ. P. 4(h)) when it argues that service was not effected on it through Greenberg.  *See* Def. Br. at 7-8.  Instead, it relies on two arguments, both of which must fail.  First, it claims that the Form 20-F it issued informed Aracruz's investors "that Aracruz did not authorize Greenberg, or anyone else, to accept service of process."[9]  *See* Def. Br. at 7.  But their 20-F does not say this at all.  Instead, it says is that "it *may not* be possible for investors to effect service of process within the U.S. upon us or our directors, executive officers or such experts."  It defies logic to conclude, from this

---

[7] Even Greenberg's own attorney, Ross Kaufman, who is listed on the cover of numerous Aracruz SEC filings (including the 2008 20-F), gives uncertain testimony regarding the "agreement," when he says "*[i]t is my understanding* that the scope of Greenberg's agency with respect to service of process is governed by the 2007 deposit agreement.  Dkt. 35-3 ¶4.

[8] An American Depository Receipt ("ADR") represents ownership in the shares of a foreign corporation, and enables American investors to buy shares in foreign corporations without the hassle of cross-border and cross-currency transactions.  By way of comparison, individual shares of a foreign corporation represented by an ADR are called American Depositary Shares (ADS).

[9] Aracruz also claims that Puglisi and White & Case are not authorized to accept service.  *See* Def. Br. at 8-10.  However, the argument they make with respect to Puglisi further undercuts the position that serving Greenberg was ineffective.  Defendants point out several times that Puglisi is a "duly authorized representative" of Aracruz, as opposed to "an agent for service of process," and they even cite to where the SEC formally specifies the difference.  Def. Br. at 9.  Perhaps this helps with Puglisi, but it only serves to further illustrate that regardless of whether Puglisi or W&C was authorized or not, Aracruz named Greenberg (and CT Corporation) as its agent for service of process.

vague statement of possible future events, that it in any way "cancels out" Aracruz's unambiguous representation to investors that "our agent for service of process in the United States is Greenberg Traurig, L.L.P." Indeed, for the Company's former executives Vieira, Aguiar, and Zagury – all of whom are purposefully avoiding liability in this action by remaining in Brazil–it remains to be seen whether Defendant's statement will come true and whether Plaintiff will be able to effect service of process. But for the Company itself to claim that it, as an entity which has purposefully availed itself of this country's laws and marketed hundreds of millions of dollars worth of ADRs to U.S. investors, is exempt from service of a complaint by its own shareholders borders on the ludicrous.

Second, Aracruz argues that part of a Deposit Agreement somehow limits its clear representation to the public and investors that Greenberg is its agent for service of process. This position fails for several reasons. The "agreement" that Defendant submitted is not even a valid contract. It is undated, with only an incomplete reference to "[Date], 2007." *See* Dkt. # 35-1 at p. 26. It is also not clear if the document was even signed, but even assuming it was, Aracruz has not given the Court the signature page. The top of the document indicates it is an exhibit to an Aracruz SEC filing, and after reviewing the relevant SEC filings, it appears that this document was attached to Defendant's Form F-6 dated June 20, 2007. Plaintiff is attaching the entire Amended and Restated Deposit Agreement, rather than a partial version submitted by Defendant. *See* Ex. F. The "agreement" is clearly not signed or executed in any manner. It is axiomatic that an unsigned, undated form cannot establish any rights or duties, and this one most certainly does not.[10]

---

[10] Even if there were a signed agreement, Defendant's argument must still fail. Defendant does not—nor cannot—explain how the Deposit Agreement that it entered into with Citibank can bind individual holders of Aracruz ADRs. *See Norfolk Southern Ry. Co. v. Groves*, 586 F.3d 1273, 1281-82 (11th Cir. 2009) ("[I]t is a tenent of contract law that a third-party cannot be bound by a contract to which it was not a party.").

11

Finally, in the event that the Court finds that the unsigned agreement does apply, or if Defendant submits the signed version to the Court (and the Court finds that effective), it still does not change the fact that Aracruz has been served and must defend this action.  In the same section cited by Aracruz, it states that it "irrevocably and unconditionally waives, to the fullest extent permitted by law, and agrees not to plead or claim, any right of immunity from" "service of process" "with respect to any matter arising out of, or in connection with, the Deposit Agreement, any ADR or the Deposited Securities."  Dkt. # 35-1 at 30.  Therefore, Aracruz's argument that it is not subject to service of process fails according to the very Deposit Agreement they claim protects them.

## V.     PLAINTIFF HAS ADEQUATELY PLED EXCHANGE ACT CLAIMS

### A.     Facts in the Complaint Raise a Strong Inference of Scienter

#### 1.     *Aracruz Had Actual Knowledge That Its Statements Were False and Misleading*

This action is unlike many securities fraud actions where circumstantial evidence alone gives rise to a finding of scienter.[11]  There is no question that improper currency wagering occurred, resulting in enormous losses.  Now everyone is scrambling for a parachute, but there are nott enough to go around.  The Company's shareholders have authorized a lawsuit against defendant Zagury, claiming he was a rogue employee and that he alone was responsible for the

---

[11] *See, e.g., In re Metawave Comm's Corp. Sec. Litig.*, No. C02-625RSM, 2009 WL 811455, at **3-4 (W.D. Wash. Mar. 27, 2009) (finding that certain circumstantial facts contributed to a strong inference of scienter); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, (S.D.N.Y. 2008) (concluding plaintiffs pled circumstantial facts against corporation and auditor sufficient to find a strong inference of scienter); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 232-33 (S.D.N.Y. 2008) (holding that the circumstantial facts detailed in the complaint contributed to a strong inference of scienter); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that the scienter requirement was satisfied by identification of specific facts constituting strong circumstantial evidence of recklessness); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1358, 1366 (N.D. Ga. 2002) (concluding that nine circumstantial facts, when taken together, contribute to a strong inference of scienter).

improper trades. ¶80.  In turn, Zagury has pointed his finger at the Company and its Board, claiming that the speculative trades were done with the express knowledge and blessing of the Company's Board and Financial Committee.  ¶¶42-44.  Deciding who is telling the truth and assessing the relative culpability of each defendant are issues far beyond the scope of a motion to dismiss.  *See, e.g., Miller v. Currie*, 50 F.3d 373, 377 (6th Cir.1995) ("Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses").[12]

