## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CIV. A. NO. 08-23317-CIV-LENARD

| | |
|---|---|
| CITY PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS IN THE CITY OF MIAMI BEACH, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| ARACRUZ CELULOSE S.A., CARLOS ALBERTO VIEIRA, CARLOS AUGUSTO LIRA AGUIAR, and ISAC ROFFE ZAGURAY, | ) ) ) ) |
| | ) |
| Defendants. | ) |

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT ARACRUZ CELULOSE S.A.'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 2

   I. THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO
      EFFECT SERVICE OF PROCESS ................................................................................. 2

     A.  Plaintiff Concedes That Neither Puglisi Nor
         W&C Is Aracruz's Agent For Service Of Process ............................................... 2

     B.  Greenberg Is Not Aracruz's Agent For
         Service Of Process For ADR Holder Lawsuits .................................................. 2

   II. THE COMPLAINT FAILS TO STATE A  CLAIM UNDER SECTION 10(b) OR RULE
       10b-5 ........................................................................................................................ 4

     A.  Plaintiff Has Not Alleged With Particularity Any False Or Misleading Statements ...... 4

        1.  Plaintiff Has Failed To Allege With Particularity That
            The Losses Aracruz Sustained In September 2008
            Have Any Relation To Disclosures Made Months Earlier .......................................... 4

        2.  The Alleged Reasons For Falsity Do Not Withstand Scrutiny ................................. 7

            a.  Plaintiff Fails To Plead With Particularity Any
               False Or Misleading Statements Regarding
               The "Necessary" Size Of The Company's Derivative Exposure ........................... 7

            b.  Plaintiff Fails To Plead With Particularity Any
               False Or Misleading Statements Regarding Compliance
              With The Company's Financial And Internal Control Policies ............................. 7

            c.  Plaintiff Fails To Plead With Particularity Any
               False Or Misleading Statements Regarding The
              Company's Purported Lack Of Internal and Financial Controls ......................... 8

            d.  Plaintiff Fails To Plead With Particularity Any False Or Misleading Statements
              Regarding The Company's Financial Condition ................................................. 10

     B.  The Complaint's Conclusory Allegations Do Not
         Satisfy The Stringent Requirements For Pleading
         Scienter Under The PSLRA Or Rule 9(b) .................................................. 11

        1.  Scienter May Not Be Established By General References
            To Information Provided To The Finance Committee And The Board .................. 13

        2.  Zagury Is Either Reliable Or Unreliable But Not Both ........................................... 15

C.   The Complaint Fails To Plead Causation Sufficiently ................................................. 16

D.   The Disclosures Are Protected By The Safe Harbor For
     Forward-Looking Statements And The "Bespeaks Caution" Doctrine ....................... 17

     1.   The Challenged Disclosures Are Forward-Looking Statements .............................. 17

     2.   Aracruz's Disclosures Are Accompanied By Meaningful
          Cautionary Language And Protected By The Safe Harbor
          Provisions And The Bespeaks Caution Doctrine ....................................................... 19

E.   Plaintiff Fails To Plead Scheme Liability Under Rule 10b-5(a) And (c) ..................... 20

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

Arazie v. Mullane,
    2 F.3d 1456, 1464 (7th Cir. 1993) ......................................................14

Berson v. Applied Signal Technology, Inc.,
    527 F.3d 982 (9th Cir. 2008) ...........................................................15

CP St. Louis Casino, LLC v. Casino Queen, Inc.,
    2007 WL 3119828 (S.D. Ill. Oct. 23, 2007) .........................................12

Cutsforth v. Renschler,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002).............................................13

City of Sterling Heights Police & Fire Retirement Sys. v. Vodafone Group Public Limited Co.,
    --- F. Supp. 2d ---, 2009 WL 1456846 (S.D.N.Y. May 20, 2009) .............................19

Durgin v. Mon,
    Civ. A. No. 06-61844, 2009 WL 3055216 (S.D. Fla. Sept. 21, 2009) ......................17

Fenoglio v. Augat, Inc.,
    50 F. Supp. 2d 46 (D. Mass. 1999) .................................................12

Gallagher v. Abbott Labs.,
    269 F.3d 806 (7th Cir. 2001) .........................................................9

Goldberg v. Bear, Stearns & Co.,
    912 F.2d 1418 (11th Cir. 1990) ....................................................4

Hooters of Augusta, Inc. v. Am. Global Ins. Co.,
    157 Fed. Appx. 201(11th Cir. 2005)................................................4

Howard v. Galesi,
    1987 WL 18460(S.D.N.Y. Oct. 6, 1987) .............................................18

Hubbard v. BankAtlantic Bancorp, Inc.,
    625 F. Supp. 2d 1267(S.D. Fla. 2008) .............................................11

Isquith v. Caremark International, Inc.,
    136 F.3d 531(7th Cir. 1998) .........................................................12

In re Astea International Inc. Sec. Litig.,
    2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ........................................11

In re Bausch & Lomb, Inc. Sec. Litig.,
    2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003)....................................14

In re Blech Sec. Litig.,
    928 F. Supp. 1279 (S.D.N.Y. 1996)...........................................................................14

In re Bisys Sec. Litig.,
    397 F. Supp. 2d 430(S.D.N.Y. 2005)........................................................................15

In re Citigroup Securities Litigation,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)..........................................................................8

In re CNET Networks, Inc. Shareholder Derivative Litigation,
    483 F. Supp. 2d 947 (N.D. Cal. 2007)......................................................................16

In re Columbia Labs, Inc. Sec. Litig.,
    144 F. Supp. 2d 1362(S.D. Fla. 2001) ......................................................................19

In re Impac Mortgage Holdings, Inc. Securities Litigation,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...................................................................13

In re Initial Public Offering Sec. Litig.,
    399 F. Supp. 2d 261(S.D.N.Y. 2005).......................................................................17

In re MSC Industrial Direct Co.,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) .....................................................................18

In re Nokia OYJ (Nokia Corp.) Sec. Litig.,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)..................................................................14, 15

In re Prudential Sec. Ltd. Partnership Litig.,
    930 F. Supp. 68 (S.D.N.Y. 1996...............................................................................19

In re Sadia S.A. Sec. Litig.,
    2009 WL 2356181 (S.D.N.Y. July 29, 2009) ........................................8, 9, 10, 11, 12

In re Scholastic Corp. Sec. Litig.,
    252 F.3d 63 (2d Cir. 2001)...................................................................................14, 15

In re Silicon Storage Technology, Inc. Shareholder Derivative Litig.,
    2009 WL 1974535 (N.D. Cal. July 7, 2009)............................................................16

In re Smith Gardner, Sec. Litig.,
    214 F. Supp. 2d 1291 (S.D. Fla. 2002) ....................................................................15

In re Stone & Webster, Inc. Sec. Litig.,
    414 F.3d 187 (1st Cir. 2005)....................................................................................14

In re Sykes Enterprises, Inc. Sec. Litig.,
    2001 WL 964160 (M.D. Fla. Mar. 7, 2001) ............................................................13

In re Technical Chemicals Securities Litigation,
    No. 98-7334, 2000 WL 1222025 (S.D. Fla. 2000) ...............................................6, 19

In re Tellium, Inc. Sec. Litig.,
    2005 WL 2090254 (S.D.N.Y. Aug. 26, 2005) ...........................................................................17