Plaintiff has pled sufficient facts to give rise to an inference of fraud that is "at least as compelling" as inferences of non-culpable intent.  *Tellabs I,* 551 U.S. at 314, see also; *Grand Lodge of Pa. v. Peters,* 550 F. Supp. 2d 1363, 1370 (M.D. Fla. 2008).  Defendant had *actual knowledge* of the Company's massive and increasing exposure to risk derivative instruments for more than "protection" in addition to numerous other indicia of severe recklessness.  For example:

- Defendant Zagury admitted that the Company made a "bet" with its use of derivatives but claimed that he was a "scapegoat" (¶12);

- Defendant Zagury claimed that beginning in the first quarter of 2008, the details of the hedging activity were sent to the finance committee on a daily basis (¶44);

- Defendant Zagury admitted to discussing the details of the derivative scheme with specific individuals including Valdir Roque, Joao Touinho and Luciano Soares in which minutes were taken and provided to the Board (¶45);

- Defendant Zagury admitted that in June of 2008, there was a presentation to the Board in which the income from derivatives was presented (¶46);

---

[12] In fact, determination of whether Zagury or the Company is more credible is not even appropriate for consideration at the summary judgment stage.  *See Florida Evergreen Foliage v. E.I. Dupont De Nemours and Co*. 336 F.Supp. 2d 1239, 1252 (S.D. Fla. 2004) (" In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

- During a shareholders meeting in Sao Paolo, the Company's shareholders in Brazil voted to sue Zagury, accusing him of unilaterally spearheading the currency speculation scheme which violated the Company's financial policy (¶11);

- Defendant Zagury admitted that the sell forward targets were "backed by the green light of the financial committee of the board" which received written confirmation of the derivate positions including "[t]he results of the exchange operations, the data, the characteristics on a daily basis" and that there was "very close oversight" of the Company's hedging activities; (¶12);

- The Company's admission that the total exposure to futures contracts "may have exceeded the limits set forth in the Company's Financial Policy approved by the Board of Directors" (¶67);

- Monthly reports were provided to the financial committee which was responsible for informing the board of the Company's financial policies (¶42);

- The board approved the Company's financial policy including the use of derivative instruments for profit rather than hedging (¶43);

- The Chairman of the Board, Chief Financial Officer and several board members "resigned" in the wake of the scandal[13] (¶12); and

- The magnitude of the exposure, representing *nearly three times the Company's quarterly revenue*, which could not have gone unnoticed by Aracruz executives,[14] and that ultimately resulted in a $2.13 billion loss and the delayed sale of Aracruz to Grupo Votorantim for a period of one year  (¶¶78, 82, 85-86).

---

[13] Terminations and resignations of key executives during the Class Period have been found to contribute to a strong inference of scienter.  *In re Sunbeam Sec. Litig.,* 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (circumstances surrounding termination of key executives contributes to an inference of scienter).

[14] Allegations concerning issues significant to a corporation's business give rise to a strong inference of scienter. *Berson v. Applied Signal Tech. Inc.,* 527 F.3d 982, 987-89 (9th Cir. 2008) (holding that CEO and CFO must have known about stop-work orders significantly reducing a corporation's revenue because of the importance of the orders to the company); *Inst'l Investors Group v. Avaya, Inc.,* 564 F.3d 242, 271 (3d Cir. 2009) (inferring scienter based on defendant's position as CFO and the importance of misrepresented financial metrics"); *South Ferry,* 542 F.3d at785 (same); *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 77 (2d Cir. 2001) (magnitude of $24 million in special charges "undermines, at the pleading stage," the defendants' argument that they were not aware of events negatively affecting financial results"); *Rothman,* 220 F.3d at 92 (magnitude of write-down "render[ed] less credible" defendants argument that they did not realize the amount of losses being incurred); *In re Bisys Sec. Litig.,* 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (noting that many courts had held that the size of a fraud could contribute to an inference of scienter, at least where the "fraud actually bankrupted the company").

14

In a virtually identical case in the Southern District of New York, Judge Shira Scheindlin[15] recently denied defendant's motion to dismiss almost in its entirety without oral argument. *See In re Sadia S.A. Sec. Litig.,* 643 F. Supp. 2d 521 (S.D.N.Y 2009). Importantly, Sadia engaged in the same scheme as Aracruz did, prompting a massive loss, an investigation by its largest shareholder and a significant drop in the value of its ADRs. *Id.* The allegations are strikingly similar.[16] Sadia, like Aracruz, entered into undisclosed currency hedging contracts. *Id.* at 524. When the *real* plunged in September 2008, Sadia, like Aracruz, was forced to liquidate its position in these currency hedges resulting in a loss of almost half a billion dollars. *Id.* In the aftermath of Sadia's meltdown, the CFO and numerous executives resigned or were terminated. *Id.*

In finding that the defendant acted with scienter, the Court noted that "the allegations, taken as true, sufficiently plead that the conduct of Sadia's officers and agents was 'highly unreasonable' and 'an extreme departure from the standards of ordinary care.'" *Id.* (internal citations omitted). The Court found the following factors probative of scienter: (1) the termination of Sadia's CFO; (2) the resignations of other top Sadia officers involved in currency transactions; (3) the admission by the company that certain transactions may have been 'unaligned' with the internal hedging policy; (4) the CEO's suggestion that there may have been an "intentional flaw" with the hedging activity; (5) Sadia's initiation of an internal review; and

---

[15] The Southern District of New York has exceptional experience in adjudicating securities fraud class cases, as does Judge Scheindlin. In addition to *In re Sadia S.A. Sec. Litig.*, No. 08-civ-9528, she has presided over cases such as *In re Centerline Holding Co. Sec. Litig.*, No. 08-civ-505; *In re eSpeed Sec. Litig.*, No. 05-civ-2091; *In re Bombardier Sec. Litig.*, No. 05-civ-1898; *In re Scottish Re Group Sec. Litig.*, No. 06-civ-05853; *In re GeoPharma Sec. Litig.*, 04-civ-9463; *In re Initial Public Offering Sec. Litig.*, No. 21-mc-92; and *In re Independent Energy Holdings Sec. Litig.*, No. 00-civ-6689.

[16] Indeed, after the revelation of the violations in Brazil, Sadia and Aracruz were referenced synonymously in the financial press. *See,* ¶87 ("In Brazil, it wasn't bad credit that sent stocks tumbling and massacred the executive ranks. It was the country's currency, which tumbled, ***exposing idiotic gambles by CFOs and their staff and turning company boards into financial firing squads.***"); *see also,* ¶¶91, 97.