In re The Loewen Group Inc. Securities Litigation,
    No. Civ.A. 98-6740, 2003 WL 22436233 (E.D. Pa. July 16, 2003) ...........................................18

In re Towne Servs. Sec. Litig.,
    184 F. Supp. 2d 1308 (N.D. Ga. 2001) ....................................................................................19

In re Winn-Dixie Stores, Inc. Securities Litigation,
    531 F. Supp. 2d 1334 (M.D. Fla. 2007) .................................................................................7, 13

Inst'l Investors Group v. Avaya, Inc.,
    564 F.3d 242 (3d Cir. 2009) ...................................................................................................15

LaGrasta v. First Union Sec., Inc.,
    358 F.3d 840 (11th Cir. 2004) ...............................................................................................19

Merzin v. Provident Financial Group Inc.,
    311 F. Supp. 2d 674 (S.D. Ohio 2004) ...................................................................................16

Mizzaro v. Home Depot, Inc.,
    544 F.3d 1230 (11th Cir. 2008) .............................................................................................15

N.A.A.C.P., Jacksonville Branch v. Duval County Sch.,
    273 F.3d 960 (11th Cir. 2001) .................................................................................................4

Paladino v. Avnet Computer Techs.,
    134 F.3d 1054 (11th Cir. 1998) ...............................................................................................4

South Ferry LP v. Killinger,
    542 F.3d 776 (9th Cir. 2008) .................................................................................................15

Stark Trading & Shepherd Investments International, Ltd. v. Falconbridge Ltd.,
    2008 WL 153542 (E.D. Wis. Jan 14, 2008) ...........................................................................15

Tellabs, Inc. v. Makor Issues & Rights, LTD.,
    551 U.S. 308 (2007) ..............................................................................................................11

Tucker v. Interarms,
    186 F.R.D. 450 (N.D. Ohio 1999) ...........................................................................................4

Aracruz[1] submits this reply memorandum of law in further support of its motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

Section 10(b) of the Exchange Act makes actionable material misstatements and omissions made severely recklessly or with intent to defraud.  Plaintiff, however, does not particularize any material misstatements or omissions, instead it complains of a "high-risk currency wagering scheme," "improper currency betting," and "speculative and illicit hedging." (Pl. Br. 12, 21, 27).  Currency trading is legal and Plaintiff's effort to equate alleged improper trading with actionable misrepresentations fails to establish a claim.  Whether Aracruz exercised sound management in its execution and monitoring of derivative trading is a red herring.  The question is whether Aracruz's Q1 and Q2 Disclosures contained material misrepresentations and omissions made with scienter.  The most plausible explanation is that Aracruz's statements were true when made and, even if incorrect, were not the result of an intent to defraud as demonstrated by Plaintiff's failure to identify any motive for fraud.  Rather, it is apparent that (i) Aracruz's losses were the result of derivative trades entered into subsequent to the disclosures at issue; (ii) Aracruz's statements were not false, and even if incorrect; (iii) were not intentionally or severely recklessly false when made; (iv) Plaintiff's alleged losses have no relationship to the alleged corrective disclosure and (v) Aracruz adequately warned investors of potential risks in derivative trading by disclosing, inter alia, that it was "exposed to various market risks, particularly the variation of the U.S. dollar against the *real*" and that "by using derivative instruments the Company exposes itself to . . . market risk."

The Court, however, need not reach these issues now, as Plaintiff never effected service of process on Aracruz properly through the appropriate Brazilian channels, as required by law and the dictates of international comity.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in Aracruz's Memorandum of Law in Support of its Motion to Dismiss ("Opening Brief" or "Op. Br."), dated November 13, 2009 or in Plaintiff's Memorandum of Law In Opposition to Defendant Aracruz Celulose S.A.'s Motion to Dismiss ("Pl. Br." or "Opposition").   The accompanying Kurtz Reply Declaration is referred to as "Kurtz Rep. Decl."

**ARGUMENT**

**I.**

**THE COMPLAINT SHOULD BE DISMISSED BECAUSE
PLAINTIFF FAILED TO EFFECT SERVICE OF PROCESS**

**A.     Plaintiff Concedes That Neither Puglisi Nor
W&C Is Aracruz's Agent For Service Of Process**

In its Opening Brief, Aracruz demonstrated that neither Puglisi nor W&C was Aracruz's agent for service of process.  Plaintiff does not dispute this and concedes that service on Puglisi and W&C was ineffective.  (Pl. Br. at 10, n. 9)

**B.     Greenberg Is Not Aracruz's Agent For Service
Of Process For ADR Holder Lawsuits**

Plaintiff's primary argument for why Greenberg is Aracruz's agent for service of process is that in public disclosures that significantly predate this Action, Aracruz disclosed that CT Corporation ("CT"), "a widely known and common agent for service in the United States" acted as its "agent for service of process in the United States."  (Pl. Br. at 9)  This argument is a non sequitur.  CT's authority in the past has no bearing on Greenberg's authority to accept service of process for this lawsuit.  Plaintiff cites no legal authority to support its bizarre argument.

Indeed, the scope of CT's grant of authority to accept service shows that its grant was <u>not</u> limited to the same extent as Greenberg's.  The deposit agreement effective at the time of CT's agency, unlike Greenberg's grant of authority, does not limit the authority to particular actions. (<u>See</u> Kurtz Rep. Decl. Ex. 1 ("CT Corporation provides the agent for service of process in New York for the above named company under the following Form F-6 Registration Statement under the Securities Act of 1933 for American Depository Receipts filed on behalf of Aracruz Celulose S.A., as the Issuer, and Morgan Guaranty Trust of New York, as Depository."); <u>see also</u> Exs. 2 and 3).  By contrast, here, as demonstrated in the Opening Brief, Greenberg's authority to accept service is limited to the following two circumstances: (1) for New York actions brought by Citi for disputes arising out of the Deposit Agreement, and (2) for lawsuits brought by an ADR holder in which Citi and Aracruz have an indemnification or other claim against each other for purposes of pursuing those claims.  (Op. Br. at 7)

Plaintiff makes three additional arguments that service on Greenberg was sufficient, all of which fail.  First, Plaintiff claims that Aracruz's disclosure in its 20-F that "it may not be possible for investors to effect service of process within the U.S. . . . based upon the civil liability provisions of the federal securities laws of the U.S." is insufficient to "cancel out" its disclosure in the 20-F that "[o]ur agent for service of process in the United States is Greenberg Traurig, LLP."  (Kurtz Decl. Ex. 2, at 12, 16).  The statements, while apparently contradictory are, as shown by Plaintiff itself, reconciled by Aracruz's clarification in its subsequent 20-F that Greenberg's agency is limited "with respect to the deposit agreement."  (Pl. Br. at 10)  More fundamentally, Greenberg's agency is not created by the 20-F disclosure at all, but rather by the Deposit Agreement, which as demonstrated does not cover this claim.  (Op. Br.  7-8)

Second, Plaintiff raises the makeweight argument that the Deposit Agreement that establishes the limited scope of Greenberg's agency is not valid because the version submitted with the Opening Brief was not executed.  The fact that the pages of the Deposit Agreement attached to the Opening Brief came from an unsigned form version is of no consequence because one, the Form F-6, which was signed by both Citi and Aracruz, clearly indicated that only a form of the Deposit Agreement was attached (See Kurtz Rep. Decl. Ex. 4) and two, the Deposit Agreement, with precisely the same terms, was signed.  (See Kurtz Rep. Decl. Ex. 5)