15

(6) regular reports detailing the hedging exposure which were provided to the Board and other executives. *Id.* The Court also concluded that "Sadia has failed to suggest an opposing inference that is more plausible than the strong inference of scienter on the part of the Individual Defendants." Id. at 535 n.111. Given the striking similarities between the two cases and the sound application of the *Tellabs* standards in the *Sadia* case, this motion to dismiss should be denied.[17]

Despite Defendant's wishes to the contrary, the Complaint details more than "periodic" updates on Aracruz's currency hedge positions. Rather, the Complaint describes a company which was informed of its currency hedge positions on a daily basis. Under these facts, this is sufficient for pleading scienter. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006) ("Scienter can be sufficiently pled when a complaint alleges that defendants were updated on a regular basis about the facts upon which the falsity is alleged.") (*citing In re Globalstar Sec. Litig.*, No. 01 Civ. 1748, 2003 WL 22953163, at *7 (S.D.N.Y. Dec. 15, 2003)). Additionally, it is simply unfathomable that, given the constant updates and communications regarding the currency derivative contracts between the financial committee, other committees, and the Board, the Company was unaware it was losing billions of dollars on these contracts, while simultaneously disclosing nothing about these massive losses to the public.

---

[17] In similar cases where defendants made admissions regarding their culpability and received similar detailed information about ongoing fraud, the scienter element has been easily satisfied. *See e.g In re Nokia Corp. Sec. Litig.,* 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006) ("Scienter can be sufficiently pled when a complaint alleges that defendants were updated on a regular basis about the facts upon which the falsity is alleged"); *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000) (scienter pled when defendants "failed to review or check information that they had a duty to monitor"); *In re Marvell Technologies Group Sec. Litig.*, 2008 WL 4544439 (N.D. Cal. Sept. 28, 2008) ("where a plaintiff is able to rely upon the defendant company's own public admission of 'I did it,' the plaintiff need not rely upon information from confidential sources"); *Hall,* 580 F. Supp. 2d at 224 ("[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter"); *Hubbard v. Bankatlantic Corp.,* 2009 WL 3261941 at *3 n.6 (S.D. May 12, 2009) (CFO who was responsible for determining, reviewing and monitoring loan loss reserves indicates he must have known about inadequate reserves).

*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."); *see also No. 84 Employer-Teamster Joint Counsel Pension Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (rejecting defendants' argument that $11 million of potential liability did not come to the attention of the board as "patently incredible" and "absurd" ).

Defendant also believes that the facts in the Complaint show that Aracruz "adequately monitored" its currency hedge positions. Def. Br. at 24. First, Defendant closes its eyes to the elephant in the room—the simple and undisputed fact that Aracruz lost $2.13 billion on its currency derivative contracts. ¶78. Defendant does not—nor cannot—explain exactly how its currency hedge positions could have been "adequately monitored" and still have resulted in such enormous losses to the Company. If, as Defendant claims here, Aracruz's currency hedge positions were "adequately monitored," then Defendant is essentially admitting that it *actually knew* that it was losing massive amounts of money, while simultaneously disclosing nothing to the public about its losses. Defendant cannot claim on one hand that its currency positions were "adequately monitored," while claiming on the other hand that it did not know the Company was hemorrhaging money due to those same positions. Second, Defendant's belief is irrelevant to Plaintiff's scienter allegations. At issue is not whether Aracruz adequately monitored its currency hedge positions. Rather, Plaintiff makes clear that this case arises from the extreme and wildly speculative nature of the hedging contracts themselves, the Company's knowledge of

these contracts, and its failure to disclose the extent and nature of the contracts to the public until after it was too late.[18]  ¶¶1-2.

### 2.     *Plaintiff's Sources Do Not Negate a Strong Inference of Scienter*

In a last-ditch attempt to avoid liability for its actions, Defendant argues that Plaintiff's sources demonstrate that Aracruz lacked an intent to defraud.  Def. Br. at 26-27.  Incredibly, the source for Defendant's proposition—that "Aracruz's losses were nobody's fault, in no manner predictable, and that the people involved conducted themselves properly"—is Defendant Zagury himself, who is the subject of a legal action in Brazil authorized by the Company's Brazilian shareholders.[19]

Aracruz is asking the Court to conclude that it did not act with scienter because one of the Individual Defendants believes that nobody was at fault for the Company's $2.13 billion loss. This is no different than if a court were to dismiss criminal fraud and conspiracy charges against a criminal defendant simply because one of the defendants said no one did it.  Additionally, Defendant's contention that Plaintiff's news articles show nothing more than poor judgment or mismanagement is wholly conclusory for the same reasons.  If the Court were to accept Defendant's argument, then any defendant could avoid liability under section 10(b) and Rule 10b-5 by simply saying that the company was mismanaged as a result of poor judgment.  It is unsurprising that this argument has been previously rejected.  *In re Sykes Enterprises, Inc. Sec. Litig.*, No. 00-cv-212, 2001 WL 964160, at *2 (M.D. Fla. Mar. 7, 2001) (rejecting defense that

---

[18] Defendant would have the Court believe that "a disclosure" the Company made on September 26, 2008 detracts from a strong inference of scienter.  Def. Br. at 24-25.  However, Defendant never actually identifies the disclosure itself or any statements in it.  Without any information regarding this supposed disclosure, the Court simply cannot conclude that its undisclosed contents negate a strong inference that Defendant acted with scienter.

[19] On November 25, 2008, the Company filed a Form 6-K with the SEC announcing that shareholders representing more than 96.5% of the Company's "voting capital" had voted to institute a legal action against Zagury in Brazil, holding him responsible for the losses incurred as a result of "engaging in derivative transactions above and beyond the limits provided for in the company's Financial Policy."  ¶80.

securities violations were understandable mistakes rather than part of a carefully orchestrated scheme to defraud).