Third, Plaintiff claims that it is entitled to rely on the Deposit Agreement's general statement that the Company waives service of process defenses "with respect to any matter arising out of, or in connection with, the Deposit Agreement, any ADR or the Deposited Securities."  (Pl. Br. at 12).  Such assertion fails for three reasons.  One, the Deposit Agreement specifically states that there are no third-party beneficiaries to the Deposit Agreement.  (See Kurtz Reply. Ex. 5, § 7.2 "No Third-Party Beneficiaries").  Accordingly, Plaintiff, a non-party to the Deposit Agreement (Pl. Br. at 11, n. 10), cannot claim the benefit of any such alleged waiver, which clearly is directed only to the contract counterparty, Citi.  Two, the Deposit Agreement clearly states that any waiver of service of process involves "any matter arising out of, or in connection with . . . any ADR or the Deposited Securities."  (See Kurtz Rep. Decl. Ex. 5)  This matter does not arise out of or in connection with any ADR, but rather arises out of alleged misstatements in

Aracruz's public SEC filings that may have affected the <u>value</u> of an ADR (but not the ADR itself). <u>Three</u>, Plaintiff's reading of the Deposit Agreement would contradict and render meaningless the specific and more limited grant of authority to Greenberg in the same section 7.6, violating the rules of contract construction that every provision should be read so as give meaning to every other provision and that more specific language should be given precedence over more general language.  <u>See</u> <u>N.A.A.C.P., Jacksonville Branch</u> v. <u>Duval County Sch.</u>, 273 F.3d 960, 979 (11th Cir. 2001) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); <u>Paladino</u> v. <u>Avnet Computer Techs.</u>, 134 F.3d 1054, 1058 (11th Cir. 1998) (same); <u>Hooters of Augusta, Inc.</u> v. <u>Am. Global Ins. Co.</u>, 157 Fed. Appx. 201, 211 (11th Cir. 2005) ("in cases of apparent conflict, specific terms in a contract should be interpreted to control general terms"); <u>Goldberg</u> v. <u>Bear, Stearns & Co.</u>, 912 F.2d 1418, 1421 (11th Cir. 1990) ("Where general propositions in a contract are qualified by the specific provisions, the rule of construction is that the specific provisions in the agreement control").[2]

## II.

## THE COMPLAINT FAILS TO STATE A
## CLAIM UNDER SECTION 10(b) OR RULE 10b-5

**A.    Plaintiff Has Not Alleged With Particularity**
**      Any False Or Misleading Statements**

**1.    Plaintiff Has Failed To Allege With Particularity**
**      That The Losses Aracruz Sustained In September 2008**
**      Have Any Relation To Disclosures Made Months Earlier**

In its Opening Brief, Aracruz showed that the Complaint (along with the documents incorporated by reference) does not plausibly allege that the Q1 or Q2 Disclosures contained any false statement.  Rather, the most plausible scenario is that the derivative contracts Aracruz

---

[2] Plaintiff's unsubstantiated accusation that Aracruz (and the Individual Defendants) are "purposefully" avoiding alleged liability in the United States is frivolous.  There can be no serious dispute that Aracruz is a company incorporated under the law of Brazil and operates in Brazil.  Aracruz is entitled to have Plaintiff comply with the relevant law.  Indeed, the important interests of international comity dictate that Plaintiff effect service of process on Aracruz through proper channels in Brazil.  <u>See</u> <u>Tucker</u> v. <u>Interarms</u>, 186 F.R.D. 450, 452-453 (N.D. Ohio 1999) ("[P]rinciples of comity encourage this Court to insist that [plaintiff] follow Brazilian law and obtain letters rogatory to ensure service of process upon [defendant].")  Plaintiff may not merely shortcut the dictates of the law because it is more convenient to do so.

entered into as of the Q1 and Q2 Disclosures were terminated pursuant to their terms and Aracruz's losses were incurred based on transactions entered into after the disclosures.  (Op. Br. at 12-14)  Plaintiff's response is unconvincing.

First, relying upon an unpled article, Plaintiff argues that "[t]he exact effect of Aracruz's 'knock-outs,' if they even existed at all, is unknown, but it has no bearing on the claims in this action."  (Pl. Br. at 20)  To the contrary, as the documents Plaintiff relies upon show,[3] "under normal conditions, the structures would knock-out and the contract expire" and "[t]he first 15 contracts were successful: with them, the company earned US$50 million, at a time when the exchange rate was relatively stable, between April and August of this year."  (Kurtz Decl. Ex. 5 at 3) (emphasis added).  Indeed, the article Plaintiff now cites shows this to be the case, noting that "[i]n some cases [the target forward contract has] a so-called knockout provision that canceled the monthly payment . . . while in other cases the contract would terminate if the accrual of gains reached a target amount."  (Pl. Br. 20, Kurtz Rep. Decl. Ex. 6, Dodd, Randall, Playing With Fire, Finance & Development, June 2009, Volume 46, Number 2).  Thus, Plaintiff's own pled documents show that contracts entered "between April and August" were successful (as would be expected based on the exchange rates) and, under the structure of the agreements, terminated – demonstrating that the contracts that caused losses would have been ones that were entered into after the Q2 Disclosures.

Second, Plaintiff's assertion that it is "ludicrous" (Pl. Br. 21) to suggest that derivative contracts entered into in July, August and September could have resulted in the losses Aracruz announced on September 26, 2009 highlights that Plaintiff does not understand its own allegations or the very derivative it criticizes Aracruz for not understanding.  As the article Plaintiff relies upon in its Opposition explains, the target forwards provided for "monthly payments for a period of one or sometimes two years," and "potential losses were not limited, and indeed the derivatives were structured in such a way that the losses would occur at a rate that was usually twice as fast as the decline in the underlying exchange rate."  (Kurtz Rep. Decl. Ex.

---

[3] Plaintiff does not contest the well-established rule that the Court may rely upon documents discussed or incorporated in the Complaint by reference.  See Op. Br. at 3 n.1.

6)  As the Complaint alleges, the Company elected to "unwind" its derivative positions rather than face continued monthly exposure.[4]  (Compl. ¶ 78)  Contrary to Plaintiff's assertion (which is inconsistent with its own allegations) that Aracruz lost $2 billion "almost immediately," the Complaint actually demonstrates that the Company decided to close its positions so as to avoid further risk and potential repeated, continued losses for up to two years.[5]

Third, the Opposition highlights the fundamental flaw of Plaintiff's claim.  Plaintiff argues that "even if all of the actual bets that led to the US$2 billion loss had actually been placed after the last false statement, that would have no effect on whether or not those statements were actionable….  It is the overall activity of placing improper currency bets, while repeatedly assuring investors these bets were mere hedges, which creates the liability."  (Pl. Br. 21) However, trading in derivatives (even risky speculation in unsuitable derivatives), is not illegal or a cognizable basis for a securities fraud claim and Plaintiff cites no authority otherwise.[6] Moreover, a securities fraud claim must be based on material misstatements made with scienter at the time they were made.  See In re Technical Chemicals Securities Litigation, No. 98-7334, 2000 WL 1222025, at *7 (S.D. Fla. 2000) ("To explain why a statement is fraudulent, '[t]he complaint must set forth an explanation as to why the disputed statement was untrue or misleading when made."); (Op. Br. 12).