**B.     Plaintiff's Facts are Sufficiently Particularized**

**1.     *Aracruz's Losses Directly Relate to Its False Statements and Omissions***

Defendant claims that the massive losses it incurred in September 2008 have "no relation" to statements it made before those losses actually occurred.  Def. Br. at 12.  The only support Defendants provide for this position is *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1348 (M.D. Fla. 2007) and the *Valor* article, which it claims "confirms this." Def. Br. at 12-13.  *Winn Dixie* offers no support to Defendant on this point, as the Court in that action dismissed the complaint because it determined that, with respect to the grocery store chain's unsuccessful strategy of centralizing its major functions, the plaintiff "has not pled facts supporting the argument that Defendants knew that centralization was a failure when the statements were made, Defendants had no duty to discuss the bumps along the road to centralization, or the fact that centralization posed new challenges in Winn-Dixie's respective divisions." *Id.*  In sharp contrast, Aracruz's "bumps" in the road were wildly speculative and unauthorized currency wagers that nearly bankrupted the company.

With respect to the *Valor* argument, Defendant claims that a supposed "knock-out" saves it from charges of securities fraud.  But Defendant's description of the so-called "knock-out" is murky at best, and misleading at worst, but either way glosses over the issue while claiming it totally absolves Aracruz of liability.  Def. Br. at 12.  A closer look reveals that it does not.  In an article entitled "Playing with Fire," issued by the International Monetary Fund in June 2009 specifically addressing the currency bets at issue here, it explains that "[p]otential gains on the transaction were capped or limited," and "in some cases it was a so-called 'knock-out' provision

that canceled the monthly payment if the foreign currency appreciated beyond a specified exchange rate."[20]  The exact effect of Aracruz's "knock-outs," if they even existed at all, is unknown, but it has no bearing on the claims in this action.

Defendant incredulously asks this Court to accept that bets that they "entered into subsequent to June 30, 2008 would have been the ones that led to Aracruz's [US$2 billion in] losses."  Def. Br. at 12.  To "prove" this, it cites to out-of-court statements made by Defendant Zaguray in the *Valor* article, where he boasted that he helped make the company US $50 million[21] between April and August of 2008, and also answered a question by explaining what a "knock-out" is.  Kurtz Decl., Ex. 5, at 3-4 (Docket No. 35-1).  Defendant then makes the leap that "many" of the derivative positions would have been knocked-out, but nowhere does Zagury say this.  All that he said is "for example . . . ," "when the accumulated gain reached [a certain price] the contract would automatically expire, or knock out."  *Id.* at 3.

Of course, even if he had said that every single contract had a "knock-out," it wouldn't matter.  Zagury himself, in the very same article, says that the contracts were "technically sophisticated," and "it was quite difficult to know which position was sold."  *Id.*  As a result, the only thing that appears to be "clear" with respect to the derivatives is that Aracruz and its management entered into complex speculative wagers at multiple times during the class period that led to billions in losses when their bets lost.  And as to the profits reported during 2008, of course risky bets can pay rewards, but "a reasonable investor familiar with the practice of currency hedging might well assume that [Aracruz's] substantial gains on its currency hedging

---

[20]  *See Playing with Fire*, Finance & Development, June 2009, Volume 46, Number 2 (Randall Dodd, Senior Financial Sector Expert IMF Monetary and Capital Markets Department) (http://www.imf.org/external/pubs/ft/fandd/2009/06/dodd.htm, retrieved on December 20, 2009).

[21]  Defendant attempts to lodge an attack by saying that "Plaintiff points out and does not contest that Aracruz reported profits from derivative transactions…."  Def. Br. at 12.  This argument is puzzling, as of course Plaintiff recognizes that Aracruz won some of its wagers before it took catastrophic losses on others.  The fact that Aracruz gambled and won, before it lost, does nothing to assist their position.

contracts meant that the Company had suffered equally substantial losses on its future sales contracts." *In re Sadia*, 643 F. Supp. 2d at 530.

Indeed, Aracruz's theory is ludicrous on its face. To suggest that Aracruz, in a matter of about two months, entered into legitimate currency hedges that caused it to lose more than US$2 billion almost immediately thereafter strains the very limits of credulity. Additionally, even if all of the actual bets that led to the US$2 billion loss had actually been placed after the last false statement, that would have no effect on whether or not those statements were actionable. In other words, nothing can change the fact that Aracruz and its executives had been engaging in improper currency betting throughout the class period, including during "the first quarter of 2008," and "between April and August" of 2008 according to Zagury himself. Dkt. # 35-1 at 33-34. It is the overall activity of placing improper currency bets, while repeatedly assuring investors these bets were mere hedges, which creates the liability.

## 2. *Aracruz's False Statements Were Directly Related to Its Scheme*

Aracruz also argues that the false and misleading statements it issued in Q1 and Q2 are not actionable "because it is clear that Aracruz's losses arose from derivative trading activity that took place after" these statements were made. Def. Br. at 13. Defendant also attempts to brush away the entire fraud by characterizing the fallout of its activities as simply "adverse results." *Id.* Losing nearly an entire year's revenue would rarely just materialize in a day at a massive public company, and even if it could, there's one thing that is certain – it cannot occur due to currency hedging. Indeed, this argument was specifically rejected by Judge Scheindlin, when she noted, that just like Aracruz, "Sadia repeatedly characterized its currency hedging activity as risk-reducing and non-speculative," which is "in line with the common use of currency hedging contracts." *In re Sadia*, 643 F.Supp.2d at 530. However, as it turns out, again just like Aracruz,

"while Sadia's public filings disclosed the total amount of all of the Company's currency hedging contracts, these disclosures were neither conspicuous nor in close proximity to the Company's description of the currency hedging contracts as risk-reducing and non-speculative."  This is precisely the situation here.  *See* Compl. ¶¶ 22, 24, 33, 37, 55, 58.

In addition, the only "evidence" that Aracruz cites to support the claim that its false statements (which it terms "disclosures") were not related to the revelation of the fraud is contained within *the false statement itself* when Defendant Zagury and Aracruz both said "we increased the level of our cash flow currency protection, to a $270 million short position in dollars." Def. Br. at 13-14.  There is a glaring flaw with Aracruz attempting to rely on this statement to absolve it of its unauthorized and fraudulent currency wagers.  As the complaint explains:

> Defendants' $270 million short position representing 5 months' worth of exposure equals approximately $54 million of cash flow exposure per month. Just five months after the April 7, 2008 Statements, the Company reported a loss of $2.13 billion as a result of its speculative currency contracts. This $2.13 billion figure, juxtaposed against Aracruz's previously disclosed hedge positions, is equivalent to *39 months'* worth of cash flow exposure and over one year's worth of net operating revenue. The extent of this gamble further underscores the speculative nature of Defendants' hedging activity, which effectively transformed Aracruz's entire business into a high-risk financial investment vehicle.