Plaintiff's assertion that Aracruz's use of indefinite words such as "to protect" rendered otherwise accurate disclosures false and intentionally misleading, simply does not make it so.

---

[4] As a review of a US dollar vs. Brazilian *real* chart demonstrates, by the time Aracruz announced it had unwound its transactions in November 2008, the *real* had continued its plummet against the dollar from where it had been in late August and early September, and had maintained such devaluation through March of 2009.  (Kurtz Reply Decl. Ex.7)

[5] Moreover, the recurring nature of the potential gains or losses on the target forwards along with the knock-out or termination provisions demonstrates the difficulty in calculating potential exposure, further showing that the allegations in the Complaint suggest that mismanagement, rather than securities fraud, is the most plausible explanation of Aracruz's derivative trading operations.  (See Kurtz Decl. Ex. 5 at 2, noting that calculation of derivative exposure "is a question of interpretation")

[6] Plaintiff, for example, points out that Aracruz disclosed its results from derivative trading but asserts that "the fact that Aracruz gambled and won, before it lost, does nothing to assist their [sic] position."  (Pl. Br. at 20 n. 21)  To the contrary, the fact that Aracruz allegedly gambled and disclosed, demonstrates that there was no intentional or reckless failure to disclose its derivative trading.

(Op. Br. at 15)  Rather, Plaintiff does not and cannot particularize any intentionally or severely recklessly misleading statement in the Q1 or Q2 Disclosures.[7]

**2.      The Alleged Reasons For Falsity Do Not Withstand Scrutiny**

**a.      Plaintiff Fails To Plead With Particularity Any False Or Misleading Statements Regarding The "Necessary" Size Of The Company's Derivative Exposure**

Plaintiff does not respond to Aracruz's arguments and apparently concedes that it cannot show falsity of Aracruz's statements on the ground that the Company's exposure was "far larger than necessary."  (Op. Br. 14-15)

**b.      Plaintiff Fails To Plead With Particularity Any False Or Misleading Statements Regarding Compliance With The Company's Financial And Internal Control Policies**

Plaintiff fails to point to particular facts showing that Aracruz made misrepresentations concerning its compliance with its financial and internal control policies at the time it made the Q1 and Q2 Disclosures.  Instead, Plaintiff argues that because "Aracruz lost billions of dollars in 2008 as a direct result of its currency 'hedges,'" it has sufficiently alleged particularized facts demonstrating that the Company made false or misleading statements in connection with its financial and internal control policies.  (Pl. Br. 26)  Plaintiff misconstrues Defendant's position and ignores the law.

First, contrary to Plaintiff's assertions, the mere fact of an announced loss on September 26, 2008 is insufficient to show that, as of the end of the previous March and June, Aracruz knowingly violated its policies.[8]  Rather, Plaintiff is required to particularize how those policies were violated and how such violations rendered Aracruz's disclosures misleading.  (Op. Br. 15-16)

---

[7] Plaintiff's attempt to distinguish In re Winn-Dixie misses the point.  Winn-Dixie demonstrates that statements, like those at issue here, are not actionable unless false or misleading when made.  (Op. Br. 12-14)

[8] Moreover, Plaintiff's reliance on a financial policy that was not in effect, without alleging that the policy was substantially the same at the time of the (non-particularized) allegations of violation of the policy clearly does not carry Plaintiff's burden to plead particularized facts showing a misstatement or violation of an existing policy. Plaintiff's assertion that it was the responsibility of Aracruz to "submit [the correct policy] along with the motion to dismiss" turns Plaintiff's pleading burden on its head and would improperly require that a defendant risk having its motion to dismiss converted to a summary judgment motion when the Complaint itself, on its face, is demonstrably insufficient, as it is here.  (Pl. Br. 26, n. 23)

Second, as demonstrated in Aracruz's Opening Brief, violation of a company's financial policy is insufficient to establish a claim under the federal securities laws.  (Id. at 17)  Although Aracruz cites In re Citigroup Securities Litigation, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) for the proposition that violation of an internal corporate policy represents no more than mismanagement, along with multiple other cases showing that mismanagement alone is not a cognizable basis for a securities fraud claim (id. at 17-18), Plaintiff devotes two paragraphs to factually distinguishing Citigroup.  (Pl. Br. 27-8)  Plaintiff misses the point.  Mismanagement, whether as a result of a failure to comply with internal policies or any other reason, absent misleading statements made with scienter, is not a sufficient basis upon which to premise a securities law claim.  (Op. Br. 17)

Plaintiff does not refute this or otherwise point to particularized allegations showing that Aracruz's financial and internal control policies were knowingly violated by or before the Q1 and Q2 Disclosures were issued.[9]  Rather, the allegations in the Complaint suggest, at most, that at some point before September 2008, the Company's policies may have been violated.  (Compl. ¶ 67 (quoting the September 26, 2008 disclosure: "the total exposure of futures contracts based on U.S. Dollars may have exceeded the limits set forth in the Company's Financial Policy approved by the Board of Directors.")) (emphasis added)  Such allegations in no way indicate anything about the veracity of the Q1 and Q2 Disclosures.

c.   **Plaintiff Fails To Plead With Particularity Any False Or Misleading Statements Regarding The Company's Purported Lack Of Internal and Financial Controls**

Plaintiff asserts in a three sentence paragraph that it has sufficiently pled a securities law violation in connection with a purported lack of internal and financial controls at Aracruz because it alleges that the Company has "publicly admitted" that derivatives trading may have exceeded the limits set by Aracruz and Plaintiff alleged that Zagury knew of the Company's losses three weeks before they were disclosed.  (Pl. Br. 28)

---

[9] The court's decision in Sadia on this point is irrelevant.  In Sadia, the company had specifically stated in public statements issued prior to the announced losses (unlike the policy that Plaintiff cites here in paragraph 58 of the Complaint, which was adopted in 2009), that the policies prohibited "speculative trading" and using swap contracts for "speculative purposes" (In re Sadia, 2009 WL 2356181, at *5) and the court in Sadia specifically found that the company mischaracterized "its currency hedging activity as risk-reducing and non-speculative."  Id. at *6.  No such contemporaneous statements are alleged here.  (Op. Br. 18-19 n.7)

<u>First</u>, Plaintiff does not, and indeed cannot, take issue with the authority set forth in the Opening Brief showing that an alleged lack of internal controls is insufficient to support a federal securities law claim.  (Op. Br. 17-18)

<u>Second</u>, Plaintiff's reliance on a purported lack of internal controls is contrary to its repeated assertions that Aracruz management was kept apprised of its foreign currency derivative position throughout 2008.  Notably, <u>In re Sadia S.A. Sec. Litig</u>, upon which Plaintiff relies extensively throughout its Opposition, found such contradictory assertions to be incompatible, and rejected a supposed lack of internal controls as a basis for alleging a claim for securities fraud.  2009 WL 2356181, at *9 (S.D.N.Y. July 29, 2009).

<u>Third</u>, Plaintiff again fails to particularize how Aracruz's late September statement that its policies may have been violated shows that it intentionally or severely recklessly misled investors in early April and July concerning the adequacy of its internal controls.