Compl. ¶ 39 (emphasis in original).  This illustrates the absurdity of Defendant's claim that it was not engaging in massive currency wagers long before the *real* reversed course and revealed that the supposed "currency protection" it was supposed to be purchasing was anything but protection.

Nor is Plaintiff required to detail the dollar and *real* specifics from Defendants' books (at the pleading stage) in order to show that Aracruz's $2 billion loss was related to its reckless currency wagers, as Defendants argue.  Def. Br. at 14.  As stated above, it is simply impossible

that currency hedging, which is nothing more than buying insurance, could ever lead to such a catastrophic loss unless Aracruz was entering into multiple positions which in reality were bets rather than hedges.  No one has ever lost the entire value of their home by the simple act of purchasing a valid homeowner's insurance policy to protect themselves from loss.  But if one gambled on the value of the house rather than buying the proper insurance, it is easy to see how huge losses could be suffered by any number of events.  A true currency hedge is no different in principle, and there is nothing speculative about it.  This is entirely belied by Zagury's own admission that "we were betting on the *real*."  Compl. ¶¶ 48, 53, 61.  If the point of hedging is to protect from currency loss by entering offsetting positions, there are absolutely no "bets" to be making.  Finally, as recognized in *Sadia*, the specific details of each currency wager are unnecessary as "the Company's interim gains and losses on its currency hedging contracts," "are essentially meaningless in isolation from the Company's gains and losses on its futures sales contracts." *In re Sadia,* 643 F.Supp.2d at 530.  "Because the stated purpose of Aracruz's currency hedging contracts was to offset potential losses on the Company's future sales contracts, a substantial gain on the Company's currency hedging contracts would not necessarily indicate a substantial profit." *Id* at 530.

### 3.   *Plaintiff's Facts Supporting a Strong Inference of Scienter are Sufficiently Particularized*

Defendant would further have the Court believe that Plaintiff's allegations of scienter are not sufficiently particularized.  Def. Br. at 25-26.  However, Defendant offers little more to support its argument than its own self-serving conclusory statement and a list of string citations

that do not at all address the substance of Plaintiff's Complaint and are easily distinguishable on the facts.[22]

It is settled that "[a] sufficient level of factual support for a [10b] claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when [*sic*] where, and how: the first paragraph of any newspaper story." *Garfield*, 466 F.3d at 1262. Plaintiff has specifically and clearly stated exactly that information in the Complaint:

- Who perpetrated the fraud: Defendant Aracruz and Individual Defendants Vieira, Aguiar, and Zagury (¶¶15-18, 67-82);

- What constituted the fraud: the Company's entry into extreme and wildly speculative currency hedging contracts, without disclosing such material information to the public, which eventually caused the Company to lose $2.13 billion (¶¶1-13, 22-32, 67-82, 87-105);

- When and Where the fraud was perpetrated: Aracruz's entry into extreme and wildly speculative currency hedging contracts was not disclosed to the public in the Company's April 7, 2008 Form 6-K (¶33); the Company's April 7, 2008 1st Quarter 2008 Earnings Report (¶¶34-35); the Company's July 7, 2008 Form 6-K (¶55); or the Company's July 7, 2008 2nd Quarter 2008 Earnings Report (¶¶56-58); and

- How the fraud was perpetrated: While having access to specific information revealing the nature and extent of the Company's currency hedges, Defendant made material misrepresentations and omissions, failing to disclose such material information to the public (¶¶36-54, 60-66, 106-108).

Defendant takes issue with the fact that Plaintiff does not identify "specifically, what data and other information" was presented to the Finance Committee and the Board. Def. Br. at 26. First, Defendant disregards each of the particularized allegations discussed above and in section V(A)(1) describing exactly what information provided to, and acted upon by, the Financial

---

[22] For example, Defendant cites *Fidel v. Rampell*, No. 02-61258-CIV, 2005 WL 5587454, at *4 (S.D. Fla. Mar. 29, 2005), for the apparent proposition that a defendant's attendance at company meetings where office needs and projected numbers were discussed did not amount to an inference of scienter. Def. Br. at 25. What Defendant does not tell the Court is that the issue in *Fidel* was whether defendants acted with scienter in violating GAAP by not writing down the company's goodwill in a timely fashion. *Id.* Such facts are completely inapposite to the present case.

24

Committee and the Board.  For example "the sell target forward operations which resulted in a loss of US $2.1 billion were backed by the green light of the financial committee and the board." ¶43.  The finance committee members also "began asking to have the results of the exchange operations, the data, the characteristics, on a daily basis."  ¶45.  Furthermore, "[t]he [finance] committee was informed [about the currency hedges] in writing.  Some (members of the committee) had doubts and we clarified them in writing."  ¶47.  Such information—including the writings given to the Finance Committee—will be subject to discovery once this action reaches that stage.

Second, Defendant's implication that Plaintiff must specify each item of data communicated to the Finance Committee and to the Board is absurd.  It clearly contradicts established law, and other courts agree that the PSLRA was not intended to subject private securities plaintiffs to such an onerous requirement.  *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 199 (1st Cir. 2005) ("[T]he PSLRA does not require the plaintiff to plead evidence."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation.").

In *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-cv-6190-CJS, 2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003), the Court rejected an argument that the plaintiff should have provided detailed factual particularity similar to the one Defendant advances here, explaining:

> Defendants also contend that the fraud and scienter allegations are not pleaded with sufficient particularity.  For example, as to the back-ordered IOLs [intraocular lenses], defendants contend that the Complaint does not indicate the size of the IOL back order, whether or not it was material, or whether the individual defendants knew about it.  And, with regard to the alleged adjustments to the surgical segment's projections, defendants contend that the complaint doesn't indicate who at company "headquarters" ordered the changes to be made, does not indicate the size of those adjustments, and does not indicate whether or

not they were material.  The Court disagrees, because, as discussed earlier, although plaintiffs are required to plead with particularity, they are not required to plead evidence.

*Id.* at *26; *see also In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1290 (S.D.N.Y. 1996) ("[A] complainant is not required to plead evidence.  Nor need a plaintiff plead facts that are within the exclusive provenance of the defendants.").