<u>Fourth</u>, Zagury's alleged knowledge of Aracruz's condition for three weeks before September 26 does nothing to bolster Plaintiff's claims.  To start, Plaintiff asserts no affirmative obligation on the part of Aracruz to inform investors immediately of potential losses, and none exists.  <u>See</u>, <u>e.g.</u>, <u>Gallagher</u> v. <u>Abbott Labs.</u>, 269 F.3d 806, 808 (7th Cir. 2001) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession.  Yet that is not the way the securities laws work.  We do not have a system of continuous disclosure.").  Additionally, Plaintiff's own allegations, as well as a review of the exchange rates, show that the value of Aracruz's derivative positions had worsened rapidly over the three week period leading to the September 26, 2008 announcement.  (Kurtz Rep. Decl. Ex. 7)  Indeed, Plaintiff quotes Zagury as saying: "I began to see that the situation had worsened very rapidly and there was no more time to do anything that would reduce the losses for Aracruz. It was very quick and they were very unpleasant days for me."  (Compl. ¶ 70)  Moreover, such allegation further demonstrates the temporal defect of Plaintiff's claim.  If, as Plaintiff alleges, Aracruz first knew of the issues three weeks before the September 26 announcement, it did not intentionally mislead anyone in the Q1 and Q2 Disclosures.

### d.    Plaintiff Fails To Plead With Particularity Any False Or Misleading Statements Regarding The Company's Financial Condition

Plaintiff asserts that it has sufficiently alleged a federal securities law violation in connection with supposed misstatements regarding the Company's financial condition because such statements "were lacking in any reasonable basis when made *as a result* of the fact that it had entered into wildly speculative currency hedges." (Pl. Br. 29) Plaintiff's argument is flawed in two respects.

First, this argument is identical to that raised by the plaintiff in <u>Sadia</u>, which the court rejected. (<u>Sadia</u>, 2009 WL 2356181, at *9; <u>see also</u> Op. Br. 19). Indeed, whether "Defendant either knew or should have known that a rapid reversal in the value of the dollar against the *real* would cause its currency wagers to trigger massive losses that could never be recouped" misses the point. (Pl. Br. 29) Aracruz's financial reporting represents a snapshot of its financial disclosures at the time it was made. The relevant inquiry is the health of the Company at the time the Disclosures were made.[10] (Op. Br. 19) As in <u>Sadia</u>, the negative impact of the derivative contracts on the Company's financial condition was not borne out until the Fall of 2008 – months after the Disclosures. Thus, subsequent losses have no bearing on statements made months earlier.

Second, Aracruz accurately disclosed its financial condition by warning in cautionary language provided to investors that it faced substantial risk as a result of changes in exchange rates and its currency derivative positions. Specifically, Aracruz stated that it was "exposed to various market risks, particularly the variation of the U.S. dollar against the *real*" and specifically identified its derivative trading as a source of market risk. (Op. Br. 32) Thus, Aracruz explained its current financial condition and identified with specificity the very risks to its financial condition that (unfortunately) came to pass.

---

[10] Oddly, even though Plaintiff bolded and italicized Aracruz's disclosures of its financial condition in the Complaint under a section called "False and Misleading Statements" (Compl. ¶¶35, 56, 57), Plaintiff now claims that it does not even "imply that the statements . . . form the basis of Defendant's fraudulent actions." (Pl. Br. 29, n. 26) Rather, Plaintiff identifies the fraud as Aracruz's entry into "speculative currency hedging practices." (<u>id.</u>) Such practices, however, are not fraudulent.

**B.    The Complaint's Conclusory Allegations Do Not
Satisfy The Stringent Requirements[11] For Pleading
Scienter Under The PSLRA Or Rule 9(b)**

Plaintiff does not even try to press its claim that it adequately alleged scienter as a result of financial motives on behalf of the Individual Defendants.  (See Op. Br. 22-23)  Rather, Plaintiff's primary argument for why it purports to have satisfied the PSLRA's stringent pleading requirements is that Judge Scheindlin sustained claims in the Sadia case, where "Sadia engaged in the same scheme as Aracruz did," and that Sadia "failed to suggest an opposing inference that is more plausible . . ." (Pl. Br. at 15, 16)  Notably, here, Aracruz suggests two more plausible inferences (that were not raised in Sadia) than that Aracruz committed fraud.  First, based on the alleged structure of the target forward derivatives at issue (i.e., a recurring monthly contract with an early termination or knock-out provision if certain profit targets are obtained) coupled with the steady and appreciating value of the *real* against the dollar for the period up to September 2008, Aracruz's losses were incurred as a result of transactions entered into after the Q1 and Q2 Disclosures.  It simply is not plausible that Aracruz's disclosures were false or contributed to the alleged loss.  Second, the much more plausible explanation than fraud for Aracruz's derivative trading activities, as demonstrated by Plaintiff's own allegations and the documents it cites, as well as the existence of the Sadia case and apparently thousands of other companies that suffered losses based on the same facts, is that Aracruz mismanaged or used poor judgment with respect to its derivative trading.

Plaintiff concedes that the Company's foreign currency derivative positions were "complex" and rely on Zagury's description of such investments as "technically sophisticated

---

[11] Plaintiff's assertion that its pleading requirements for alleging scienter under the federal securities laws may be satisfied by reliance on "vague or ambiguous allegations" is simply wrong. (Pl. Br. 8)  The Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, LTD., 551 U.S. 308 (2007), upon which Plaintiff relies, does not state that "vague or ambiguous allegations must be considered" as part of the scienter inquiry.  (Pl. Br. 8)  The phrase "vague or ambiguous" is only used to reference an argument made by one of the parties.  Id. at 325.  The Court's conclusion is actually that "omissions and ambiguities count against inferring scienter, for plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  Id. at 326; see also Hubbard v. BankAtlantic Bancorp, Inc., 625 F. Supp. 2d 1267, 1286 (S.D. Fla. 2008) ("[V]ague and conclusory assertion that it was 'common knowledge' that the Company had risky loans on its books is not the type of particularized allegations required under the PSLRA.");  In re Astea International Inc. Sec. Litig., 2007 WL 2306586, at *9 (E.D. Pa. Aug. 9, 2007) ("Significantly, if plaintiffs fail to allege facts supporting their claims of fraud with the requisite particularity, they may not benefit from inferences flowing from vague or unspecific allegations").

and… quite difficult to know which position was sold." (Pl. Br. 20)  Given the complexity, and because calculation of exposure "is a question of interpretation," Aracruz's potential confusion is not surprising.  See, e.g., CP St. Louis Casino, LLC v. Casino Queen, Inc., 2007 WL 3119828, at *5 (S.D. Ill. Oct. 23, 2007) (rejecting scienter argument, in part, where the agreement at issue was described as "complex"); Fenoglio v. Augat, Inc., 50 F. Supp. 2d 46, 59-60 (D. Mass. 1999) ("There is not a scintilla of scienter.  Plaintiff himself believed that the stock option provisions only gave him three months. The evidence demonstrates rampant confusion as to when stock options had to be exercised by employee-directors.  Accordingly, any dispute over their meaning cannot support a claim of securities fraud.").