Defendant further argues that Plaintiff seeks to allege scienter through conclusory references  to the positions held by Aracruz executives.  Def. Br. at 26 at n.12.  Again, Defendant disregards each of the particularized allegations above and in section V(A)(1) that the currency hedging scheme was perpetrated with the full knowledge, support and approval of the Company's executives and directors.  ¶¶42-54, 60-66.

### 4.     *Plaintiff's Facts Regarding Aracruz's Financial and Internal Controls are Sufficiently Particularized*

Despite the undisputed fact that Aracruz lost billions of dollars in 2008 as a direct result of its currency "hedges," Defendant contends that Plaintiff has not adequately described how the Company's internal policies were violated and when the violations occurred.  Def. Br. at 15-16.  This argument, however, simply belies both the clear and unambiguous facts in the complaint, as well as simple logic.

Aracruz maintained a financial policy with specific prohibitions on the use of speculative hedging.[23]  ¶58.  Similarly, the Company's financial strategy stated that its purpose for entering into currency hedging contracts was "to protect against market risks" and "to minimize currency

---

[23] Defendant's argument that Plaintiff relies on a financial policy that was not in place at the time of Defendant's fraud is ultimately unavailing.  It is undisputed that the Company had a financial policy in place while they were speculating with investors' money, as it is referenced in the 2Q2008 earnings report.  ¶58.  Further, Plaintiff relies on the financial policy's stance on currency derivatives only to the extent specified in the Complaint.  *Id.*  For Defendant's argument that the policy may not have been "substantially identical" at the time of the fraud to hold true, there would essentially have to be a policy permitting Aracruz to enter into risk-laden speculative hedging.  Moreover, if such a policy were to exist, Plaintiff has little doubt that Defendant would have submitted it along with its motion to dismiss.

risk exposure.[24]  ¶59.  Aracruz violated its internal policies by entering into currency derivative contracts that were not hedges, but were instead outright speculation.  ¶¶37-40, 60-62.  Indeed, on September 26, 2008, Aracruz publicly admitted that it "may have exceeded the limits set forth in [the] Company's Financial Policy."  ¶67.  Aracruz's speculative and illicit hedging began in the first quarter of 2008.  ¶44.  Furthermore, the fact that Aracruz unwound 97% of its currency hedges, resulting in a loss of $2.13 billion (¶78), is itself evidence that the Company did not 'protect against . . . market risks" or "minimize currency risk exposure" as it had pledged to do in its financial strategy.  ¶59.

Defendant goes on to liken Plaintiff's allegations to the mismanagement claims which were dismissed in *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004).  Def. Br. at 17.  However, Aracruz's reliance on *Citigroup* is entirely inapposite.  In *Citigroup*, the plaintiff unsuccessfully tried to hold Citigroup liable for entering into a variety of lending and investment transactions with Enron Corp., Dynegy Inc. and WorldCom Inc., which were allegedly designed to mislead the public investors in these companies.  In dismissing the plaintiff's complaint, the Court specifically noted that the plaintiff "fails to allege [fraudulent] activity *in connection with the market for Citigroup's own securities*," and that the plaintiff's claims "thus fail to state a cause of action under section 10(b) upon which relief can be granted." *Citigroup*, 330 F. Supp. 2d at 377 (emphasis added).  This is in marked contrast to Plaintiff's allegations here that Aracruz itself engaged in fraudulent activity through its illicit currency hedging contracts, which had catastrophic consequences to the market for its *own* securities.  It is therefore unsurprising that Judge Scheindlin rejected this very same argument which was put

---

[24] Defendant does not challenge the timing of Aracruz's financial strategy as it does with the Company's financial policy. Def. Br. at 16-17.  Accordingly, even if the Court were to find that the facts do not show a violation of the financial policy (even though it should not), it nevertheless remains that Defendant's fraud violated the Company's publicly-disclosed financial strategy, and that Plaintiff has pled such violations with sufficient particularity.

forth by defendants in *In re Sadia, S.A. Sec. Litig.* Judge Scheindlin explained that "*In re Citigroup, Inc. Securities Litigation,* upon which Sadia relies, is distinguishable from the case at bar because Sadia's alleged failure to adhere to Company policy was intended to deceive *its own* shareholders, not investors in the securities of other companies." *Sadia*, 643 F. Supp. 2d. at 532 (emphasis original).

In addition, the Court in *Citigroup* also found that the plaintiff "fails to proffer facts supporting an inference that the transactions complained of were material in the context of Citigroup's overall business," and that "it is not a foregone conclusion that such knowledge would alter the 'total mix' of information available to the reasonable investor." *Id.* at 378. Contrary to the Court's findings in *Citigroup*, it is indisputable that a reasonable investor would consider material the information that Aracruz was engaging in high-risk, speculative hedging activity to supplement its operating profits, that such activity was in direct violation of its stated "non-speculative" and conservative hedging policy, and that the Company was placing massive amounts of money at stake by means of these currency contracts.

Defendant also suggests that Plaintiff has not sufficiently pled that Aracruz lacked adequate internal controls. Def. Br. at 17-18. However, Defendant Zagury has already publicly admitted that he knew of the Company's massive losses for three weeks before they were made public. ¶70. Moreover, on September 26, 2008, Aracruz publicly admitted that it "may have exceeded the limits set forth in [the] Company's Financial Policy." ¶67.

5.   ***Plaintiff's Facts Regarding Aracruz's Financial Condition are Sufficiently Particularized***

Defendant's belief that Plaintiff has not pled with particularity facts regarding Aracruz's financial condition (Def. Br. at 19-20) is based on a complete misunderstanding (or a purposeful misconstruction) of the Complaint. Plaintiff makes clear that the Company's statements

28

regarding its financial condition were lacking in any reasonable basis when made *as a result of* the fact that it had entered into wildly speculative currency hedges; Plaintiff does *not* allege that the Company's financial condition was precarious *in addition to* the fact that it had entered into speculative currency hedges. ¶¶36, 60.[25]  In other words, Defendant either knew or should have known that a rapid reversal in the  value of the dollar against the *real* would cause its currency wagers to trigger massive losses that could never be recouped.  Indeed, this is exactly what happened, causing Aracruz's losses on its currency speculation to represent nearly three times the Company's quarterly revenue.  ¶86.  Defendant's argument about the Company's "relative" financial condition is therefore nothing but a red herring designed to distract the Court.[26]

Defendant would further have the Court believe that the investors themselves somehow should have known of the risk attendant to the Company's currency hedges because of the previously reported gains from its derivative trading activity.  Def. Br. at 20.  In *Sadia*, the defendant advanced an identical argument, which Judge Scheindlin soundly rejected, explaining:

> [W]hile Sadia's public filings also disclosed the Company's interim gains and losses on its currency hedging contracts, these figures are essentially meaningless in isolation from the Company's gains and losses on its futures sales contracts. Because the stated purpose of Sadia's currency hedging contracts was to offset potential losses on the Company's future sales contracts, a substantial gain on the Company's currency hedging contracts would not necessarily indicate a substantial profit.