Indeed, Plaintiff's newly cited article, which notes that 50,000 firms across nine markets suffered significant losses as a result of transactions involving target forward derivatives, provides the most plausible hypotheses.  Specifically, the article notes that "no knowledgeable investor would be likely to enter into these contracts intentionally" and that banks were likely targeting "less sophisticated nonfinancial corporate customers."  (Kurtz Rep. Decl. Ex. 6)  It then notes that:

> One hypothesis is that the investors were either unsophisticated or that they were not informed or knowledgeable of the risks.  Indeed, the international financial markets had been benign for so long that investors in many markets began to underestimate certain risks. And the nonfinancial firms were presumably less sophisticated than the major banks offering these trades.
>
> Another hypothesis is that investors were sometimes pressured into the contracts by banks as a condition for rolling over their loans.

Id.  Such hypotheses are far more plausible than that thousands of companies, including Aracruz, across multiple markets engaged in a simultaneous fraud with no clear individual economic benefit.  Losses incurred as a result of poor judgment or mismanagement though, are not actionable under the federal securities laws.  See, e.g., Isquith v. Caremark International, Inc., 136 F.3d 531, 534-35 (7th Cir. 1998) (rejecting argument that "would allow every complaint about the mismanagement of a corporation that issues securities subject to federal securities law to be shoehorned into federal court on the theory that management had defrauded the shareholders by concealing the mismanagement. This would carry the securities laws far outside

their intended domain."); <u>In re Impac Mortgage Holdings, Inc. Securities Litigation</u>, 554 F. Supp. 2d 1083, 1087 (C.D. Cal. 2008) ("Plaintiffs' allegations… suggest, at most, that [the company's] management team exhibited poor judgment, obstinacy, arrogance, and perhaps incompetence.  Corporate mismanagement, however, is not actionable fraud under the securities laws."); <u>In re Winn-Dixie Stores, Inc. Securities Litigation</u>, 531 F. Supp. 2d 1334, 1345 (M.D. Fla. 2007) ("[T]he Supreme Court has emphasized that § 10(b) was not enacted to prevent corporate mismanagement or similar breaches."); <u>Cutsforth</u> v. <u>Renschler</u>, 235 F. Supp. 2d 1216, 1243 (M.D. Fla. 2002) ("[W]here the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." (citation omitted)).[12]

Moreover, Plaintiff's argument that Aracruz knew that the Q1 and Q2 Disclosures were false makes no sense.  Plaintiff argues that as a result of alleged communications to the Board it was "unfathomable" that the Company was "losing billions of dollars on these contracts, while simultaneously disclosing nothing about these massive losses to the public."  (Pl. Br. 16-17)  As a result of Aracruz's disclosed "short position" in U.S. dollars (Compl. ¶ 34, 35, 56, 57), however, Aracruz would not have been incurring significant losses until September, when the dollar began to appreciate rapidly against the *real*.  (Kurtz Rep. Decl. Ex. 7)

### 1.     Scienter May Not Be Established By General References To <u>Information Provided To The Finance Committee And The Board</u>

Plaintiff does not attempt to address the litany of Eleventh Circuit case law set forth in Aracruz's Opening Brief which shows that in order to allege scienter properly based on information provided in meetings and reports, a plaintiff must allege: (i) what information was conveyed, (ii) in which reports it was presented, (iii) when, and (iv) how such information demonstrates that "these Defendants knew or should have known about the Company's… practices."  (Op. Br. 25-26)  Rather Plaintiff contends that it is "absurd" to suggest that it "must

---

[12] Plaintiff's reliance on <u>In re Sykes Enterprises, Inc. Sec. Litig.</u>, 2001 WL 964160 (M.D. Fla. Mar. 7, 2001) to assert that alleged mismanagement may be sufficient to state a securities law claim is misplaced.  <u>Sykes</u> addressed only whether scienter was satisfied where the company restated its financial statements, not whether allegations, as here, that amounted to mismanagement could state a claim.  <u>Id.</u> at *2.

specify each item of data communicated to the Finance Committee and to the Board." (Pl. Br. 25) Notably, the cases relied upon by Plaintiff from other jurisdictions do not suggest otherwise.[13]

In re Nokia OYJ (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364 (S.D.N.Y. 2006), upon which Plaintiff relies (Pl. Br. 16), underscores Aracruz's position. In granting defendant's motion to dismiss, the court in Nokia concluded that scienter could not be established based upon allegations similar to those offered by Plaintiff here. In Nokia, "Plaintiffs allege that [defendants] 'received detailed sales information on a global and per country level in the course of [company's] internal, bottom-up process to support [company's] internal planning and that they had exceptionally good visibility throughout the channel, and that [an individual defendant] himself received reports weekly on revenue and on how we are doing against our competition and how our share is evolving.'" Id. at 406. The court found such allegations lacking because plaintiff failed to plead adequately "when Defendants had the data to know its general optimistic statements were false or recklessly made." Id. at 407. Moreover, the court in Nokia observed that, as here, the allegations pled suggested a temporal deficiency – that merely because a company's statements turned out to be incorrect did not mean that earlier statements on the matter were false or reckless when made. Id. ("In fact, the record shows that [the company's] disappointing first quarter 2004 sales were, in substantial part, due to [the company] not fully exploiting its 'usual seasonal market pick up in March.' As a result, the generalized allegations that Defendants received weekly reports on revenue amount to unsubstantiated speculation that Defendants knew their public statements were inaccurate at any point before its April 6 statement announcing its disappointing first quarter 2004 results."). The court in Nokia also recognized

---

[13] (Pl. Br. 25-26) In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 199 (1st Cir. 2005) does not discuss the quantum of information necessary to plead with particularity based upon information provided to a committee, and the court concludes that scienter was not pled. In re Blech Sec. Litig., 928 F. Supp. 1279 (S.D.N.Y. 1996) is even less relevant. There, the court explicitly notes that its discussion of "[t]ime, place and content requirements" was specific to "where the principal allegations of wrongdoing involve market manipulation rather than false statements." Id. at 1291. The other cases relied upon by Plaintiff are consistent with this circuit's pleading requirements. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72-3 (2d Cir. 2001) ("[A] plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them….) (citing Arazie v. Mullane, 2 F.3d 1456, 1464 (7th Cir. 1993) ("failure to give specific identification held insufficient.")); In re Bausch & Lomb, Inc. Sec. Litig., 2003 WL 23101782, at *25 (W.D.N.Y. Mar. 28, 2003) (citing, among other things, the  names of people who authored specific reports, when issued, the specific information and conclusions contained in each, and the names of people who reviewed them).

that Nokia's decision to disclose negative results earlier than required, just as Aracruz did here, undermined the plaintiffs' scienter allegations.  (Id. at 407-408, Op. Br. at 24-25)

    Moreover, Plaintiff's extensive reliance on the magnitude of the losses sustained by Aracruz to infer scienter (See, e.g., Pl. Br. 14, 17, 21, 27) is insufficient to support a claim for violation of the federal securities laws.  See, e.g., Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1247 (11th Cir. 2008) (affirming dismissal where "the amended complaint relies exclusively on the widespread nature of the fraud, and the purported amount of the fraud, to draw a strong inference of scienter."); Stark Trading & Shepherd Investments International, Ltd. v. Falconbridge Ltd., 2008 WL 153542, at *9 (E.D. Wis. Jan 14, 2008) ("Allowing an inference of scienter based on the magnitude of fraud would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.") (internal citation omitted); In re Smith Gardner  Sec. Litig., 214 F. Supp. 2d 1291, 1301 (S.D. Fla. 2002) (dismissing complaint where plaintiff alleged accounting violations and "the magnitude" of the violations as the basis for scienter.").[14]

### 2.      Zagury Is Either Reliable Or Unreliable But Not Both

    Plaintiff inconsistently argues that it can rely on newspaper interviews with Zagury to support its allegations of scienter, but not when the same statements undermine scienter.  (Pl. Br.