*Sadia*, 634 F. Supp. 2d at 530.  Judge Scheindlin went on to explain in that "a reasonable investor familiar with the practice of currency hedging might well assume that Sadia's substantial gains on its currency hedging contracts meant that the Company had suffered equally

---

[25] The date in paragraph 60 in the Complaint should properly read "July 7, 2008."

[26] Defendant also makes the curious argument that certain statements of Aracruz's past financial performance cannot form the basis for Plaintiff's securities fraud claims because Plaintiff does not allege that these statements are incorrect.  Def. Br. at 19-20.  This is yet another red herring designed to distract the Court.  Nowhere in the Complaint does Plaintiff even imply that the statements that Defendant identifies form the basis of Defendant's fraudulent actions.  Further, these statements of past financial performance are wholly irrelevant to the fact that Aracruz was engaging in wildly speculative currency hedging practices.

substantial losses on its future sales contracts." *Id.* at n.69.  In addition, if Aracruz claims that

the investors should have known the risks, then it is impossible to claim that Aracruz itself would

be unaware.  For these same reasons, the Court should reject Defendant's argument here

### C.    Aracruz's Boilerplate Disclosures Are Not Protected by the PSLRA Safe Harbor

The PSLRA's safe harbor provision protects against liability "based on forward-looking

statements if: (1) the statement is identified as a forward-looking statement and accompanied by

cautionary language, (2) the statement was immaterial, or (3) the plaintiffs fail to establish that

the person (or entity) making the statement had 'actual knowledge' of its falsity.  *In re Scientific-*

*Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 (N.D. Ga. 2002), *aff'd, Phillips v. Scientific-*

*Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004).  Aracruz's statements are not protected by the safe

harbor because Defendant had actual knowledge that the statements were false when made, and

the statements were not accompanied by meaningful cautionary language.  Notably, Defendant

does not dispute the materiality of the statements.

### 1.    *Aracruz's Statements Were False When Made*

The safe harbor provision does not apply "to forward-looking statements made with

actual knowledge . . . that the statement was false or misleading."  *Catalina*, 390 F. Supp. 2d at

1116 (alteration original).  As demonstrated in section V(A)(1), Defendant had actual knowledge

that its statements were false at the time they were made.  Such statements discussing the

purported purposes or uses of currency derivative contracts (¶¶33, 58, 59) and the ostensible

exposure and levels of cash flow currency protection (¶¶34, 35, 56) were false because the

Company had already entered into wildly speculative currency hedges that were not disclosed to

the public and which far exceeded the company's publicly-reported exposure.  "If Plaintiffs'

allegations are true, as the Court must presume at this stage, Defendants' statements were made

with 'actual knowledge' that they were false and misleading.  Thus, at this time, these statements fall outside the safe harbor of the PSLRA."  *Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1189 (S.D. Fla. 2005).

Furthermore, "the safe harbor of the PSLRA only applies to forward-looking statements and not material omissions or misstatements of historical or contemporaneous facts."  *Marrari*, 395 F. Supp. 2d at 1188 (*citing Miller v. Champion Enter., Inc.*, 346 F.3d 660, 677-78 (6th Cir. 2003)).  Defendant's statements regarding the purported exposure and levels of cash flow protection (¶¶34, 35, 56) constitute statements of historical fact, not forward-looking statements as defined in the PSLRA.  *See* 15 U.S.C. §78u-5(i)(1).  These statements straightforwardly describe cash flow currency positions taken in the past.  A plain reading shows that the amount of "future exposure" these positions purportedly represented constituted the purported future exposure *at the time the position was taken*—not, as Defendant maintains, the future exposure to be determined at some date in the future.  Moreover, while Defendant contends that statements of fact mixed with forward-looking statements are treated as forward-looking statements under the safe harbor, the Seventh Circuit has recently rejected this very argument, specifically concluding that "a mixed present/future statement is *not entitled to the safe harbor* with respect to the part of the statements that refers to the present."  *Tellabs II*, 513 F.3d at 705 (emphasis added).

## 2.    *Aracruz's Statements Are Not Accompanied by Meaningful Cautionary Language*

To qualify as meaningful cautionary language, a statement's warning must advise the public of "risks of a significance similar to that actually realized."  *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).  "Boilerplate warnings will not suffice as meaningful cautionary statements."  *Scientific-Atlanta*, 239 F. Supp. 2d at 1362.

Here, Aracruz offers nothing but boilerplate risk disclosures, including how the Company is subject to market risks and currency fluctuation. These disclosures are so generic and lacking in specificity that they could apply to any multinational company. They are "not explicit or specific as to the fraud alleged." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 851 (11th Cir. 2004). The purported cautionary language regarding the market risks and currency fluctuation far fall short of what is required. Despite Defendant's attempts to hide behind cautionary language, there are simply no disclosures warning that Aracruz's financial policy would be disregarded and violated. There is no language warning investors that the Company was taking such enormous positions in currency derivative contracts or that the losses were mounting and could be so massive that they would constitute nearly three times the Company's quarterly revenue. There is "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Ltd. Partnership Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[27]

In any event, warning about the risks associated with entering into currency hedging contracts that may occur in the future stands far afield from warning about the massive positions the Company had already taken in those contracts and the enormous losses that being suffered by the Company that Defendants knew were occurring. *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320–21 (N.D. Ga. 2001) ("The plaintiffs do not contend that the statements in the prospectus are false or misleading because of later events, but rather, that they are false or misleading because of events that had already occurred at the time of the SPO. A claim of this

---

[27] The *Prudential* court made this statement in the context of a discussion on the bespeaks caution doctrine. The Eleventh Circuit has used the bespeaks caution doctrine to inform its decisions on the PSLRA safe harbor. *La Grasta*, 358 F.3d at 850.

type is not barred by the safe harbor for 'forward-looking' statements or the 'bespeaks caution' doctrine.)