---

[14] Several cases relied upon by Plaintiff to argue that the centrality of Aracruz's derivative trading to its results demonstrates scienter, if anything, underscore the temporal deficiencies of Plaintiff's theory. (Pl. Br. 14 n.14)  In Berson v. Applied Signal Technology, Inc., 527 F.3d 982, 987-88 (9th Cir. 2008), the court found scienter to be properly inferred from the fact that losses had occurred prior to the alleged misstatement. Id. at 987, 989 ("[P]laintiffs infer that these high-level managers must have known about the orders because of their devastating effect on the corporation's revenue" while noting that the PSLRA requires particularized allegations "which strongly imply Defendants' contemporaneous knowledge that the statement was false when made." (emphasis in original)). In Inst'l Investors Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009), the court infers scienter from the condition of the company at the time the disclosure was made. Id. at 270 (inferring "recklessness" from defendant's position as CFO "and the alleged state of the [company's] business at the time the questions were asked.").  The court in In re Scholastic Corp. Sec. Litig., 252 F.3d 63 (2d Cir. 2001), infers scienter by reference to losses sustained months before the supposed misstatement. Id. at 77 ("At this point… [the company] knew the return rate for January 2007 had increased 150 percent from the year before.  Yet, by telling Merrill Lynch (in February 1997) that return rates remained at normal levels of 20 percent, defendants acted in ways that could be found to be reckless.").  The remaining case law relied upon by Plaintiff does not support its position.  The court in South Ferry LP v. Killinger, 542 F.3d 776 (9th Cir. 2008) did not find that plaintiffs had sufficiently pled scienter, but rather articulated a standard for the lower court to apply.  Moreover, Plaintiff misreads South Ferry.  There, the court states that allegations regarding management's role plus the import of the purported misstatement are sufficient from which to infer scienter "when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." Id. at 785.  Here, Plaintiff has failed to allege sufficiently particularized facts demonstrating such knowledge.  (Op. Br. 25-26)  Finally, Plaintiff misrepresents the court's finding in In re Bisys Sec. Litig., 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005).  There, the court was explicit that plaintiff's argument that "the size of the restatement alone constitutes strong inference of scienter" was "without merit."

13-14, 18, 20-21, 24-25).  Plaintiff's use of selected quotations while ignoring others is not merely an issue of weighing evidence as Plaintiff suggests.  (Pl. Br. 13)  Rather, the issue is determining the plausibility of Plaintiff's claims, which are not plausible when all the information it relies upon is considered.  See, e.g., In re Silicon Storage Technology, Inc. Shareholder Derivative Litig., 2009 WL 1974535, at *6 (N.D. Cal. July 7, 2009) ("Plaintiffs are not entitled to pick and choose which of [D]efendants' statements in public documents favor them and have all others ignored." (citation omitted)); In re CNET Networks, Inc. Shareholder Derivative Litigation, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007) ("Plaintiffs are entitled to inferences in their favor at the pleading stage, however, those inferences must be reasonable. Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored."); Merzin v. Provident Financial Group Inc., 311 F. Supp. 2d 674, 677 n.1 (S.D. Ohio 2004) ("Although Plaintiffs argue that Defendants' citation to select portions of a news release is improper as 'outside the scope of the pleadings,' the Court does not find such argument well-taken.  It would be inequitable to allow Plaintiffs to pick and choose from the news release those portions favorable to their position to the exclusion of all others.").

## C.    **The Complaint Fails To Plead Causation Sufficiently**

Plaintiff's theory of loss causation is based on the notion that when Aracruz made its September 26, 2008 announcement that its derivative positions "may have exceeded the limits set forth in the Company's Financial Policy" and "had been strongly affected by the recent US Dollar trade prices instability" and its October 3, 2008 announcement that the fair value of its derivative positions was negative $1.02, billion, the market was reacting to a supposed correction of Aracruz's indefinite disclosure in April 7, 2008 that the Company may use derivatives "to protect" against foreign exchange volatility, rather than to the news that the fair value of the Company's assets was a billion dollars less than what had been known by the market before.  (Pl. Br. 33-34)  Simply, that theory does not make sense.  Plaintiff does not rebut the more likely explanation, that the drop in the value of Aracruz's ADRs was a result of the Company's disclosure that it lost a lot of money in the wake of an unprecedented worldwide financial crisis.

The disclosures were not corrective disclosures, such as a restatement of a company's financial statements (the prototypical fact pattern for a securities law claim), but rather new disclosures reflecting a change of circumstance.  See In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect.  Such a failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices.  It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme." (emphasis in original)); In re Tellium, Inc. Sec. Litig., 2005 WL 2090254, at *3 (S.D.N.Y. Aug. 26, 2005) (rejecting assertion of loss causation where the supposedly "curative disclosure neither revealed the alleged illusoriness and unenforceability of [the company's] three contracts, nor exposed that the… revenue projections were not based upon real contractual commitments" and noting that "Dura itself makes clear that loss causation is not pled upon allegation of drops in stock price following an announcement of bad news that does not disclose the fraud.").

**D.    The Disclosures Are Protected
By The Safe Harbor For Forward-Looking
Statements And The "Bespeaks Caution" Doctrine**

**1.    The Challenged Disclosures Are Forward-Looking Statements**

Plaintiff misstates the law in arguing that mixed present and forward-looking statements are not entitled to safe harbor protection.  (Pl. Br. 31)  It erroneously relies on a Seventh Circuit case, ignoring that courts in this circuit have concluded otherwise.  (Op. Br. 30)  Thus, to the extent this Court finds the Disclosures to constitute mixtures of present and forward-looking statements, they are protectable under the PSLRA's safe harbor provision.

Plaintiff asserts that "statements regarding the purported exposure and levels of cash flow protection (¶¶ 34, 35 and 56) constitute statements of historical fact."  A review of the entire disclosures in context show that they are, at most, mixed present and forward looking statements entitled to safe harbor protection because whether the Company's foreign currency derivative exposure accomplished its intended purpose of reducing risk was only verifiable after the period of exposure described.  See Durgin v. Mon, 2009 WL 3055216, at *11 (S.D. Fla. Sept. 21, 2009)

(concluding that "statements about the role of [an investment] in reducing risk" are protected under the PSLRA's safe harbor) (Op. Br. 30-31).  Moreover, to the extent that the statements are not considered forward-looking, Plaintiff clearly fails to particularize that they were incorrect and made with a severely reckless or intentional goal to deceive, as necessary (<u>supra</u> at 11-13).  The statements alleged are:

- "we increased the level of our cash flow currency protection, to a $270 million short position in dollars, representing 5 months of future exposure, which generated a positive impact of $4 million in the quarter."  (Compl. ¶ 34);

- "[a]t the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 270 million, which represented approximately 5 months of cash flow exposure to the local currency (real - R$)" (Compl. ¶ 35); and