### D.     The Complaint Establishes Loss Causation

"[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *In re Paincare Holdings Sec. Litig.,* 541 F. Supp. 2d 1283, 1293-94 (M.D. Fla. 2008).  The liberal notice pleading standard applies to allegations of loss causation.  *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346 (2005) ("[T]he Federal Rules of Civil Procedure require only a 'short and plain" statement of the claim showing that the pleader is entitled to relief.'").

Loss causation is adequately pled in the Complaint, and the theory is simple.  Aracruz made misrepresentations and omissions concerning its derivative trading practices, assuring investors that the purpose of such trades was to hedge, not to gamble.  ¶¶33-35, 55-59.  Despite the fact that financial experts and analysts were stunned by the news, stating for example, "*we had no idea they [Aracruz] had these kinds of contracts,*"[28] and that the President of Brazil, Luiz Inácio Lula da Silva, stated unequivocally that Aracruz's loss "*was not because of the crisis, but because of speculation,*" Defendant incorrectly claims that Plaintiff does "not attribute the decline in Aracruz's ADR price to the market's understanding of the **scope** or **risk** arising from the Company's currency derivative contracts," and that "Plaintiff attributes the

---

[28] The reaction of the market and analysts covering Aracruz further demonstrates the already obvious link between the Company's undisclosed market speculation in derivatives and the resulting loss.  For example in an October 3, 2008 report issued by Guilherme Sand, Solidus Brokerage stated: "[n]obody thought it would be such a big loss.  It looks like, to lose that much, they probably were leveraged in their bets."  Similarly, Mark Mobius of Templeton Asset Management commented on the shocking loss stating: "management should be blamed for taking excessive risks for these currency and derivative gambles."

decline in stock price to the Company's announcements that it had lost money."   Def. Br. at 27. Based on this flawed analysis,  Defendant further argues there is no connection between the Company's loss and its improper currency wagers because "there is no plausible linkage, or proximate causation, between the alleged misstatement (i.e. about the exposure to exchange rate risk) and the loss in the value of Aracruz's ADRs, which went down when the company announced material financial losses…"[29]  Def. Br. at 27-28.  This contention is simply false and unsupported by the facts.

The false statements began on April 7, 2008 when the Company stated its "foreign currency risk and interest rate management strategy may use derivative instruments to **protect** against foreign exchange and interest rate volatility."  ¶33.  On September 26, 2008, when the Company revealed that its exposure to futures contracts "may have exceeded the limits set forth in [the] Company's Financial Policy approved by the Board of Directors," (¶67) it was essentially informing the market that the "scope and risk" it had taken had exceeded previous public statements and was not simply for "protection" of its forward revenue stream.  Over the next two days, the price of the Company's ADRs plummeted over 25% in value.  ¶68.  In the

---

[29] The cases relied on by Defendants, such as *In re Faro Techs. Sec. Litig.*, 2007 WL 430731, at *12 (M.D. Fla. Feb. 3, 2007) and *In re TECO Energy, Inc. Sec. Litig.*, 2006 WL 845161, at *5 (M.D. Fla. Mar. 30, 2006) do not advance their position.  In *Faro,* the Court found that there were insufficient allegations that the false statements regarding the Company's inventory levels were the cause of an inventory write-down resulting in a loss.  *Id.*  The Court concluded that the end of the class period adjustment could have stemmed from other issues, such as routine inventory shifts.  By contrast, the end of the class period disclosures here clearly are linked to Aracruz's financial losses resulting from its undisclosed overexposure to derivative instruments.  ¶¶ 111-112.  Similarly, in *TECO*, the Court found that the information contained in the purported "disclosures" at the end of the class period did not "identify, reveal or correct any prior misstatement, omission, or improper accounting practice by Defendants." *TECO*, 2006 WL 845161, at *5-6.  Unlike in *TECO*, the end of the class period disclosures in this action directly relate to the huge and undisclosed derivative position which put the Company in harm's way and caused a $2.13 billion loss.  Indeed, the court in *TECO* subsequently found, in an order six months later, that loss causation had been adequately pled and sustained numerous statements, noting that "plaintiffs need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was "substantial," i.e., a significant contributing cause**."** *In re Teco Energy, Inc. Securities Litig.*, No. 04-cv-1948, 2006 WL 2884960, at *8 (M.D. Fla. Oct. 6, 2006) (*citing Robbins v. Koger Props, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)).

absence of any statements to date regarding the Company's possible financial loss, there can be no other proximate cause of this 25% loss than the market's absorption of the true nature of the "scope and risk" of Aracruz's currency derivative contracts.  It was not until  October 3, 2008, when Aracruz announced that the "fair value" of the Company's currency-related derivative contracts was negative $1.02 billion.  ¶72.  This announcement caused the price of Aracruz's ADRs to drop another $8.22 over the next two trading days, closing at $15.18 on October 7, 2008.  ¶73.  These disclosures revealed that Aracruz was not simply a pulp company with "protective" currency hedging contracts as Defendants had represented, but a highly speculative currency derivative trading operation so heavily leveraged that it could erase nearly a full year of revenue from main business operations.  These admissions, on trading that was much heavier in volume than the daily average during the Class Period, resulted in a significant drop in the ADRs' price as artificial inflation was removed.[30]  Thus, the loss causation requirement is met.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Aracruz's motion to dismiss in its entirety.

---

[30] The average daily volume in the Class Period class period was 492,603 shares (ADRs only) per day.  On September 26, 2008 stock closed at $37.99, a drop of $8.39 per share, on volume of 2,095,374 shares. This volume *was 425% of average class period daily volume*.  On October 3, 2008 stock closed at $23.40, a drop of $7.84 per share, on volume of 2,512,562 shares. This volume was ***510% of average class period daily volume***.

Dated: December 22, 2009

By: */s/ Maya Saxena*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Christopher S. Jones
Lester R. Hooker
Brandon Grzandziel
2424 N. Federal Highway
Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3082

*Lead Counsel for Lead Plaintiff*
*City Pension Fund for Firefighters*
*and Police Officers in the City of*
*Miami Beach*

36

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December, 22 2009, I presented the foregoing to the Clerk

of the Court for filing and uploading to the CM/ECF system.

*/s/ Maya Saxena*
Maya Saxena