- "We increased the level of our cash flow currency protection to a short position of $360 million at the end of the 2Q08 ($270 million at the end of the 1Q08), representing 6 months of future exposure, which generated a positive impact of $46 million in the quarter."  (Compl. ¶ 56)

Plaintiff does not particularize why any such statement was false.  It does not allege how the exposure differed, that the exposure disclosed (as opposed to subsequent exposure) resulted in losses, or that if such exposure calculation is incorrect, that it was not the result of simple miscalculation as opposed to intentional fraud. <u>See</u> <u>In re MSC Industrial Direct Co.</u>, 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) (dismissing 10b-5 claim noting, in part, that "the amended complaint does not allege what the inventory reserve for [the company] or any other acquired company should have been."); <u>In re the Loewen Group Inc. Securities Litigation</u>, No. Civ.A. 98-6740, 2003 WL 22436233, at *11 (E.D. Pa. July 16, 2003) (dismissing 10b-5 claim where "[p]laintiffs have not pleaded the amount by which any acquisition was overvalued, the time and amount by which any asset should have been written down"); <u>Howard</u> v. <u>Galesi</u>, 1987 WL 18460, at *4 (S.D.N.Y. Oct. 6, 1987) (dismissing 10b-5 claim where "plaintiffs allege that the stock in question was worth 'far more' than [defendant] had represented, but they do not state exactly what [the defendant] told them the stock was worth and how much it was in fact worth.") Rather, as with the rest of its Complaint, Plaintiff merely notes that months later, Aracruz lost money and guesses that its earlier disclosures were false and made with scienter.

**2.      Aracruz's Disclosures Are Accompanied By Meaningful
Cautionary Language And Protected By The Safe
Harbor Provisions And The Bespeaks Caution Doctrine**

Plaintiff does not address Aracruz's explicit warning that it was "exposed to various market risks, particularly the variation of the U.S. dollar against the *real*" and that "by using derivative instruments the Company exposes itself to . . . market risk." (Op. Br. 32)  Rather, without analysis or even addressing the actual statements, it dismisses Aracruz's warnings as "boilerplate disclosures."  To the contrary, Aracruz's disclosures specifically identified the market risk attendant to its derivative trading operations.

Moreover, to preclude liability, contrary to Plaintiff's assertion, risk disclosures need not be "explicit or specific as to the fraud alleged."  (Pl. Br. 32)  Rather, to be protected by the PSLRA's safe harbor, cautionary language must "merely warn investors of risks similar to that actually realized to give sufficient notice of the investment's potential danger."[15]  In re Columbia Labs, Inc. Sec. Litig., 144 F. Supp. 2d 1362, 1369 (S.D. Fla. 2001); In re Technical Chems. Sec. Litig., 2001 WL 543769, at *8 (S.D. Fla. Mar. 20, 2001) (concluding that "a reasonable investor should be cautious" even though warning is "not explicit.") (emphasis added); see Op. Br. 31.

Plaintiff further alleges that Aracruz's warnings were inadequate because they did not warn that "Aracruz's financial policy would be disregarded;" Aracruz was taking "enormous positions;" and "losses were mounting and could be . . . massive."  (Pl. Br. 32)  The examples of what Plaintiff alleges should have been disclosed show the weakness of its claims.  Aracruz obviously could not warn that its financial policy "would be" disregarded because it could not have known that it "would be."  See City of Sterling Heights Police & Fire Retirement Sys. v.

---

[15] Cases relied upon by Plaintiff do not suggest otherwise.  LaGrasta v. First Union Sec., Inc., 358 F.3d 840 (11th Cir. 2004) involves allegations irrelevant to the instant matter.  In LaGrasta, the defendant relied upon generalized conflict of interest language describing that it might "from time to time acquire, hold or sell a position in securities as to which it renders advice" to defend against allegations that it had engaged in deliberate market manipulation in an effort to drum up business from one entity at the expense of defendant's clients.  Id. at 850.  Here, there are no allegations of market manipulation and there is no dispute that Aracruz disclosed that it engaged in currency hedging.  In re Prudential Sec. Ltd. Partnership Litig., 930 F. Supp. 68 (S.D.N.Y. 1996) is also off point.  The court in In re Prudential was resolving a motion for summary judgment and, based on the evidence before it, found that "[g]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution."  Id. at 72.  Here, at the time of disclosure, the plummeting of the *real* was far from "bordering on certainty."  Reliance upon In re Towne Servs. Sec. Litig., 184 F. Supp. 2d 1308 (N.D. Ga. 2001) is also misplaced as the Complaint lacks any particularized allegations supporting Plaintiff's guess that the Company's foreign currency derivation position was greater than described in the Q1 and Q2 Disclosures.

Vodafone Group Public Limited Co., --- F. Supp. 2d ---, 2009 WL 1456846, at *4 (S.D.N.Y. May 20, 2009) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud…. As long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.") (internal citation omitted).  That the financial policy may have been violated subsequently demonstrates no more than non-actionable mismanagement or negligence (supra at 8), not that Aracruz's disclosures were false when made months earlier.  Plaintiff's claim that Aracruz had to warn about its "enormous positions" highlights that Plaintiff has not alleged with particularity that the amount of exposure Aracruz disclosed as of the Q1 and Q2 Disclosures was incorrect and, if false, that such incorrect disclosure was made with scienter.  Finally, Plaintiff's assertion that Aracruz should have warned that "losses were mounting" once again highlights the temporal disconnect undergirding Plaintiff's allegations, i.e., that Aracruz's losses were sustained as a result of activities and circumstances that postdate the Disclosures.  Nowhere in the Complaint does Plaintiff allege that *any* losses had been sustained in Q1 or Q2 of 2008.  Rather, the Complaint alleges the opposite, that in Q1 and Q2 the Company recognized gains from its derivative trading.  (Compl. ¶ 33, 55)  Such result is obvious because the *real* did not begin to lose value to the dollar until late in the third quarter.  (Kurtz Rep. Decl. Ex. 7, Compl. ¶ 30)

**E.**     **Plaintiff Fails To Plead Scheme Liability Under Rule 10b-5(a) And (c)**

Plaintiff has abandoned its claim of scheme liability under Rule 10b-5(a) and (c).  (Pl. Br. 6 n.3)

**CONCLUSION**

For the foregoing reasons, Aracruz respectfully requests that the Amended Class Action Complaint be dismissed with prejudice.

Dated: January 28, 2010                          **WHITE & CASE LLP**

                                        By: /s/ Douglas P. Baumstein
                                           Glenn M. Kurtz (admitted pro hac vice)
                                           Douglas P. Baumstein (admitted pro hac vice)
                                           1155 Avenue of the Americas
                                           New York, NY 10036-2787

(212) 819-8200

Rudolph F. Aragon
Fla. Bar No. 286249
raragon@whitecase.com
Jason N. Zakia
Fla. Bar No. 698121
jzakia@whitecase.com
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
Telephone: (305) 995-5244
Facsimile: (305) 358-5744

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 28, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of notices of electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of electronic filing.


Christopher Steven Jones
cjones@saxenawhite.com


Joseph E. White, III
jwhite@saxenawhite.com


Lester Rene Hooker
lhooker@saxenawhite.com


Maya Susan Saxena
msaxena@saxenawhite.com

SAXENA WHITE P.A.
2424 North Federal Highway
Suite 257
Boca Raton, Florida  33431


/s/ Maria J. Beguiristain